## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SOFI BANK, N.A.,
    2750 East Cottonwood Pkwy, Suite 300
    Cottonwood Heights, UT 84121,

and

SOFI LENDING CORP.,
    375 Healdsburg Ave., Suite 280
    Healdsburg, CA 95448,

          *Plaintiffs*,

      v.

MIGUEL CARDONA,
in his official capacity as Secretary,
United States Department of Education,
    400 Maryland Ave. SW
    Washington, D.C. 20202,

and

UNITED STATES DEPARTMENT
OF EDUCATION,
    400 Maryland Ave. SW
    Washington, D.C. 20202,

          *Defendants*.

Civil Action No. 23-CV-599

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

## INTRODUCTION

1.     At the start of the COVID-19 pandemic, Congress enacted legislation that temporarily suspended interest and payments on federally held student loans. This law, commonly known as the CARES Act, was designed to alleviate severe distress to borrowers whose ability to make payments was threatened by the upheaval and dislocation of the pandemic's early stages.

2.     The suspension of federal student-debt repayment provided by the CARES Act expired on September 30, 2020. By that time, the federal government had allocated more than $2.2 trillion in stimulus funding, including $300 billion in cash payments to individuals, $260 billion in increased unemployment benefits, $350 billion in paycheck protection payments, and hundreds of billions more in aid for employers. Though Americans were still contending with the virus—vaccines did not become widely available until the start of 2021—the pandemic had by then already moved into a different stage.

3.     Despite expiration of the CARES Act's limited pause on student-debt repayment, the Department of Education declared an *administrative* moratorium on loan repayment for all federal borrowers. At first, the Department said it was issuing only a temporary moratorium to give Congress a chance to extend the pause legislatively. Yet even after Congress declined to do so, the Department extended the moratorium through another administrative order. And then it did so again. And then again and again—it issued a total of *seven* extensions from October 1, 2020, through December 31, 2022.

4.     As authority for each of these extensions, the Department of Education invoked the Higher Education Relief Opportunities for Students Act, known as the HEROES Act. Enacted at the outset of the Iraq War to help avoid loan-payment defaults by troops suddenly called into active duty, the HEROES Act gives the Secretary of Education limited authority to waive certain

2

requirements for federal borrowers when doing so is necessary "in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1). Among other restrictions, the Secretary's waiver authority applies only when "necessary" to avoid "plac[ing]" individuals "affected" by an emergency "in a worse position financially in relation to [their federal] financial assistance because of" the emergency. 20 U.S.C. § 1098bb(a)(2)(A). Each of the seven times it extended the loan-repayment moratorium under the HEROES Act, the Department of Education stated that pausing repayment for all federal student borrowers was necessary to avoid disadvantage to them caused by the pandemic.

5.      On August 24, 2022, the same day that the Department of Education announced the seventh extension of the loan moratorium—promised by the Department to be the last—it also announced a $519 billion program to *cancel* student debt for certain federal borrowers. In doing so, the Department invoked the same HEROES Act authority, and it again cited the pandemic as the justification. But the initiative quickly stalled, as multiple courts issued rulings declaring the program unlawful and enjoining it. The Supreme Court agreed to hear the cases, and oral argument was held on February 28, 2023.

6.      Amid the litigation over its loan-cancellation program, the Department of Education announced an eighth extension of the loan moratorium on November 22, 2022. Unlike the other extensions, the Department did not claim that continuing the moratorium was necessary to address harm caused to borrowers affected by the pandemic. Instead, the Department asserted that the further extension was intended to alleviate "uncertainty" for borrowers during the pendency of ongoing litigation regarding the debt-cancellation program. Yet the extension applies to all federal borrowers, whether or not they qualify for debt cancellation. The Department also expressly tied the extension's duration to the pending litigation, requiring payments to resume

60 days after the Supreme Court's ruling (or 60 days after June 30, 2023, if no decision has issued by then).

7.    The eighth extension of the loan moratorium is unlawful on multiple grounds. The HEROES Act provides limited authority to relieve transitory burdens for federal student borrowers who are temporarily unable to make payments on their loans due to active military service or national emergencies. But the eighth extension applies to *all* federal borrowers in the country, not just those suffering hardship as a result of the current phase of the pandemic. Indeed, the eighth extension does not even attempt to redress harm from the pandemic at all, but rather to alleviate "uncertainty" caused by the debt-cancellation litigation—a justification that the Act does not recognize or allow. And the eighth extension is also structured to address litigation uncertainty, not to return borrowers to the financial position that they would have occupied absent the current phase of the pandemic. Even if the text of the HEROES Act could plausibly be stretched that far, the major questions doctrine requires "*clear* congressional authorization" before an agency is allowed to claim such extraordinarily broad power. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (emphasis added). No such clear authorization exists here.

8.    The eighth extension of the loan moratorium was also adopted in an arbitrary and capricious manner without following mandatory procedural requirements. Even though the HEROES Act requires the Department of Education to provide *more* public notice than regular agency rulemaking, the Department failed even to satisfy basic notice-and-comment obligations. Nor did the Department make any attempt to explain why the current extension satisfies the Act's statutory requirements. Instead, the Department's asserted justification was to alleviate "uncertainty" for borrowers during ongoing litigation over the debt-cancellation program—plainly not a valid basis under the Act. And the Department's asserted justification fails even on its own

terms: The moratorium applies to all borrowers, even those who do not qualify for student-debt cancellation; thus, millions of borrowers who are *not* subject to any litigation "uncertainty" are nevertheless being relieved of the obligation to repay their loans.

9.     For these and other reasons explained below, the eighth extension of the loan moratorium should be invalidated and set aside. At minimum, the Department of Education should be ordered to require repayment by borrowers who are not eligible for student-debt cancellation.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701–06 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

11.     The loan moratorium constitutes a final agency action and is therefore judicially reviewable under the Administrative Procedure Act. 5 U.S.C. §§ 704, 706.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities; Defendants are located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

13.     Plaintiff SoFi Bank, N.A., an affiliate of SoFi Technologies Inc., offers credit products to its members, including products for the refinancing of student loans. SoFi Bank, N.A. commenced operations in February of 2022 and originates loans to refinance student loans.

14.     Plaintiff SoFi Lending Corp., an affiliate of SoFi Technologies Inc., also offers credit products to its members. SoFi Lending Corp. originated loans to refinance student loans until the second quarter of 2022.

15.     Plaintiffs, referred to here collectively as "SoFi," have a mission to help people reach financial independence to realize their ambitions.

16.     Defendant Miguel Cardona is the United States Secretary of Education and the head of the United States Department of Education. He is sued in his official capacity only.

17.     Defendant United States Department of Education is an executive department of the United States government headquartered in Washington, D.C.

## LEGAL BACKGROUND

### *The Department of Education, the Administrative Procedure Act, and the Major Questions Doctrine*

18.     The Department of Education was established by Congress in 1979. Pub. L. No. 96-88, 93 Stat. 668 (1979).

19.     The Department's decision-making, like that of other Executive Branch agencies, is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq.*

20.     The APA sets forth basic procedural requirements. Among other things, agencies engaging in substantive policymaking must undertake a series of steps designed to promote public participation, *see* 5 U.S.C. § 553, a process commonly referred to as "notice-and-comment" rulemaking.

21.     As the Supreme Court has explained, notice-and-comment rulemaking involves three steps:

> First, the agency must issue a "general notice of proposed rule making," ordinarily by publication in the Federal Register. § 553(b). Second, . . . the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." § 553(c). An agency must

consider and respond to significant comments received during the period for public comment. Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of its basis and purpose." § 553(c).

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (brackets and citations omitted).

22.     Congress imposed notice-and-comment requirements on agencies "to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion); *see New Jersey v. HHS*, 670 F.2d 1262, 1281 (3d Cir. 1981) (the requirements exist "to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public"). For these reasons, "exceptions to notice-and-comment rulemaking under the APA are 'narrowly construed and only reluctantly countenanced.'" *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1380 (Fed. Cir. 2017); *see id.* at n.12 (collecting cases).

23.     In addition to prescribing rules that agencies must follow, the APA authorizes judicial review of any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. A court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C); or undertaken "without observance of procedure required by law," *id.* § 706(2)(D).

24.     In evaluating agency action under the APA, courts must apply the "major questions doctrine." *West Virginia*, 142 S. Ct. at 2609. Under this doctrine, when an agency asserts authority over matters of "economic and political significance," courts require the agency to "point to *clear* congressional authorization for the power it [has] claim[ed]." *Id.* at 2608–09 (emphasis added) (quotation marks omitted).

25.    As the Supreme Court recently explained, the major questions doctrine reflects "both separation of powers principles and a practical understanding of legislative intent," including the presumption that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 2609 (quotation marks omitted). Even when an agency can identify "a colorable textual basis" for its authority, therefore, courts must be "'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

### Federal Loans and the Negotiated Rulemaking Process

26.    Title IV of the Higher Education Act, 20 U.S.C. § 1070 *et seq.*, establishes several federal student loan programs administered by the Department of Education. The total outstanding loan balance across these programs is more than $1.6 trillion. Cong. Research Serv., *Federal Student Loan Debt Cancellation: Policy Considerations* 1 (2022) (CRS Report), https://bit.ly/3hmnO2H.

27.    Under the William D. Ford Federal Direct Loan program, 20 U.S.C. § 1087a *et seq.*, "the federal government makes loans" directly to borrowers "using federal capital (i.e., funds from the U.S. Treasury), and once made, outstanding loans constitute an asset of the federal government." CRS Report at 2. As of March 2022, more than 37.1 million borrowers under the Direct Loan program had a total outstanding loan balance of nearly $1.4 trillion. *Id.* at 4 tbl.I.

28.    Under the Federal Family Education Loan Program (FFELP), 20 U.S.C. §1071 *et seq.*, the federal government paid lenders to make student loans and guaranteed their repayment. Although the authority to issue FFELP loans expired in 2010, *id.* § 1071(d), such loans currently account for nearly $210 billion of outstanding student debt nationwide. *See Federal Student Loan Portfolio*, U.S. Dep't of Educ. (2022), https://bit.ly/3qYd5Nm.

29.     Under the Perkins Loan Program, 20 U.S.C. § 1087aa *et seq.*, colleges and universities made loans to financially needy students, and the federal government guaranteed their repayment. The authority to issue loans under the Perkins program expired in 2017, *id.* § 1087aa(b), but Perkins loans still account for about $4 billion of outstanding student debt. *See Federal Student Loan Portfolio*, *supra*.

### The HEROES Act

30.     First enacted following the deployment of troops to Afghanistan, and later reenacted at the outset of the Iraq War, the Higher Education Relief Opportunities for Students (HEROES) Act "provide[s] the Secretary of Education with specific waiver authority to respond to a war or other military operation or national emergency." Pub. L. No. 108-76, 117 Stat. 904.

31.     The HEROES Act was initially passed by unanimous voice vote in both the House and Senate in 2001, only weeks after members of our Armed Forces invaded Afghanistan in Operation Enduring Freedom. 147 Cong. Rec. H7155 (daily ed. Oct. 23, 2001); 147 Cong. Rec. S13311 (daily ed. Dec. 14, 2001). The Act was reauthorized and amended in 2003, shortly after service members began deploying in large numbers to fight in Iraq. 149 Cong. Rec. H2553–54 (daily ed. Apr. 1, 2003); 149 Cong. Rec. S10866 (daily ed. July 31, 2003).

32.     In passing the HEROES Act, Congress was focused on helping service members who were temporarily unable to comply with their loan-repayment obligations while deployed overseas. As one supporter explained, the Act "provides assurance to our men and women in uniform that they will not face education-related financial or administrative difficulties while they defend our Nation." 149 Cong. Rec. 7922 (2003) (Statement of Representative Kline); *see also* 149 Cong. Rec. 7919–20 (2003) (Statement of Representative Garrett) ("[T]his legislation will now grant to the Secretary of Education the authority and the power to grant to the students who

are overseas now the relief that they need."); 149 Cong. Rec. 7922 (2003) (Statement of Representative Isakson) ("[T]he HEROES Act of 2003 . . . gives the Secretary the authority . . . to make those waivers and deferrals that are necessary to ensure that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that their families are not harassed by collectors and that their loan payments are deferred until they return; and also encourage those institutions of higher learning that have accepted tuition for semesters or quarters that now cannot be fulfilled because that Reservist has been activated to refund the tuition back to those Reservists.").

33.    The Act's "Findings" section reflects Congress's concern with ensuring temporary relief for servicemembers while on active duty:

The Congress finds the following:

(1) There is no more important cause than that of our nation's defense.

(2) The United States will protect the freedom and secure the safety of its citizens.

(3) The United States military is the finest in the world and its personnel are determined to lead the world in pursuit of peace.

(4) Hundreds of thousands of Army, Air Force, Marine Corps, Navy, and Coast Guard reservists and members of the National Guard have been called to active duty or active service.

(5) The men and women of the United States military put their lives on hold, leave their families, jobs, and postsecondary education in order to serve their country and do so with distinction.

(6) There is no more important cause for this Congress than to support the members of the United States military and provide assistance with their transition into and out of active duty and active service.

20 U.S.C. § 1098aa(b).

34.    The HEROES Act accomplishes these objectives by providing the Secretary of Education with authority to "waive or modify any statutory or regulatory provision applicable to

[certain federal] financial assistance programs . . . as the Secretary deems necessary in connection with a war or other military operation or national emergency," but only as "authorized by paragraph (2)." *Id.* § 1098bb(a)(1).

35.    In paragraph (2), the Act limits such waivers or modifications to five specified objectives. *Id.* § 1098bb(a)(2). These objectives include relatively modest adjustments to federal financial-assistance programs, such as "avoid[ing] inadvertent, technical violations or defaults" and modifying the calculation of the borrower's "annual adjusted family income." *Id.* § 1098bb(a)(B), (C). And, of particular relevance here, the Secretary also may issue a waiver or modification as is "necessary to ensure that . . . affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(1)(A).

36.    The Act defines an "affected individual" as someone who "(A) is serving on active duty during a war or other military operation or national emergency; (B) is performing qualifying National Guard duty during a war or other military operation or national emergency; (C) resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or (D) suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." *Id.* § 1098ee(2).

37.    Exercises of the Secretary's authority are subject to a mandatory reporting requirement: The Secretary must "publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary" by notice in the Federal Register. *Id.* § 1098bb(b)(1). This reporting requirement applies "[n]otwithstanding section 1232 of this title and section 553 of title 5." *Id.* Both of the cited provisions would otherwise provide certain limited "except[ions]" to

the APA's notice-and-comment requirements. 5 U.S.C. § 553(a); *see* 20 U.S.C. § 1232(d) ("exemption").

## FACTUAL BACKGROUND

### *Initial Moratorium on Federal Student Loan Collection During the COVID-19 Pandemic*

38.     Over the past two-and-a-half years, the Department of Education has suspended repayment requirements for federally held student loans. This suspension has been significant, costing the federal government more than $100 billion dollars and propelling the federal government toward its debt limit. *See* Zachary Warmbrodt & Victoria Guida, *The Doomsday Clock on the Debt Limit Is Ticking*, Politico (Jan. 19, 2023, 11:22 AM), https://bit.ly/3kz81Pu; U.S. Gov't Accountability Office, GAO-22-105365, *Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes* 14 (2022), https://bit.ly/3XsnOOD.

39.     Although initially invoking COVID-19 to justify its actions—which are collectively referred to here as the "Loan Moratorium"—the Department has long since abandoned any pretense that the continued suspension of loan repayments is necessitated by or an appropriate response to the pandemic itself.

40.     On March 20, 2020, at the outset of the pandemic, the Department announced that it would set the interest rates on federally held student loans to 0% for "a period of at least 60 days" and would allow borrowers with such loans to suspend their payments "for at least two months." *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, U.S. Dep't of Educ. (Mar. 20, 2020), https://bit.ly/3FhTkqM. The Department tied this temporary relief directly to the pandemic. Then-Secretary of Education Betsy DeVos explained: "Right now, everyone should be focused on

12

staying safe and healthy, not worrying about their student loan balance growing." *Id.* The Department of Education did not identify the legal authority under which it was granting this relief.

41.     On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES Act gave the Secretary of Education statutory authority to "suspend all payments" for federal loans held by the Department of Education until September 30, 2020, and provided that no interest would accrue for such loans during that period. *Id.* § 3513(a)–(b).

42.     Notwithstanding the expiration of the CARES Act authority for the student loan repayment pause, the Executive Branch has administratively extended the Loan Moratorium—and has done so repeatedly.

43.     On August 8, 2020, President Trump directed Secretary DeVos to extend the Loan Moratorium through December 31, 2020. *Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, The White House (Aug. 8, 2020), https://bit.ly/3FHwSJ7.

44.      On December 4, 2020, Secretary DeVos announced that the Department of Education had extended the Loan Moratorium through January 31, 2021, to "allow[] Congress to do its job and determine what measures it believes are necessary and appropriate." *Secretary DeVos Extends Student Loan Forbearance Period Through January 31, 2021, in Response to COVID-19 National Emergency*, U.S. Dep't of Educ. (Dec. 4, 2020), https://bit.ly/3YbHerW. In announcing the extension, Secretary DeVos stressed that "Congress, not the Executive Branch, is in charge of student loan policy." *Id.*

45.     Upon taking office on January 20, 2021, President Biden directed the Acting Secretary of Education to extend the Loan Moratorium for an additional, unspecified period. *Pausing Federal Student Loan Payments*, The White House (Jan. 20, 2021), https://bit.ly/3Pgg4Mm.

46.     Eight months later, on August 6, 2021, President Biden announced that he was extending the Loan Moratorium "one final time until January 31, 2022." *Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, The White House (Aug. 6, 2021), https://bit.ly/3heemOY.

47.     Notwithstanding his claim that the August 2021 extension was the "final" one, on December 22, 2021, President Biden announced that the Loan Moratorium would continue for an additional 90 days, through May 1, 2022. *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, The White House (Dec. 22, 2021), https://bit.ly/3PlTP7S. In announcing the extension, President Biden simultaneously affirmed that the nation's "jobs recovery [was] one of the strongest ever—with nearly 6 million jobs added [in 2021], the fewest Americans filing for unemployment in more than 50 years, and overall unemployment at 4.2 percent." *Id.*

48.     On April 6, 2022, President Biden announced that he was further extending the Loan Moratorium through August 31, 2022. *Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, The White House (Apr. 6, 2022), https://bit.ly/3hijfX9. President Biden again underscored the strength of the U.S. economy, noting that the United States had "seen the fastest economic growth in nearly 40 years." *Id.*

49.     On August 24, 2022, the Department of Education announced another "final extension"—the seventh overall—to continue through December 31, 2022. *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://bit.ly/3Bnweh3.

50.     In issuing these extensions, the Department of Education repeatedly invoked the Secretary's "authority" to grant "waivers and modifications" under the HEROES ACT. *See, e.g.*, 85 Fed. Reg. 79,856 (Dec. 11, 2020); 86 Fed. Reg. 5,008 (Jan. 19, 2021); 87 Fed. Reg. 61,512, 61,513–14 (Oct. 12, 2022).

51.     The Department of Education did not provide advance notice or an opportunity for public input before putting these extensions into place. Instead, the Department asserted that the HEROES Act relieved the agency of its duty under the APA to engage in notice-and-comment rulemaking—pointing for support to the very statutory provision that requires publication of waiver decisions in the Federal Register. *See* 85 Fed. Reg. at 79,856.

### The Administration Declares an End to the COVID-19 Pandemic

52.     At the same time that the Biden Administration was using the pandemic to justify extending the Loan Moratorium—including three extensions in 2022—the Administration made a series of announcements and decisions emphasizing the declining impact of COVID-19.

53.     In February 2022, the Centers for Disease Control and Prevention (CDC) issued updated guidance under which it no longer recommended universal masking in most of the country. *See, e.g.*, *Transcript for CDC Media Telebriefing: Update on COVID-19*, Ctrs. for Disease Control & Prevention (Feb. 25, 2022), https://bit.ly/3FEoqdp. Two months later, the CDC terminated a prior order that had "suspend[ed] the right to introduce migrants into the United States" due to COVID-19 concerns, finding that the order "[wa]s no longer necessary." *CDC Public Health Determination and Termination of Title 42 Order*, Ctrs. for Disease Control & Prevention (Apr. 1, 2022), https://bit.ly/3UDP0Yw. In August 2022, the CDC determined that "quarantine of exposed persons [wa]s no longer recommended." *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care*

*Systems*, Ctrs. for Disease Control & Prevention (Aug. 19, 2022), https://bit.ly/3VJSmdX. And a month after that, the CDC announced that universal masking was no longer necessary even in healthcare settings. *Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic*, Ctrs. for Disease Control & Prevention (Sept. 23, 2022), https://bit.ly/3Y2GZiC.

54.     Indeed, as early as April 2022, the Administration had begun suggesting that the COVID-19 pandemic was in the past. *See Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, The White House (Apr. 6, 2022), https://bit.ly/3hijfX9 ("[W]e are still *recovering* from the pandemic and the unprecedented economic disruption it *caused*.") (emphasis added).

55.     President Biden put the issue most bluntly in a September 18, 2022, interview with 60 Minutes: "The pandemic is over." 60 Minutes, *President Biden: "The Pandemic Is Over"*, YouTube (Sept. 19, 2022), https://bit.ly/3UZpIo1.

### *The Biden Administration Attempts to Cancel Student Debt*

56.     On the same day that the Biden Administration announced the seventh extension of the student loan repayment pause—promised by the Administration to be the last—it also announced a $519 billion program to cancel student debt. *FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3iUhb8w (Fact Sheet); Penn Wharton, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact* 1 (Aug. 26, 2022), https://bit.ly/3lJifxn.

57.     As a candidate, President Biden had campaigned on student debt forgiveness. *See, e.g.*, *Joe's Agenda for Students*, JoeBiden.com (2020), https://bit.ly/3VQk7BE; Joe Biden, *Joe Biden Outlines New Steps to Ease Economic Burden on Working People*, Medium (Apr. 9, 2020),

https://bit.ly/3FpoZXs (proposing "to forgive all undergraduate tuition-related federal student debt from two- and four-year public colleges and universities for debt-holders earning up to $125,000"). But in office, the President was unable to secure the passage of debt-forgiveness legislation; the sole bill introduced in 2021 to accomplish that result failed. *See* Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021).

58.     On August 24, 2022, the Biden Administration announced that it would do administratively what it could not accomplish legislatively. Under the Mass Debt Cancellation Program, the Department of Education intends to cancel up to $20,000 in student debt for borrowers with loans held by the federal government whose individual income is less than $125,000 ($250,000 for married couples filing jointly). *See* Fact Sheet, *supra*. The Department will further refund payments to certain borrowers of such loans who made voluntary payments during the Loan Moratorium. *One-Time Federal Student Loan Debt Relief*, Fed. Student Aid, https://bit.ly/3iQ7urt.

59.     On the same day that the Department of Education announced the Mass Debt Cancellation Program, the U.S. Department of Justice's Office of Legal Counsel released a legal memorandum opining that the HEROES Act "grants the [Education Secretary] authority to reduce or eliminate the obligation to repay the principal balance of federal student loan debt, including on a class-wide basis in response to the COVID-19 pandemic." *Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans*, 2022 WL 3975075 (Aug. 23, 2022), https://bit.ly/3HlYWmt (OLC Memo).

60.     The OLC Memo "conclude[s] that invocation of the HEROES Act to provide debt reduction or cancellation on a class-wide basis to individuals affected by the COVID-19 national

emergency *could* be structured as a permissible invocation of the Act," *id.* at *13 (emphasis added), so long as three requirements are met:

      a.    First, "the beneficiary of the cancellation must be an 'affected individual.'" *Id.* (quoting 20 U.S.C. § 1098bb(a)(2)(A)).

      b.    Second, "the harm sought to be avoided must arise '*because of*' the beneficiary's status as such an individual." *Id.* (quoting 20 U.S.C. § 1098bb(a)(2)(A)) (emphasis added). That is, the Department of Education must "determine that the COVID-19 pandemic was a *but-for* cause of the financial harm" sought to be addressed by any cancellation. *Id.* at *14 (emphasis added).

      c.    Third, "the [Education] Secretary must deem the cancellation 'necessary' to 'ensure' the beneficiary is not placed in a 'worse position financially in relation to [the individual's] financial assistance." *Id.* at *13 (quoting 20 U.S.C. § 1098bb(a)(2)). In other words, any cancellation must "be structured to put loan recipients back into the financial position they would be in were it not for the national emergency." *Id.* at *14.

61.    Legal challenges to the Mass Debt Cancellation Program were swift. On September 29, 2022, six States filed suit in the U.S. District Court for the Eastern District of Missouri, alleging that the Program exceeded the Secretary of Education's authority and was arbitrary and capricious. *See* Complaint, *Nebraska v. Biden*, No. 4:22CV1040, 2022 WL 11728905 (E.D. Mo. Oct. 20, 2022). The district court dismissed the case for lack of standing, *Nebraska v. Biden*, No. 4:22CV1040, 2022 WL 11728905, at *7 (E.D. Mo. Oct. 20, 2022), but the Eighth Circuit reversed and granted the States' request for an injunction pending appeal, *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (per curiam).

62.     In a separate suit filed by private plaintiffs, the U.S. District Court for the Northern District of Texas held that the Mass Debt Cancellation Program was "an unconstitutional exercise of Congress's legislative power," and vacated the Program on a nationwide basis. *Brown v. U.S. Dep't of Educ.*, No. 22-cv-908, 2022 WL 16858525, at *1, 15 (N.D. Tex. Nov. 10, 2022). The Fifth Circuit denied the Government's motion for a stay pending appeal. Order, *Brown v. U.S. Dep't of Educ.*, No. 22-11115 (5th Cir. Nov. 30, 2022), ECF No. 75.

63.     On December 1, 2022, the Supreme Court granted certiorari in *Biden v. Nebraska* to determine whether the plaintiff States have standing and whether the Mass Debt Cancellation Program exceeds the Secretary of Education's authority. *Biden v. Nebraska*, 143 S. Ct. 477 (2022). The Supreme Court later granted certiorari before judgment in *Department of Education v. Brown*, 143 S. Ct. 541 (2022). The Supreme Court heard oral argument in both cases on February 28, 2023.

### *The Department of Education Extends the Loan Moratorium for an Eighth Time*

64.     In the midst of these legal challenges, the Department of Education announced an eighth extension of the Loan Moratorium on November 22, 2022. *Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause*, U.S. Dep't of Educ. (Nov. 22, 2022), https://bit.ly/3Y7V3aK (*Eighth Extension Announcement*).

65.     In its announcement, the Department of Education did not claim that this most-recent extension of the Loan Moratorium was necessary to address harm caused to borrowers affected by the COVID-19 pandemic. Indeed, to the extent the pandemic was mentioned at all, it was solely in conjunction with *other* Administration initiatives. *Id.*

66.     Instead, the Department asserted that the further extension was intended to "alleviate uncertainty for borrowers" during the pendency of ongoing litigation regarding the Biden Administration's student-debt cancellation efforts. *Id.* The announcement thus quoted Secretary Cardona's statement that "it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay, were it not for the [pending lawsuits]." *Id.*

67.     The Department also expressly tied the extension's duration to the pending litigation: "Payments will resume 60 days after the Department is permitted to implement the program or the litigation is resolved," and, "[i]f the program has not been implemented and the litigation has not been resolved by June 30, 2023—payments will resume 60 days after that." *Id.*

68.     The Department did not explain why, if a further extension of the Loan Moratorium was necessary to alleviate uncertainty for borrowers who might benefit from the Administration's student-debt cancellation policy, the Moratorium was applied to *all* borrowers, even those who do not qualify for student-debt cancellation.

69.     Like the seven others that preceded it, the eighth extension of the Loan Moratorium did not go through notice-and-comment rulemaking.

### *The Biden Administration Announces an End to the COVID-19 National Emergency*

70.     On January 30, 2023, the Biden Administration announced that it would end the COVID-19 national emergency on May 11, 2023. Office of Mgmt. & Budget, *Statement of Administration Policy* 1 (Jan. 30, 2023), https://bit.ly/3jmdf0T.

71.     In making this announcement, however, the Administration simultaneously declared that ending the national emergency would have no effect on the ongoing student-loan repayment pause. In response to questions about how a pause predicated on the existence of a national emergency could nonetheless continue beyond the end of that emergency, the

Administration explained its view that no ongoing national emergency was required to indefinitely extend the pause. Instead, the Administration asserted that "[p]roviding debt relief and pausing loan payments can continue after the formal end of the national emergency." Michael Stratford, *Ending Covid Emergency Won't Disrupt Student Debt Relief, Biden Administration Says*, PoliticoPro (Jan. 30, 2023, 8:48 PM), https://bit.ly/40mfIJb. An Administrative official further opined that the Loan Moratorium "does not require an ongoing . . . national emergency" and that "the emergency ending doesn't change the legal justification [for the Loan Moratorium]." *Press Briefing by Press Secretary Karine Jean-Pierre*, The White House (Feb. 1, 2023, 2:47 PM), https://bit.ly/3XWDp9x; *see id.* ("[W]e're not using any emergency power."). The official declined to answer questions regarding how far beyond the end of the national emergency the Administration's HEROES Act authority extends, or how the Administration is determining which borrowers have been harmed by the COVID-19 pandemic. *See id.*

### The Department of Education's Loan Moratorium Has Injured SoFi

72.     SoFi is the nation's premiere lender in the student loan refinance space. Since 2012, SoFi has refinanced over $30 billion in student loans for more than 450,000 borrowers.

73.     Student loan refinancing enables borrowers to consolidate some or all of their debt into a single loan with a new interest rate and loan period. Obtaining a lower interest rate can reduce the total interest that a borrower pays over the course of his or her loan and may reduce the borrower's monthly loan payments. Adjusting a loan's period can enable a borrower to achieve a payment plan that is suited to his or her current and projected financial circumstances.

74.     SoFi enables borrowers to refinance both private and federal student loans. When a borrower refinances a federal student loan with a private lender like SoFi, the new, refinanced loan is not subject to federal repayment programs (such as income-driven repayment plans) or

policies (such as loan forbearance and deferment). Instead, the refinanced loan is subject to the terms and policies set by the private lender.

75.     SoFi thus competes with the federal government for federal student loan borrowers by offering them private financing under more favorable terms. In addition to lower interest rates and revised loan periods, SoFi also offers deferment and forbearance for eligible borrowers under certain circumstances, such as during periods of graduate education or financial hardship.

76.     The Loan Moratorium has directly harmed SoFi's federal loan refinancing business. Because the Moratorium suspended payments and interest for federal student loans, and because privately refinanced loans are ineligible for programs and policies applicable to federal student loans, the Moratorium has eliminated the primary benefits of student loan refinancing. In essence, SoFi is being forced to compete with loans with 0% interest rates and for which any ongoing repayment of the principal is entirely optional.

77.     Predictably, the Loan Moratorium has caused SoFi's refinancing of federal student loans to decline dramatically. Prior to the first Loan Moratorium, SoFi originated approximately $450 to $500 million of refinanced federal student loans per month. Following the announcement of the initial Loan Moratorium in March 2020, the volume of SoFi's federal student-debt refinancing dropped precipitously, to less than $100 million per month—a decline of more than 75%. And the decline in business has accelerated over time: By 2022, SoFi was originating approximately 1/10th of the volume of refinancing compared to 2019. In fact, those numbers significantly *understate* the effect, because SoFi's federal student-debt refinancing business was expanding swiftly when the Moratorium was initiated and likely would have continued to grow if not for the Moratorium.

78.     The decrease in refinancing business caused by the Loan Moratorium has substantially injured SoFi. Since the Loan Moratorium went into effect in March 2020, and as a direct result of the Moratorium, SoFi has lost approximately $300 to $400 million in total revenues from its federal loan refinancing business. As a result, SoFi has lost approximately $150 to $200 million in profits during that period. Those numbers also significantly understate the Moratorium's harmful effects, because they do not take into account the growth that SoFi's federal student-debt refinancing business would otherwise have experienced.

79.     The injury to SoFi has continued throughout—and indeed, has been exacerbated by—the eighth extension of the Loan Moratorium. As a result of the eighth extension, rather than a return to normal business conditions following the lapse of the seventh extension at the end of December 2022, SoFi continues to face competition from 0% interest rates and no required monthly payments. Since the eighth extension went into effect in January 2023, SoFi has lost approximately $9 to $11 million in total revenues and approximately $6 to $8 million in profits. Every day that the eighth extension of the Loan Moratorium remains in place, it causes significant, irreparable harm to SoFi. SoFi projects that if the eighth extension continues in effect through August 2023, it will result in $40 to $45 million in total lost revenues and approximately $25 to $30 million in total lost profits.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act
(Declaratory/Injunctive Relief – The Loan Moratorium Exceeds
the Department of Education's Statutory Authority)**

80.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

81.     The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

82.     The Department of Education's announcement of the eighth extension to the Loan Moratorium did not identify any statutory authority for the extension; and, to date, notice of the extension has not been published in the Federal Register.

83.     To the extent the Department has instituted the extension under the HEROES Act, the Loan Moratorium is contrary to law because it is beyond the scope of the Secretary of Education's authority under 20 U.S.C. § 1098bb.

84.     The Secretary's authority to grant a waiver or modification is limited to "ensur[ing] that . . . recipients of student financial assistance . . . who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A).

85.     As the Office of Legal Counsel has explained, this provision requires that: "(1) the beneficiary of the cancellation must be an 'affected individual'; (2) the harm sought to be avoided must arise 'because of' the beneficiary's status as such an individual; and (3) the Secretary must deem the cancellation 'necessary' to 'ensure' the beneficiary is not placed in a 'worse position financially in relation to the individual's financial assistance.'" OLC Memo, *supra*, at *13 (brackets omitted). Yet the eighth extension of the Loan Moratorium satisfies *none* of those requirements.

86.     First, beneficiaries of the extension are not "affected individuals" because they have not "suffered direct economic hardship as a direct result of . . . [a] national emergency, as determined by the Secretary." 20 U.S.C. § 1098ee(2). The Loan Moratorium affects all federal

borrowers in the country. Even insofar as the Secretary can be said to have determined that this entire class of beneficiaries *initially* suffered "direct economic hardship" from early stages of the pandemic, the Secretary did not make that determination for the relevant period of the eighth extension: November 22, 2022, through August 29, 2023. Nor would such a determination be supportable, given the Administration's own account of the economy's current strength.

87.     Second, the asserted national emergency was not "a *but-for* cause of the financial harm" sought to be addressed by the eighth extension. OLC Memo, *supra*, at \*14. Indeed, the Department of Education's announcement makes clear that the extension does not seek to redress harm caused by the pandemic at all. Instead, it seeks to "alleviate uncertainty for borrowers" caused by ongoing "litigation" over the Biden Administration's student-debt cancellation efforts. *Eighth Extension Announcement*, *supra*. But minimizing any "unfair[ness]" that might result from "ask[ing] borrowers to pay a debt that they wouldn't have to pay, were it not for [the ongoing litigation]," which is Secretary Cardona's stated rationale for the extension, *id.*, has *no* connection to harms caused by the pandemic itself—much less a "but-for" causal connection, as required by the statute.

88.     Third, the eighth extension of the Loan Moratorium has not been "structured to put loan recipients back into the financial position they would be in were it not for the national emergency." OLC Memo, *supra*, at \*14. The extension is intended to address uncertainty caused by litigation over the Administration's debt-cancellation efforts, not the pandemic, and it is structured for that purpose only: "Payments will resume 60 days after the Department is permitted to implement the [debt-cancellation] program or the litigation is resolved," and, "[i]f the program has not been implemented and the litigation has not been resolved by June 30, 2023 payments will resume 60 days after that." *Id.* And regardless of whatever happens in the debt-cancellation

litigation, the extension will not return borrowers to the financial position that they would have occupied absent the current phase of the pandemic. Further, the extension applies to borrowers who are not eligible for student loan forgiveness under the stated terms of the Department's debt forgiveness plan and who are not within the class of borrowers that Secretary Cardona claimed it would be unfair to put back in repayment.

89.     When an administrative agency asserts authority over matters of "economic and political significance," the major questions doctrine requires the agency to "point to *clear* congressional authorization for the power it [has] claim[ed]," *West Virginia*, 142 S. Ct. at 2608–09 (emphasis added) (quotation marks omitted). Even if the HEROES Act could plausibly be read as authorizing the Secretary to extend the Loan Moratorium for an eighth time—and it cannot—any such authorization certainly is not "clear."

90.     The eighth extension of the Loan Moratorium is therefore "not in accordance with law," is "in excess of statutory jurisdiction, authority, or limitations," and must be set aside under 5 U.S.C. § 706(2)(A), (C).

### SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act**
**(Declaratory/Injunctive Relief – The Loan Moratorium is Arbitrary and Capricious)**

91.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

92.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

93.     Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted). Among other things,

an agency rule flunks this test "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

94.     The Secretary of Education's decision to adopt the eighth extension of the Loan Moratorium was arbitrary and capricious.

95.     The announcement of the extension on November 22, 2022, did not identify the legal authority under which the Secretary was extending the Loan Moratorium for an eighth time. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (agency action must be judged "upon the validity of the grounds upon which the [agency] itself based its action"). While prior extensions were ostensibly based on the HEROES Act, the Secretary made no attempt to explain why the eighth extension was an appropriate exercise of authority under the Act: why the extension, although it applies to all federal borrowers, is aimed at only individuals "affected" by the current stage of the pandemic; how it avoids harm arising "because of" the pandemic's current effects; or why the extension is "necessary to ensure" that beneficiaries are not placed in a "worse position financially in relation to [their] financial assistance." 20 U.S.C. § 1098bb(a)(2)(A).

96.     Instead, the Secretary relied on "factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, such as a desire to "alleviate uncertainty for borrowers" during the pendency of ongoing litigation regarding the Administration's student-debt cancellation efforts, *Eighth Extension Announcement*, *supra*.

97.     The Secretary's asserted justification for the eighth extension of the Loan Moratorium fails even on its own terms. Even assuming a further extension of the Moratorium was necessary to alleviate "uncertainty" for borrowers who might benefit from the Administration's

student-debt cancellation policy, the Moratorium applies to *all* borrowers, even those who do not qualify for student-debt cancellation. There are accordingly millions of borrowers—easily identified by the Administration—who are not subject to the uncertainty invoked by the Secretary, yet who nevertheless are being relieved of the obligation to repay their loans.

98.     The Secretary's decision to extend the Loan Moratorium for an eighth time also ignores "an important aspect of the problem," *State Farm*, 463 U.S. at 43—namely, the substantial change in the pandemic that has occurred in more than two years since the lapse of the Secretary's CARES Act authority. By the Administration's own account, the threat to public health has been dramatically diminished, and the economy is even stronger now than when the pandemic began. Indeed, the most recent extension of the Loan Moratorium was instituted months *after* President Biden declared that "the pandemic is over." 60 Minutes, *supra*.

99.     Finally, even insofar as the Secretary *did* consider these important aspects of the problem, and nevertheless determined that an eighth extension of the Loan Moratorium was a necessary and appropriate application of the statutory factors, any such determination would be "implausible" and "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

100.    The eighth extension of the Loan Moratorium thus is "arbitrary" and "capricious" and must be set aside under 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act**
**(Declaratory/Injunctive Relief – The Loan Moratorium Was Issued Without Observance of**
**Procedure Required by 5 U.S.C. § 553)**

101.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

102.    Under the APA, courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

103.    The APA requires administrative agencies to undertake notice-and-comment rulemaking when engaging in substantive decision-making: They must publish a notice of "proposed rule making" in the Federal Register, *id.* § 553(b); must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c); and must include in the rule's text "a concise general statement of [its] basis and purpose," *id.*; *see Perez*, 575 U.S. at 96. The APA also requires "publication . . . of a substantive rule [to] be made not less than 30 days before its effective date." 5 U.S.C. § 553(d).

104.    The eighth extension of the Loan Moratorium was not adopted through the required notice-and-comment procedures. Notice of a proposal for the extension was not published in advance in the Federal Register; interested persons were not given an opportunity to comment, and their views were not considered by the agency; no concise statement was published articulating the extension's basis and purpose; and the agency did not provide for the required 30-day delay in the extension's effective date.

105.    The eighth extension of the Loan Moratorium also violates the additional notice requirement imposed by the HEROES Act itself, because the Secretary did not publish it "by notice in the Federal Register." 20 U.S.C. § 1098bb(b)(1).

106.    The rule was therefore promulgated "without observance of procedure required by law" and must be set aside under 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request a judgment in their favor against Defendants as follows:

1.  Declare that the eighth extension of the Loan Moratorium is not in accordance with law, is without observance of procedure required by law, is arbitrary and capricious, and is invalid;

2.  Vacate and set aside the eighth extension of the Loan Moratorium;

3.  Enter a permanent injunction restraining Defendants from enforcing, applying, or implementing the eighth extension of the Loan Moratorium;

4.  In the alternative to (1)–(3):

    a.  Declare that the eighth extension of the Loan Moratorium is not in accordance with law in its application to borrowers who are not eligible for student-loan forgiveness under the stated terms of the Department's debt-forgiveness plan;

    b.  Vacate and set aside the eighth extension of the Loan Moratorium as to those borrowers who are not eligible for student-loan forgiveness under the stated terms of the Department's debt-forgiveness plan;

    c.  Enter a permanent injunction restraining Defendants from enforcing, applying, or implementing the eighth extension of the Loan Moratorium as to those borrowers who are not eligible for student-loan forgiveness under the stated terms of the Department's debt-forgiveness plan;

5.  Award Plaintiffs reasonable attorneys' fees and costs; and

6.  Grant such other and further relief as the Court may deem appropriate.

Dated:  March 3, 2023                                 Respectfully submitted,

                                   */s/ Allon Kedem*

                                   Allon Kedem (D.C. Bar No. 1009039)

                                   Andrew T. Tutt (D.C. Bar. No. 1026916)

                                   ARNOLD & PORTER

                                      KAYE SCHOLER LLP

                                   601 Massachusetts Ave., NW

                                   Washington, DC 20001-3743

                                   Tel: (202) 942-5000

                                   allon.kedem@arnoldporter.com

                                   andrew.tutt@arnoldporter.com

                                   *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendants in accordance with

Fed. R. Civ. P. 4.

*/s/ Allon Kedem*
Allon Kedem (D.C. Bar No. 1009039)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com