**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOFI BANK, N.A. and SOFI LENDING CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION and MIGUEL CARDONA, in his official capacity as Secretary of Education, <br><br> Defendants. | Civil Action No. 23-CV-599 |

**<u>DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

BACKGROUND ..........................................................................................................2

   I.    Statutory and Regulatory Background ..........................................................2

   II.   The HEROES Act .........................................................................................3

   III.  The COVID-19 Pandemic .............................................................................4

   IV.  The Targeted One-Time Debt Relief Plan ...................................................5

   V.   Litigation Over Pandemic-Connected Loan Discharges ..............................6

   VI.  The Challenged Payment Pause Extension ...................................................7

   VII.  This Litigation ..............................................................................................8

LEGAL STANDARD ...............................................................................................9

ARGUMENT ...........................................................................................................10

   I.    Private Banks Fall Far Outside the Zone of Interests of the Relevant Statutes. ......................10

   II.   The Limited-Duration Payment Pause Is Comfortably Within the Secretary's Statutory Authority ...........................................................................................14

       A.  The Secretary Properly Invoked His Authority Under The Heroes Act. ..............................15

       B.  The Heroes Act Authorizes the Secretary's Extension of the Limited-Duration Pause. ......17

       C.  The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act. ...................................................23

   III.  Temporarily Pausing Payments to Avert a Wave of Delinquency and Default was Neither Arbitrary nor Capricious. ...................................................27

       *1.   The Secretary reasonably explained his decision* ...................................29

       *2.   The Secretary considered various alternatives* ......................................30

       *3.   SoFi's reliance on the waning publilc-health emergency is misplaced* ......................32

   IV.  The HEROES Act Provides For An Expedited Process That Does Not Include Notice-and-Comment Procedures. ...................................................33

CONCLUSION ...................................................................................................10

i

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021) ......................................................................................... 24, 26

*Am. Lung Ass'n v. EPA*,
No. 19-1140, 2022 WL 15163000 (D.C. Cir. Oct. 27, 2022) ................................. 23

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) ................................................................................ 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................. 9, 10

*Association of Data Processing Service Organizations, Inc. v. Camp*,
397 U.S. 150 (1970) ............................................................................................ 10, 11

*Bellion Spirits, LLC v. United States*,
393 F. Supp. 3d 5 (D.D.C. 2019) ........................................................................... 20

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................ 11

*Biden v. Missouri*,
142 S. Ct. 647 (2022) ......................................................................................... 19, 25

*Brock v. Pierce Cnty.*,
476 U.S. 253 (1986) ................................................................................................ 16

*Brown Cnty. Taxpayers Ass'n v. Biden*,
No. 22-cv-1171-WCG, 2022 WL 19404285, (E.D. Wis. Oct. 6, 2022) ................... 6

*Brown v. Dep't of Ed.*,
---F. Supp. 3d---, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ................ 7, 33, 34

*Brown v. U.S. Dep't of Ed.*,
143 S. Ct. 541 (Dec. 1, 2022) (Mem.) ..................................................................... 7

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ................................................................................. 9

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ..................................................................................... 11, 13, 14

*Copper & Brass Fabricators Council, Inc. v. Dep't of the Treasury*,
679 F.2d 951 (D.C. Cir. 1982) ................................................................................ 13

*Dep't of Ed. v. Brown,*
   143 S.Ct. 541 (Dec 12, 2022) ............................................................................ 7, 8

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ..........................................................................19, 21, 29

*Florida Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ..........................................................................................28

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ....................................................................................25, 26

*French v. Edwards,*
   80 U.S. (1 Wall.) 506 (1871) ...........................................................................16

*Garrison v. Dep't of Ed.,*
   ---F. Supp. 3d---, 2022 WL 16509532 (S.D. Ind. Oct. 21, 2022) .....................6

*Glass Packaging Institute v. Regan,*
   737 F.2d 1083 (D.C. Cir. 1984) .......................................................................13

*George E. Warren Corp. v. EPA,*
   159 F.3d 616 (1998) ............................................................................30, 31, 32

*Gonzalez-Vera v. Townley,*
   83 F. Supp. 3d 306 (D.D.C. 2015) ...................................................................34

*Grid Radio v. FCC,*
   278 F.3d 1314 (D.C. Cir. 2002) .......................................................................28

*Harris v. D.C. Water & Sewer Auth.,*
   791 F.3d 65 (D.C. Cir. 2015) ...........................................................................10

*Hazardous Waste Treatment Council v. Thomas,*
   885 F.2d 918 (D.C. Cir. 1989) .........................................................................14

*Int'l Ladies' Garment Workers' Union v. Donovan,*
   722 F.2d 795 (D.C. Cir. 1983) .........................................................................21

*Kadi v. Geithner,*
   42 F. Supp. 3d 1 (D.D.C. 2012) .......................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ....................................................................................10, 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   140 S. Ct. 2367 (2020) .....................................................................................27

*Lujan v. National Wildlife Federation,*
497 U.S. 871 (1990) ...................................................................................................11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ............................................................................................ 11, 12

*Matrixx Initiatives, Inc. v. Siracusano,*
563 U.S. 27 (2011) ......................................................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Insurance Co.,*
463 U.S. 29 (1983) ....................................................................................................28

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
551 U.S. 644 (2007) ..................................................................................................28

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
138 S. Ct. 617 (2018) ................................................................................................27

*Nat'l Treasury Emps. Union v. Whipple,*
636 F. Supp. 2d 63 (D.D.C. 2009) ...........................................................................10

*Nebraska v. Biden,*
52 F.4th 1044 (Nov. 14, 2022) ....................................................................................7

*Nebraska v. Biden,*
143 S. Ct. 477 (Mem) (2022) .......................................................................................7

*Nebraska v. Biden,*
---F. Supp. 3d---, 2022 WL 11728905 (E.D. Mo. Oct. 20, 2022) ..............................6

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
896 F.3d 520, 538 (D.C. Cir. 2018) ..........................................................................17

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
45 F.4th 291 (D.C. Cir. 2022) ............................................................................. 16, 17

*Plummer v. Safeway, Inc.,*
934 F. Supp. 2d 191 (D.D.C. 2013) .............................................................................9

*Prohibition Juice Co. v. U.S. Food & Drug Admin.,*
45 F.4th 8 (D.C. Cir. 2022) .......................................................................................16

*Rural Cellular Ass'n v. FCC,*
588 F.3d 1095 (D.C. Cir. 2009) ................................................................................29

*Thompson v. N. Am. Stainless, LP,*
562 U.S. 170 (2011) .........................................................................................11, 12, 14

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
   570 U.S. 338 (2013) ............................................................................................ 22, 23

*Universal Camera Corp. v. NLRB,*
   340 U.S. 474 (1951),
   *aff'd,* 7 F.4th 1201 (D.C. Cir. 2021) ....................................................................... 20

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ............................................................................................... 24

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) .................................................................................... *passim*

*Zevallos v. Obama,*
   10 F. Supp. 3d 111 (D.D.C. 2014),
   *aff'd,* 793 F.3d 106 (D.C. Cir. 2015) ...................................................................... 10

**Statutes**

5 U.S.C. § 553 ........................................................................................................... 33

5 U.S.C. § 553(a) ...................................................................................................... 34

5 U.S.C. § 706(2)(A) ...................................................................................... 9, 14, 28

20 U.S.C. § 1070 ......................................................................................................... 2

20 U.S.C. § 1070(a) .................................................................................................. 12

20 U.S.C. § 1082 ......................................................................................................... 3

20 U.S.C. § 1082(a)(4) ............................................................................................. 27

20 U.S.C. § 1087*ll* ...................................................................................................... 2

20 U.S.C. § 1098a ....................................................................................................... 4

20 U.S.C. § 1098aa ..................................................................................................... 3

20 U.S.C. § 1098aa(b) .............................................................................................. 12

20 U.S.C. § 1098bb ...................................................................................... 24, 25, 27

20 U.S.C. § 1098bb(a)(1) ............................................................................... 3, 17, 27

20 U.S.C. § 1098bb(a)(2)(A) .................................................................................... 18

20 U.S.C. § 1098bb(b)(1) ............................................................................. 15, 17, 33

20 U.S.C. § 1098bb(b)(3) .......................................................................................... 20

20 U.S.C. § 1098ee(2) ................................................................................................................19

20 U.S.C. § 1098ee(2)(C) ........................................................................................................ 18, 19

20 U.S.C. § 1098ee(2)(D) ...........................................................................................................18

50 U.S.C. § 1621 ...........................................................................................................................3

Pub. L. No. 108-76, 117 Stat. 904 (2003) .....................................................................................3

Pub. L. No. 116-136, 134 Stat. 281 (2020) ....................................................................................5

Pub. L. No. 118-3 ...........................................................................................................................4

**Rules**

D.C. Cir. Rule 7(h) ......................................................................................................................10

Fed. R. Civ. P. 56(a) ...................................................................................................................10

Federal Rule of Civil Procedure 12(b)(6) ....................................................................................9

Federal Rule of Civil Procedure 56 ............................................................................................10

**Regulations**

85 Fed. Reg. 15,337 (Mar. 18, 2020) ..................................................................................... 4, 17

85 Fed. Reg. 79,856 (Dec. 11, 2020) ...................................................................................*passim*

87 Fed. Reg. 52,943 (Aug. 30, 2022) ...........................................................................................4

87 Fed. Reg. 61,512 (Oct. 12, 2022) ................................................................................6, 18, 19

88 Fed. Reg. 8884 (Feb. 10, 2023) ..............................................................................................18

**Other Authorities**

Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans,
Op. O.L.C., 2022 WL 3975075 (Aug. 23, 2022) ....................................................................4

In August of 2022, as the Nation focused on emerging from a once-in-a-century global pandemic, the Secretary of Education determined that the pause on student-loan repayment and interest accrual instituted by his predecessor should come to an end. Because economically vulnerable borrowers face a high risk of delinquency and default when payments resume following a long period of forbearance, the Secretary invoked the HEROES Act to provide targeted student loan cancellation so that affected individuals will not be worse off with respect to their student loans because of the pandemic. But after two courts blocked the Secretary from effectuating this plan, roughly six weeks before payments were set to resume and after tens of millions of borrowers already had applied to have loans forgiven, the Secretary recognized that millions of borrowers—including those whose applications for relief already had been approved—would soon encounter exactly the risks of delinquency and default that his targeted loan-forgiveness plan had been designed to avoid. The Secretary swiftly sought relief from the Supreme Court, which granted certiorari before judgment and is set to decide those challenges this Term. In the interim, the Secretary once more invoked his broad authority under the HEROES Act to extend the payment and interest pause for a brief and finite period of time, to avert a catastrophic wave of loan delinquencies and defaults that might otherwise occur.

Plaintiff SoFi Bank, N.A. ("SoFi"), a private bank that claims to have made tens of millions of dollars in profits from refinancing federal student loans before the pandemic, now challenges the Secretary's limited-duration pause, complaining that it "is being forced to compete with loans with 0% interest rates and for which any ongoing repayment of the principal is entirely optional." Compl. For Declaratory and Injunctive Relief ¶ 76, ECF 1 ("Compl."). SoFi asks this Court to declare the Secretary's temporary pause unlawful and order *tens of millions* of federal student-loan borrowers to reenter repayment and interest accrual so that SoFi can convince some of those borrowers to refinance into its private-loan products. And although SoFi claims to "have a mission to help people reach

financial independence to realize their ambitions," *id.* ¶ 15, this suit can only be seen as contrary to that goal.

This suit should be dismissed at the outset because SoFi lacks a cause of action to press its claim. Because the interest SoFi asserts in this suit—maximizing profits from charging interest to student-loan borrowers who refinance into private loans—is directly at-odds with the purposes underlying the statutes on which it rests its complaint, SoFi lies far outside the zone of interests to maintain suit under the APA.

Even were SoFi a proper plaintiff to challenge the temporary pause, its claims are meritless. The Secretary has ample authority under the HEROES Act to pause payments and interest accrual— in fact, the statute has been invoked to take those very actions repeatedly and without challenge. Furthermore, the Secretary reasonably explained his decision, grounded his rationale in the statutory criteria, and considered and selected among various alternatives. Finally, SoFi's assertion that the emergency powers granted under the HEROES Act obligate the Secretary to undertake *greater* procedural requirements than general agency actions contorts the text of the statute, which expressly exempts waivers and modifications under HEROES from notice-and-comment requirements. SoFi is not entitled to any relief.

## BACKGROUND

### I.    Statutory and Regulatory Background

The Secretary of Education ("Secretary") is charged with carrying out certain student loan programs under Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 *et seq.* Foremost among these is the William D. Ford Federal Direct Loan Program, which allows postsecondary students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. 20 U.S.C. § 1087*ll.* Title IV also includes other programs, such as the Federal Family Education Loan ("FFEL") Program, *id.* §§ 1071-1087-4, and the Perkins Loan Program, *id.* §§ 1087aa-1087ii, although no new loans are authorized under either program. *See id.* § 1078(a)(1)); *id.* § 1087aa(b)(2). The HEA delegates significant authority

to the Secretary to administer the Department's portfolio of more than 43 million federal student loans, *see* 20 U.S.C. §§ 1082, 3441, 3471, including the authority to "compromise, waive, or release any right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties" to administer student loans, *id.* § 1082(a).

## II.    The HEROES Act

The Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa-1098ee) ("HEROES Act"), authorizes the Secretary to take broad and decisive action with respect to the federal student financial aid programs in times of national emergency. Specifically it provides that, "[n]otwithstanding any other provision of law," the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student financial aid programs "as the Secretary deems necessary in connection with a … national emergency to" accomplish certain statutory goals. 20 U.S.C. § 1098bb(a)(1). As relevant here, the Secretary may provide such waivers and modifications as "necessary to ensure" that (1) covered Title IV financial aid recipients "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals," and (2) administrative requirements placed on such covered individuals are "minimized … to ease the burden on such students and avoid inadvertent, technical violations or defaults." *Id.* § 1098bb(a)(2). The Act defines the covered population of "affected individual[s]" broadly to encompass any individual who, as relevant here, either "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency," or "suffered direct economic hardship as a direct result of a [national emergency] as determined by the Secretary." *Id.* § 1098ee(2). And a "national emergency" is "a national emergency declared by the President of the United States." *Id.* § 1098ee(4); *see also* 50 U.S.C. § 1621 (authorizing President to declare national emergency).

The Act exempts any exercise of its authority from certain otherwise-applicable procedural requirements, including Administrative Procedure Act ("APA") notice-and-comment rulemaking. Section 1098bb(b)(1) provides that "[n]otwithstanding section 1232 of this title and section 553 of

3

Title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section." And Section 1098bb(d) states that 20 U.S.C. § 1098a, which requires the Department to engage in negotiated rulemaking to develop certain proposed rules under the HEA, "shall not apply to the waivers and modifications authorized or required by this part."

The statute also explicitly states that the Secretary "is not required to exercise the waiver or modification authority under this section on a case-by-case basis." *Id.* § 1098bb(b)(3). Historically, the Department has exercised this authority to provide categorical relief to borrowers in connection with national emergencies. *See* Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, Op. O.L.C., 2022 WL 3975075, at *4-5 (Aug. 23, 2022) ("OLC Opinion"); Memorandum from the U.S. Dep't of Educ., Office of the General Counsel, *The Secretary's Legal Authority for Debt Cancellation* (Aug. 23, 2022), *available at* Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52,943 (Aug. 30, 2022) ("ED Legal Authority Memo").

## III.    The COVID-19 Pandemic

In March 2020, then-President Trump declared a national emergency to contain and combat the virus known as COVID-19. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020). That declaration, which rendered every state, the District of Columbia, and the territories disaster areas due to COVID-19, remained in effect for more than three years, ending only recently on April 10, 2023. *See* National Emergencies Act, Pub. L. No. 118-3. During that national emergency COVID-19 killed more than 1.1 million Americans, *see* Centers for Disease Control and Prevention, COVID Data Tracker (last visited May 15, 2023), https://covid.cdc.gov/covid-data-tracker/#datatracker-home, and caused significant disruptions to all aspects of American life, especially to the national economy.

In response to the pandemic and the myriad economic difficulties it caused, the federal government took several significant actions to provide relief to federal student loan borrowers with Department-held loans. On March 20, 2020, then-Secretary Betsy DeVos invoked the HEROES Act to pause repayment obligations and suspend interest accrual on Department-held student loans.

*See* Federal Student Aid Programs, 85 Fed. Reg. 79,856, 79,857 (Dec. 11, 2020) ("2020 Notice"). Shortly thereafter, Congress enacted legislation directing the Secretary to suspend all payments on any Title IV loans held by the Department and apply a zero-percent interest rate to all such loans, through September 2020. Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281 (2020). These protections were extended by both the Trump Administration and the Biden Administration and remain in effect today pursuant to invocations of the Secretary's HEROES Act authority. *See, e.g.*, 2020 Notice, 85 Fed. Reg. at 79,857; U.S. Dep't of Educ., Federal Student Aid ("FSA"), Annual Report FY 2020 (Nov. 16, 2020), https://perma.cc/9ZM7-HWZP ("FSA Report"); Memorandum from Sec'y of Educ. Miguel Cardona to FSA Chief Operating Officer ("COO") Richard Cordray (Aug. 24, 2022), SoFi – 297 ("Forgiveness Memo"). As a result, federal student loan borrowers with Department-held loans have not been required to make payments on those loans since March 2020. On August 24, 2022, the Secretary announced that he would use his authority under the HEROES Act to extend the payment pause and zero-percent interest protections one final time, through December 31, 2022, to allow the Department to implement its targeted loan discharge plan. *See* U.S. Dep't of Educ., *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment* (Aug. 24, 2022), https://perma.cc/AP3Q-3V6C.

## IV.  The Targeted One-Time Debt Relief Plan

To address the financial harms to student loan borrowers caused by the pandemic and ensure a smooth transition back to repayment status after the extended payment pause, the Secretary announced he would use his HEROES Act authority to provide targeted one-time debt relief to federal student loan borrowers affected by the pandemic. *Id.* Designed to "address the financial harms of the pandemic" by providing relief to "borrowers at highest risk of delinquencies or default once payments resume," the Department's plan would make up to $10,000 in student loan debt relief available to eligible borrowers making less than $125,000 (or married couples and heads of households making less than $250,000). *Id.* Borrowers who received a Pell Grant to attend college are eligible to

receive up to $20,000 in loan relief. *Id.* The Secretary published the relevant HEROES Act waivers and modifications in a notice in the Federal Register on October 12, 2022.  *See* Federal Student Aid Programs, 87 Fed. Reg. 61,512 (Oct. 12, 2022) ("2022 Notice").

This loan forgiveness program is based on the Secretary's determination that such measures are necessary to ensure that "borrowers subject to the payment pause are not placed in a worse position financially by the COVID-19 national emergency as they restart payments." Forgiveness Memo at 1. The Secretary recognized that, while the payment pause had "delivered substantial relief to millions of loan borrowers," additional steps are needed to address the "heightened risk of loan delinquency and default" that many borrowers face upon reentering repayment after such an extended period, and to ensure that such borrowers do not end up "in a worse position financially due to the pandemic with regard to their ability to repay their loans." *Id.* That determination was based on, among other things, an economic analysis finding that discharging $10,000 in federal student loan debt (and $20,000 for Pell Grant recipients) for borrowers making less than $125,000 (or married couples or heads of households making less than $250,000) would reduce the likelihood of delinquency and default for borrowers transitioning back to repayment and ensure that such borrowers are not made worse off with respect to their financial assistance by the COVID-19 pandemic. *See generally* Rationale for Pandemic-Connected Loan Discharge Program (Aug. 24, 2022), SoFi – 299-311("Forgiveness Supporting Analysis").

## V.   Litigation Over Pandemic-Connected Loan Discharges

The Secretary's targeted loan-forgiveness plan was challenged in multiple courts. Several of these suits were quickly dismissed, with courts concluding that various plaintiffs lack standing to challenge the provision of debt relief *to other individuals. See Brown Cnty. Taxpayers Ass'n v. Biden*, No. 22-cv-1171-WCG, 2022 WL 19404285, (E.D. Wis. Oct. 6, 2022), Decision & Order, ECF 12 (taxpayers lack standing); *Garrison v. Dep't of Ed.*, ---F. Supp. 3d---, 2022 WL 16509532 (S.D. Ind. Oct. 21, 2022), Entry Dismissing Pls.' Am. Compl., ECF 36 (borrowers eligible for forgiveness lack standing based on theory of purported tax consequences); *Nebraska v. Biden*, ---F. Supp. 3d---, 2022 WL 11728905

(E.D. Mo. Oct. 20, 2022), Op., Mem. & Order, ECF 44 (states lack standing). But then a district court in Texas, hearing a request for preliminary injunction brought by two individual borrowers purportedly dissatisfied with their ineligibility for the full measure of debt relief, enjoined implementation of the Secretary's plan. *Brown v. Dep't of Ed.*, ---F. Supp. 3d---, 2022 WL 16858525, at *15 (N.D. Tex. Nov. 10, 2022), *granting cert. before judgement sub nom.*, *Dep't of Ed. v. Brown*, 143 S.Ct. 541 (Dec 12, 2022). Although that court rejected the sole claim presented by the plaintiffs—that the agency had erred by failing to submit its forgiveness plan to notice and comment—it nonetheless advanced the emergency motion to final judgment on the merits and vacated the program nationwide, concluding that it ran afoul of the major-questions doctrine. *Id.* at 18-23. That same week, in a different suit the Eighth Circuit preliminarily enjoined the Secretary from implementing the program, disagreeing with the district court's conclusion that state plaintiffs likely lack standing to pursue their challenge. *Nebraska v. Biden*, 52 F.4th 1044 (Nov. 14, 2022). The Secretary promptly sought, and the Supreme Court granted, certiorari before judgment in both cases. *Nebraska v. Biden*, 143 S. Ct. 477 (Mem) (2022); *Brown v. U.S. Dep't of Education*, 143 S. Ct. 541 (Dec. 1, 2022) (Mem.). The Court heard argument on February 28, 2023, and a decision is expected sometime this Term. Supreme Court of The United States October Term 2022, *For the Session Beginning February 21, 2023*, (Feb. 16, 2023), https://perma.cc/VDE3-EAQF (Monthly argument calendar).

## VI.   The Challenged Payment Pause Extension

These rulings rendered the Department unable to effectuate its targeted, one-time forgiveness plan—with only 51 days remaining before the payment pause was set to end for tens of millions of borrowers. Memorandum from Under Sec'y of Educ. James Kvaal to Sec'y of Educ. Miguel Cardona on Pandemic-Connected Student Loan Payment Pause, Nov. 22, 2022, SoFi – 005 ("Kvaal Pause Rationale Memo"). With such a short time remaining and with its transition plan suddenly on hold, the Department was unable to "identify and carry out other strategies to meaningfully reduce risk of delinquency and default." *Id.* – 004. The Secretary thus announced that he would extend the payment pause and zero-interest protections, in part because "it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay" were it not for the injunctions that had created "tremendous

financial uncertainty" for borrowers, more than *26 million* of whom who already had applied for debt relief yet lacked "a clear picture of their student debt obligations." U.S. Dep't of Educ., Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause (Nov. 22, 2022), https://perma.cc/6LLQ-XN9R.

In the memorandum documenting his decision, the Secretary explained that the conditions that led him to issue waivers and modifications in August "have not changed significantly." Memorandum from Sec'y of Educ. Miguel Cardona to FSA COO Richard Cordray on Extension of the Federal Student Loan Payment Pause for All Borrowers, SoFi – 001-002 ("Decision Memo"). He further stated that a pause extension was "necessary" while the Department "seek[s] relief from the courts" because allowing borrowers to "face the end of the payment pause and the restart of payments before the Department can implement the Pandemic-Connected Loan Forgiveness Program … will create exactly the financial harms that the Program was intended to prevent." *Id.* Relying on his authority under the HEROES Act, the Secretary took this action "because of the financial impacts the COVID-19 national emergency has had on student loan borrowers," finding that, when payments resume, "many borrowers will be at heightened risk of loan delinquency and default that could … leave borrowers worse off" with relation to their student loans "than they were before the pandemic." *Id.* at 1, 2. And since this decision was necessitated by the injunctions barring implementation of loan discharges, the pause is tied to resolution of those disputes: It "will continue until two months after the Department is permitted to implement the Program or until the litigation is resolved—but no later than 60 days after June 30, 2023, the approximate end of the Supreme Court's current term." *Id.* at 2.

## VII.    This Litigation

More than 100 days after the Secretary announced this payment pause (and roughly three years after the payment pause and zero-interest protections first were put in place), Plaintiff SoFi Bank, N.A., a private, for-profit bank, filed this suit seeking to force tens of millions of borrowers to abruptly resume repayments. *See* Compl. SoFi alleges that it historically has profited handsomely from interest earned by convincing certain student-loan borrowers to forgo the protections of federal student aid programs and refinance into a private loan, and that SoFi has suffered harm because the Department

has "forced [it] to compete with loans with 0% interest rates and for which any ongoing repayment of the principal is entirely optional." Compl. ¶ 76; *see also id.* ¶ 78 (alleging that "SoFi has lost approximately $150 to 200 million in profits" due to zero-interest protections afforded to borrowers during the pandemic). Although SoFi alleges that its refinancing business "dropped precipitously" "[f]ollowing the announcement of the initial [payment pause] in March 2020," Compl. ¶ 77, it challenges only the November 2022 extension that the Secretary determined was necessary to avert the risk of default were borrowers to be forced unexpectedly to make payments on debts that, absent the injunctions, they would not owe. SoFi challenges the decision as exceeding the Secretary's authority under the HEROES Act, as arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and as procedurally defective for failure to undertake notice and comment, *see id.* §§ 706(2)(D), 553. SoFi asks the Court to declare the pause unlawful, vacate and set aside the decision, and enjoin the Department from effectuating it—in other words, to require the agency to institute an abrupt resumption of payments and interest accrual for all federal student-loan borrowers.[1] *See* Compl. at 30, Prayer for Relief.

## LEGAL STANDARDS

The Department moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted), that is, whether the complaint's allegations are sufficient to permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (quoting *Iqbal*, 556 U.S. at 678). Therefore, a court "may consider [] the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." *Plummer v.*

---

[1] SoFi pleads in the alternative that the Court can issue this relief only as to "borrowers who are not eligible for student-loan forgiveness under the stated terms of the Department's debt-forgiveness plan," *see* Compl. at 30, Prayer for Relief, but, as explained *infra* Section III, the Department already has determined that carving out a subset of borrowers to resume payments is infeasible.

*Safeway, Inc.*, 934 F. Supp. 2d 191, 195-96 (D.D.C. 2013) (quotation omitted) (alteration in original). It may also consider public records. *Nat'l Treasury Emps. Union v. Whipple*, 636 F. Supp. 2d 63, 77 n.8 (D.D.C. 2009). In this regard, a court "must accept as true all of the allegations contained in a complaint[,]" but need not do the same for legal conclusions. *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

In the alternative, the Department moves for summary judgment in its favor. Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of an APA claim, "[s]ummary judgment … serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015). Thus, "[w]hen assessing a summary judgment motion in an APA case, 'the district judge sits as an appellate tribunal'" and otherwise has a "limited role … in reviewing the administrative record." *Id.* (citations omitted); *see also* D.C. Cir. Rule 7(h).

## ARGUMENT

**I.    Private Banks Fall Far Outside the Zone of Interests of the Relevant Statutes.**

Congress passed both the HEROES Act and the HEA to provide aid to students that have pursued higher education—not to benefit private banks. Because SoFi's interests are anathema to those of the statutes' intended beneficiaries—*i.e.*, the borrowers it wishes to force into repayment and interest accrual—SoFi lacks a cause of action to maintain this suit and it should be dismissed.

The zone-of-interests requirement originated in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 156 (1970), and serves as a general presumption about Congress's intended limits on the scope of causes of action. *See Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 127-33 (2014). The zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated." *Id.* at 129 (quoting *Bennett v. Spear*, 520 U.S. 154, 163-64 (1997)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (applying zone-of-interests test to alleged statutory violation).

The zone-of-interests test requires courts to assess whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute … in question." *Ass'n of Data Processing Serv. Org.*, 397 U.S. at 153. The test forecloses suit where the plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit" the plaintiff to enforce it. *Patchak*, 567 U.S. at 225 (citation omitted). When Congress authorizes a cause of action, it presumptively does not intend the "absurd consequences" that would follow "[i]f any person injured in the Article III sense" by an alleged violation of federal law could sue over the violation. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176-77 (2011); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987) (recognizing "the potential for disruption inherent in allowing every party adversely affected by agency action to seek judicial review"). The zone-of-interests requirement thus limits the plaintiffs who may invoke a cause of action under the APA for an alleged violation of the statutes administered by the defendant agency. Most importantly, perhaps, the zone-of-interests inquiry "*exclude[s]* those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Id.* at 397 n.12 (emphasis added).

The relevant statute for this inquiry "is the statute whose violation is the gravamen of the complaint," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 886 (1990), which here is the HEROES Act. *See, e.g.*, Compl. ¶¶ 82-90. But SoFi's suit would *cause harm to* the statute's intended beneficiaries and thus falls far outside the zone of interests. In articulating its interest in bringing this suit, SoFi claims that it "competes with the federal government for federal student loan borrowers by offering them private financing under [purportedly] more favorable terms" and complains that the payment pause and interest protections have "forced [it] to compete with loans with 0% interest rates and for which any ongoing repayment of the principal is entirely optional." Compl. ¶¶ 75-76. But the

11

HEROES Act's broad grant of authority to the Secretary of Education contains no hint that student loan waivers and modifications should be structured to benefit private banks. On the contrary, Congress's findings in enacting the HEROES Act elucidate its purpose in *protecting* borrowers impacted by active military service or a Presidentially declared national emergency. *See* 20 U.S.C. § 1098aa(b) ("There is no more important cause for this Congress than to … provide assistance with the[] transition into and out of active duty"); *id.* § 1098bb(a)(1) (confirming that HEROES Act authority extends to individuals impacted by "national emergency"). Indeed, there is no hint that Congress even contemplated the participation of private banks in the relevant student-loan programs—much less sought to protect those entities' profits when they choose to enter the market. SoFi's interests in maximizing the profits it earns from charging interest on loans used to fund borrowers' educational pursuits are not even "marginally related to … the purposes implicit" in the HEROES Act.[2] *Patchak*, 567 U.S. at 225 (citation omitted).

Even were the Court to look to the purposes behind the HEA, rather than the HEROES Act, the same conclusion results, since Congress provided an exceptionally clear statement demonstrating that it intended to benefit borrowers, not banks. Congress established the financial-aid programs administered by the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students … in institutions of higher education" by providing financial aid to students and "assistance to institutions of higher education." 20 U.S.C. § 1070(a). Nowhere did Congress suggest that private lenders should generate tens of millions of dollars in profits by persuading borrowers to refinance Federal loans into private loans that, as SoFi even admits, are "not subject to federal repayment programs (such as income-driven repayment plans) or policies (such as loan forbearance and deferment)," *see* Compl. ¶ 74, or for loan forgiveness under any program. Nor does forcing borrowers to abruptly resume payments and interest accrual, notwithstanding the

---

[2] That SoFi's revenues may have been impacted by pandemic-related changes to federal student loan programs does not mean it can pursue the claims presented here. The Supreme Court has made clear that the zone-of-interests test "exclud[es] plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the" statutory goals. *Thompson*, 562 U.S. at 178.

Secretary's determination that it likely would lead to a wave of delinquencies, align with Congress's purposes in passing the HEA.[3]

Taken together, these statutes promote higher education; provide a means for students to access college and other educational programs; and bestow authority on the Secretary to grant discretionary relief, where necessary, for borrowers impacted by military service or a national emergency. Nothing about the statutory text or context suggests any purpose to benefit a private company complaining that actions taken directly to aid the statutes' intended beneficiaries has indirectly harmed its revenue. Nor did Congress give any indication that, in administering these statutes, the Department of Education should consider the potential impact on private financial institutions that seek to siphon borrowers *out of* the very lending programs Congress created. Indeed, it is hard to imagine a suit where the plaintiff's stated interest is more in conflict with, and thus more likely to frustrate the purposes behind, a legislatively created program. *See Clarke*, 479 U.S. at 397 n.12.

As the D.C. Circuit has explained, there must be "some indicia—however slight—that the litigant before the court was intended to be protected, benefited, or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council, Inc. v. Dep't of the Treasury*, 679 F.2d 951, 952 (D.C. Cir. 1982). Indeed, the court of appeals explicitly has rejected analogous challenges based on injury to competitive interests. In *Glass Packaging Institute v. Regan*, a manufacturer demonstrated that regulatory changes would harm its competitive interests. 737 F.2d 1083, 1090-91 (D.C. Cir. 1984). But because the relevant statute was unquestionably intended to protect governmental tax revenue, not "to monitor or protect the competitive status or financial health of the affected industry," the plaintiff's harm "plainly is not an interest which Congress authorized the [agency] to regulate or protect." *Id.* "[M]ere regulatory impact on a party's commercial interests" does not satisfy the zone-of-interests test "when that competitive status is not an interest arguably regulated by the statute forming the basis for" the agency's action. *Id.* at 1089. *See also Copper & Brass Fabricators Council*, 679

---

[3] It is true that in the HEA Congress did contemplate that interest would accrue and borrowers would make payments, at appropriate times. But that matters not, since the intended beneficiaries of interest and payments are plainly the U.S. Treasury and, indirectly, taxpayers—not private lenders.

F.2d at 953 (rejecting challenge to penny composition change by copper-industry plaintiffs because Congress instructed Treasury to ensure adequate supply of coins, not "to benefit, protect or regulate the copper industry"); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924-26 (D.C. Cir. 1989) (private firm with incentive "to pursue regulation that encourages the alternatives with the greatest profit potential" fell outside zone of interests, despite profiting from environmental regulatory scheme, where its interests could frustrate the statutory objectives).

Moreover, allowing this suit to proceed would lead to "absurd consequences" by enabling profit-motivated private parties to superintend the Department of Education's administration of the massive student loan programs that enable millions of Americans to pursue their educational goals. *Thompson*, 562 U.S. at 176-77. This is an unusually clearcut example of "a particular plaintiff" who should not "be heard to complain of a particular agency decision" because its asserted interest is "so … inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.

Because SoFi cannot satisfy the zone-of-interest test, as it must, it lacks a cause of action under the APA and this suit should be dismissed.

## II.    The Limited-Duration Payment Pause Is Comfortably Within the Secretary's Statutory Authority.

Even if SoFi did have a cause of action to maintain this suit, it still would fail on the merits. SoFi contends, as its first claim for relief, that the latest extension of the pause is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations." *See* Compl. ¶ 90 (quoting 5 U.S.C. § 706(2)(A), (C)). In SoFi's view, the pause extension is invalid either because the Secretary failed to invoke any authority supporting the extension when he announced it, *see id.* ¶ 82, or because, to the extent the Secretary intended to act under the HEROES Act, that Act does not grant authority to issue the extension, *see id.* ¶¶ 83–89. But none of SoFi's statutory arguments have merit, and so the Court should enter judgment for the Secretary on SoFi's first claim for relief.

14

### A.  The Secretary Properly Invoked His Authority Under The Heroes Act.

As a threshold matter, the Secretary in fact invoked his authority under the HEROES Act when he ordered the November 2022 extension of the pandemic-related pause on student-loan payments and interest accrual. In the memorandum documenting his decision, the Secretary reviewed the history of the pause on payments and interest accrual during the COVID-19 pandemic, noting that he had previously exercised authority under the HEROES Act to extend that pause through December 31, 2022. *See* SoFi - 001. The Secretary then explained how he had determined previously that, alongside the resumption of payments and interest accrual, it was necessary to discharge certain amounts of student-loan balances for certain borrowers to protect them from a heightened risk of delinquency and default after such a long period of forbearance. *See id.* The Secretary noted, however, that this comprehensive plan for ending the pause was the subject of ongoing litigation, and its implementation recently had been blocked by certain judicial decisions. *See id.* at SoFi - 002. Given this development, the Secretary noted his concern that ending the pause in the absence of any corresponding steps to safeguard against a spike in delinquencies and defaults would "create exactly the financial harms" that he had previously found it necessary to prevent. *Id.* Accordingly, the Secretary found it necessary to further "extend[] those waivers and modifications specified in the December 11, 2020, *Federal Register* notice (85 Fed. Reg. at 79,856), that relate to the payment and collection of, and accumulation of interest on, federal student loans," and he expressly noted that he was doing so "under the authority granted to [him] by the HEROES Act." *Id.*  There can be no question, then, that the Secretary in fact identified the source of statutory authority for the November 2022 extension of the pause.

It makes no difference to this analysis that the Secretary has yet to publish notice of the pause extension in the Federal Register. *Contra* Compl. ¶ 82. True, publication of waivers and modifications is contemplated by the HEROES Act. *See* 20 U.S.C. § 1098bb(b)(1) ("Notwithstanding section 1232 of this title and section 553 of Title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section."). But the HEROES Act does not require that the Secretary

publish such a notice contemporaneously with his decision or even at any particular time, nor does it suggest that waivers or modifications purportedly issued pursuant to the Act are invalid absent publication of a Federal Register notice. Moreover, history reveals that the Secretary previously has published after-the-fact notice of waivers and modifications made under the Act. *See, e.g.*, 85 Fed. Reg. 79,857 (providing notice in the Federal Register in December 2020 of waivers and modifications necessary to extend pause on payments and interest accrual as of October 2020, some of which dated back to March 2020). That approach makes sense in this context, where the Secretary must be able to act swiftly to protect borrowers in the face of emergencies. Indeed, even were the Department required to contemporaneously publish notice—which it is not—the Court should be "most reluctant to conclude that" the "failure … to observe a procedural requirement voids" the Secretary's decision, given the important interests at stake. *Brock v. Pierce Cnty.*, 476 U.S. 253, 260 (1986).

For similar reasons, even if the Secretary's failure to publish contemporaneous notice of the pause extension had rendered his action procedurally deficient, that deficiency would not justify vacating the extension and permanently enjoining its implementation, as SoFi demands. *See* Compl. at 30. Indeed, given that the Secretary considered all the factors relevant under the HEROES Act at the time he ordered the extension, *see* SoFi - 002, a purely technical deficiency like the failure to timely publish an updated notice in the Federal Register would constitute a harmless error for purposes of the APA. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 300 (D.C. Cir. 2022) (finding harmless error when, notwithstanding formal failings in the decisionmaking process, an agency conducted the required analysis and the technical errors did not affect the agency's action), *denying reh'g en banc*, No. 20-1489, 2022 WL 17721819 (D.C. Cir. Dec. 13, 2022); *Prohibition Juice Co. v. U.S. Food & Drug Admin.*, 45 F.4th 8, 24 (D.C. Cir. 2022) (harmless-error rule applies "[w]hen an agency's mistake plainly had no bearing on the substance of its decision" (citation omitted)); *cf. French v. Edwards*, 80 U.S. (1 Wall.) 506, 510 (1871) ("There are undoubtedly many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them, which do not limit their power or render its exercise in disregard of the requisitions ineffectual. Such generally are regulations designed to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties

interested cannot be injuriously affected."). At most, any deficiency stemming from the Secretary's failure to publish a notice in the Federal Register that the November 2022 extension of the payment pause was effectuated pursuant to the HEROES Act should be remedied by a remand without vacatur for the Department to publish notice. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (finding remand without vacatur appropriate where there was no "reason to expect that the agency will be unable to correct [the] deficiencies" and court was "concerned about the disruptive consequences of vacating" the agency action in the interim).

### B. The Heroes Act Authorizes the Secretary's Extension of the Limited-Duration Pause.

SoFi's other theory of liability—that even if the Secretary instituted the pause extension pursuant to the HEROES Act, the Act did not actually grant him authority to do so—fares no better. Through the HEROES Act, Congress gave the Secretary broad authority to waive or modify student-loan obligations in response to a national emergency. In such circumstances, the Act provides that, "[n]otwithstanding any other provision of law, unless enacted with specific reference to" Section 1098bb, the Secretary may "waive or modify any statutory or regulatory provision applicable to" the federal student loan programs, 20 U.S.C. § 1098bb(a)(1), to "ensure that," among other things, borrowers "who are affected individuals are not placed in a worse position financially in relation to" their student loans, *id.* § 1098bb(a)(2)(A). And in light of the President's March 13, 2020 proclamation that the COVID-19 pandemic constituted a national emergency, *see* 85 Fed. Reg. 15,337; the fact that all parts of the United States were designated as disaster areas due to the pandemic, *see* Federal Emergency Management Agency, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD; the well-established, widespread, and lingering economic hardship caused by that emergency, *see, e.g.*, SoFi - 300–302; and the need to return borrowers to repayment in a manner that did not put borrowers at undue risk of delinquency and default, *see* SoFi - 001–006, the Secretary validly exercised that authority to further extend the previously established pause on student loan payments and interest accrual.

**1.** SoFi first disputes this conclusion on the ground that the Secretary has sought to aid an improper class of borrowers. *See* Compl. ¶ 86. Not so: In the context of the COVID-19 pandemic, all student-loan borrowers qualify as "affected individuals" under the HEROES Act. 20 U.S.C. § 1098bb(a)(2)(A). That is not *only* because they have suffered "direct economic hardship" due to the pandemic, 20 U.S.C. § 1098ee(2)(D), though—given that the pandemic caused profound economic harms on a global scale that have yet to be fully mended—all borrowers do qualify on that basis. *See* SoFi - 002 (noting "the financial impacts the COVID-19 national emergency has had on student loan borrowers"); SoFi - 300–302 (discussing recent "rise of inflation to levels not seen in 40 years" that was attributable in large part to "COVID-induced supply-chain disruptions"); *see also* Federal Student Aid Programs, 87 Fed. Reg. 61,512, 61,513 (Oct. 12, 2022) (relying in part on finding of direct economic hardship to issue relief to all borrowers under the HEROES Act); 2020 Notice, 85 Fed. Reg. at 79,857 (same). Rather, for all student-loan borrowers save the negligible number living and working abroad, they also separately qualify as "affected individual[s]" based on where they "reside[]" or are "employed," 20 U.S.C. § 1098ee(2)(C), as each of the 50 States, the District of Columbia, and the five permanently populated United States territories were, at the time of the Secretary's action, designated as COVID-19 disaster areas. *See* FEMA, COVID-19 Disaster Declarations, https://perma.cc/B7KA-W4KD; Major Disaster Declarations and Related Determinations: Expiration of COVID-19-Related Measures, 88 Fed. Reg. 8884 (Feb. 10, 2023) (noting that "the incident period for all COVID-19 major disaster declarations and the nationwide emergency declaration will close effective May 11, 2023"); *see also* 87 Fed. Reg. at 61,513 (relying in part on disaster declaration to issue relief to all borrowers under the HEROES Act); 2020 Notice, 85 Fed. Reg. at 79,857 (same). Thus, just as he and his predecessor had been at earlier points in the pandemic, the Secretary was justified in exercising his HEROES Act authority to apply the November 2022 extension of the pause to all student-loan borrowers. *Cf.* 87 Fed. Reg. at 61,513 ("[T]he 'affected individuals' for purposes of the waivers and modifications described in this document include any person with a Federal student loan under title IV of the HEA"); 85 Fed. Reg. at 79,857 ("An 'affected borrower' is one whose Federal student loans provided under title IV are in repayment.").

18

Remarkably, to argue otherwise, SoFi denies the profound economic harms that borrowers suffered from the pandemic. *See* Compl. ¶ 86 (contending that "beneficiaries of the extension are not 'affected individuals' because they have not suffered direct economic hardship" from the pandemic (quoting 20 U.S.C. § 1098ee(2))). In its view, the Secretary could not reasonably determine that all federal student-loan borrowers suffered direct economic harm from the pandemic—at least not at the time that he decided to order the latest extension of the pause in November 2022. *See id.* (arguing contemporaneous finding of direct economic hardship would be unjustifiable "given the Administration's own account of the economy's current strength"). SoFi's argument wholly ignores the additional, clearly applicable definition of "affected individual" based on residence or employment in a federally declared disaster area, *see* 20 U.S.C. § 1098ee(2)(C). Moreover, this argument is not really an argument about the Secretary's statutory authority. As SoFi frames it, the question is not so much whether the HEROES Act authorizes the Secretary to find that all federal student-loan borrowers qualify as "affected individuals" for purposes of the Act—the Act clearly does, provided that all borrowers fall within some combination of the categories listed in 20 U.S.C. § 1098ee(2)—but whether the Secretary reasonably determined that all borrowers so qualified at the time of his decision in November 2022. And in answering that question, the Court's review should be guided by the APA's arbitrary-and-capricious standard, and "simply ensure[] that the [Secretary] has acted within a zone of reasonableness." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).[4]

Applying that deferential standard, *see infra* Section III, the Secretary's determination that all student-loan borrowers were "affected individuals" was eminently reasonable. As discussed, by November 2022, the Secretary and his predecessor already had, on multiple occasions, determined that all federal student-loan borrowers were "affected individuals" in the context of the COVID-19 pandemic. *See* 87 Fed. Reg. at 61,513; 85 Fed. Reg. at 79,857. The Secretary was entitled to rely on those earlier findings to inform his decision in November 2022. To be sure, by that time, the public

---

[4] SoFi appears to appreciate this, given that it later advances substantially the same argument in its second claim for relief from "arbitrary and capricious" agency action. *See* Compl. ¶ 94.

health crisis caused by COVID-19 had begun to ebb, and extraordinary policy interventions (including direct economic impact payments to taxpayers) had helped avert economic catastrophe earlier in the pandemic. But like the wake of destruction left even after a hurricane stops spinning, the significant economic and personal harms that many had suffered over the prior two and a half years were not erased by the pandemic's easing. Indeed, information considered by the Department showed that even in November 2022, the economic harms of the pandemic lingered, and the nascent recovery was fragile for many student-loan borrowers. *See, e.g.*, Thomas Conkling & Christa Gibbs, *Office of Research blog: Update on student loan borrowers during payment suspension*, Consumer Financial Prot. Bureau (Nov. 2, 2022), SoFi - 010 (data showing student loan borrowers struggling to pay debts at higher rates than before the pandemic); Office of Hum. Servs. Pol'y, The Impact of the First Year of the COVID-19 Pandemic and Recession on Families With Low Incomes (Sept. 2021), SoFi - 460–61 (discussing long-term economic impacts of the pandemic and pandemic-related recession). Thus, the Secretary did not ignore the improvement in pandemic conditions and the attendant benefits to borrowers and the economy as a whole; he simply determined, based on the evidence before him, that the harms experienced by borrowers as a class had not fully dissipated. Besides, the HEROES Act expressly authorized the Secretary to act on such a class-wide basis, notwithstanding the possibility of some imprecision. *See* 20 U.S.C. § 1098bb(b)(3). While SoFi might have preferred the Secretary weigh the evidence differently, "a court may [not] displace the [agency's] choice between two fairly conflicting views, even [if] the court would justifiably have made a different choice had the matter been before it *de novo.*" *Bellion Spirits, LLC v. United States*, 393 F. Supp. 3d 5, 13 (D.D.C. 2019) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)), *aff'd*, 7 F.4th 1201 (D.C. Cir. 2021).

**2.** In a similar vein, SoFi next attacks the Secretary's authority to extend the payment pause, arguing that the COVID-19 pandemic was not a "but-for cause of the financial harm sought to be addressed" by the extension. Compl. ¶ 87 (citation omitted). In SoFi's telling, rather than seeking to ensure that borrowers were not left worse off in relation to their student loans as a result of the COVID-19 pandemic, the Secretary was instead acting to "alleviate uncertainty" and "unfairness" that

had been "caused by ongoing litigation"—problems that SoFi claims "ha[ve] *no* connection to harms caused by the pandemic itself." *Id.* (citation omitted).

The Secretary's decision and the record supporting it refute SoFi's argument. As the Secretary's decision memorandum explains, pandemic-related financial harms to borrowers were the central factor necessitating action. *See* SoFi - 001–002 ("I have made this determination because of the financial impacts the COVID-19 national emergency has had on student loan borrowers, and to ensure that such borrowers are not in a worse position financially due to that national emergency."). To be sure, the Secretary's decision was not made *in vacuo*. But to the extent that the Secretary expressed concern about the "uncertainty" and "unfairness" precipitated by court decisions blocking the Department from implementing the loan-forgiveness program, *see* Compl. ¶ 87, those concerns only arose because of the impact the pandemic had on borrowers' financial health.

The administrative record reflects all of this. As the Secretary's decision memorandums reveal, the student-loan forgiveness program had been adopted by the Secretary for substantially the same reasons that the Secretary found it necessary to extend the pause. *Compare* SoFi - 001–002 *with* SoFi - 297–299. In particular, evidence before the Secretary showed that student-loan borrowers remained under significant financial pressure that was, in important respects, worse than before the pandemic, and that many would face a risk of delinquency and default as their loans were placed back into repayment. *See, e.g.,* SoFi - 012 ("Not only has the share of student loan borrowers with delinquencies on other debts trended upwards since mid-2021, but more student loan borrowers face higher monthly payments on non-student loans."). Further analyses considered by the Secretary showed that this risk was likely to be heightened due to the long period of forbearance. *See* SoFi - 299–300. These data may not have been perfect, but the Secretary was entitled to interpret the information reasonably, and he did not need to commission an exhaustive study to confirm his findings before acting. *See Prometheus Radio Project*, 141 S. Ct. at 1159–60. Indeed, "predictive judgments about areas that are within the agency's field of discretion and expertise" are entitled to "particularly deferential" treatment. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983).

So when the Secretary's plan for restarting payments was upended less than two months before borrowers were to enter repayment, it was entirely reasonable not to simply charge ahead without adjustment, especially when tens of millions of borrowers had been told some or all of their loans would be forgiven and there was only a short time left for the Department to communicate with borrowers and servicers about the new court-ordered reality. *See* SoFi - 005 (describing how confusion among borrowers was likely to lead to an even higher rate of delinquency and default). It was in this context, acting against the backdrop of the established economic harms of the pandemic, the known risks to borrowers of resuming payments in the absence of other measures, and a heightened potential for borrower confusion—that the Secretary determined that a limited-duration extension of the pause was appropriate. The ongoing litigation over the student-loan forgiveness program certainly contributed to the problem the Secretary was forced to confront in November 2022. But the harms the Secretary sought to address "would not have occurred in the absence of—that is, but for"—the COVID-19 pandemic and the national emergency it caused. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013) (citation omitted). So the national emergency and the harms it inflicted on borrowers remained the but-for cause of the harms the Secretary sought to redress.

**3.** In a related objection, SoFi accuses the Secretary of structuring the extension in a manner inconsistent with his authority under the HEROES Act. *See* Compl. ¶ 88. In particular, SoFi argues that the Secretary lacked authority to tie the pause extension's expiration date to the resolution of ongoing litigation concerning a loan-forgiveness plan available only to some borrowers, while simultaneously providing the extension to all borrowers. *See id.* Again, this is not so much a question of the Secretary's authority—pausing student-loan payments and interest accrual are clearly a permissible form of relief available to the Secretary under the HEROES Act, and one that has been provided often, without challenge—as it is a challenge to the reasonableness of the Secretary's choice to extend that relief in this case. Here again, the Court should find that the Secretary's choice was reasonable.

As explained above, the Secretary already had determined that the eventual resumption of student-loan payments needed to be paired with some form of additional relief for borrowers that

would smooth borrowers' exit from the pandemic-necessitated pause. *See* SoFi - 297–99. Yet intervening court decisions meant that, as of November 2022, payments were set to resume without that necessary relief, even for borrowers whose applications for loan discharge had been *approved*. *See* SoFi - 004. This fact only heightened the Secretary's concern about the economic fallout for borrowers resulting from a poorly choreographed restart to long-paused student-loan payments. *See* SoFi - 005 (describing how restarting payments in this context "will create exactly the financial harms due to heightened delinquency and default that the Program was intended to prevent"). There were also substantial concerns about the Department's ability to respond adequately to the situation and assist borrowers in adjusting to the new possibility that their payment obligations would resume without any further forms of relief. *See id.* (describing anticipated difficulties in communicating new expectations to borrowers and the probability of substantial strain on administrative systems).

Given the situation facing the Department and borrowers—with less than two months to act to protect borrowers from the predictable harms that were likely to befall them upon the resumption of payments—the Secretary reasonably opted for the most administratively feasible option available to "ensure that" no affected individual would be left worse off in relation to their student-loan obligations as a result of the pandemic: One brief extension of the pause that had proved so crucial for many over the course of the pandemic. Extending the pause until 60 days after the resolution of the then-pending litigation would enable the Department to either implement its planned loan forgiveness prior to restarting payments, or alternatively allow the Department sufficient time to devise a new plan and communicate with borrowers and servicers in a manner that minimized the risk that borrowers would be placed in financial jeopardy upon the resumption of payments. This choice was reasonable, and the Secretary appropriately structured the extension to redress the pandemic-related harms that justified him in exercising his authority under the HEROES Act in the first place.

## C. The Major Questions Doctrine Does Not Undermine the Clear Statutory Authorization Provided by the HEROES Act.

SoFi's attempt to invoke the major questions doctrine likewise fails. See Compl. ¶¶ 7, 89. In a few extraordinary cases, the Supreme Court has required "clear congressional authorization" for

sweeping agency action where, "under more 'ordinary' circumstances," a "merely plausible textual basis" for that action might suffice under standard principles of statutory interpretation. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), *remanded sub nom.*, *Am. Lung Ass'n v. EPA*, No. 19-1140, 2022 WL 15163000 (D.C. Cir. Oct. 27, 2022); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'") (citation omitted). This is not such an extraordinary case.

That is not to deny that the Secretary's administration of federal student-loan programs is a matter of economic and political significance; many cases challenging national policies are. But not every agency action of economic and political significance triggers the doctrine, *contra* Compl. ¶ 24. Rather, the hallmark of an exceptional "major questions case" is a marked incongruence between the regulatory action at issue and the history, purpose, or context of the statute that purportedly authorizes it. Thus, the Supreme Court has applied the doctrine to regulatory action that advanced "novel reading[s]" of longstanding statutes, *West Virginia*, 142 S. Ct. at 2605, in order to claim "extravagant statutory power over the national economy," id. at 2609, and made "decisions of vast economic and political significance," *id.* at 2605 (citation omitted), without firm indication that Congress intended to grant that authority. *See also Utility Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014) (requiring clear congressional authorization "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" and the challenged action would "bring about an enormous and transformative expansion in … regulatory authority").

This case bears none of these features. Most fundamentally, this case does not involve any assertion of "regulatory authority," but rather the exercise of discretionary authority over a government benefit program to relieve burdens on program beneficiaries. Every case in which the Supreme Court has invoked the major-questions doctrine to invalidate agency action involved an assertion of the power to regulate—not simply the provision of government benefits. Offering student borrowers an extension to a temporary pause on payment obligations does not regulate anyone—and certainly not bystanders like SoFi.

24

Furthermore, the Secretary's action to temporarily extend a pause on payments and interest accrual is consistent with and proportional to the clearly apparent purposes of the HEROES Act. The Act's central provision, Section 1098bb, is all about getting student-loan-related relief to affected borrowers in "response to military contingencies and national emergencies." 20 U.S.C. § 1098bb. It is unsurprising, then, that the Secretary relied on that provision to grant relief from payments and interest to federal student loan borrowers facing harm from the COVID-19 pandemic, given that litigation over the one-time, targeted debt relief would have forced borrowers to abruptly resume paying debts that, absent injunctions, they would not owe. *See* SoFi - 002. And the relief the Secretary afforded in the most-recent pause is proportional and tied to the circumstances necessitating it: The pause will end "two months after the Department is permitted to implement the Program or [when] the litigation is resolved—but no later than 60 days after June 30, 2023." SoFi – 002. That extension (the only decision SoFi challenges) does not remotely resemble a major-questions case. That the pandemic-related payment pauses have outlasted other, military- or disaster-connected forbearances simply reflects the the vastly greater scope of the relevant national emergency and the economic devastation it wrought, not any different understanding of the reach of the HEROES Act during its first 19 years of existence. See *Missouri v. Biden*, 142 S. Ct. 647, 653 (2022) (upholding agency action that went "further than what the Secretary has done in the past" to achieve statutory objective, in part because the agency "never had to address an infection problem of [the] scale and scope [of COVID-19] before").

Moreover, there is nothing "cryptic," *Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), or "ancillary," *West Virginia*, 142 S. Ct. at 2605, about the Act's provisions, which operate together, through unambiguous language, to give the Secretary maximum flexibility to prevent affected borrowers from suffering financially with respect to their financial assistance as a result of an emergency. *See, e.g.*, 20 U.S.C. § 1098bb(a)(1) (providing waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section"); *id.* §§ 1098bb(b)(1), (d) (waiving certain procedural requirements); *id.* §

1098bb(b)(3) (clarifying that the Secretary need not exercise waiver or modification authority "on a case-by-case basis").

All of that distinguishes this case from *West Virginia*. The Court found there that the agency action at issue involved the use of what the Court described as a "little-used backwater" provision of the Clean Air Act to impose a 10% energy rate hike, permanently shut down many power plants, inflict a $1 trillion loss to GDP, and require a complete reorganization of American energy infrastructure. 142 S. Ct. at 2604, 2613. In that context, the Court concluded that some "skepticism" of the agency's position might have been warranted. Id. at 2614. But nothing of the sort is justified here, where the Secretary has granted a temporary measure of relief from monthly payments and interest accrual to certain borrowers affected by the COVID-19 pandemic pursuant to the central provision of a statute whose purpose is the provision of substantial loan-related relief to borrowers during a war or national emergency.

Nor is this a case in which SoFi could argue that the agency lacks comparative expertise in making the relevant policy decisions. *See West Virginia*, 142 S. Ct. at 2612–13 ("[W]hen an agency has no comparative expertise in making certain policy judgments, we have said, Congress presumably would not task it with doing so.") (internal quotation omitted). The Secretary of Education is in the business of administering the federal student financial aid programs and, in myriad circumstances, providing appropriate relief from federal student loan repayment obligations. And the Secretary's action is limited to providing relief within the confines of the programs he has long administered— he has not purported to use HEROES Act authority in a manner that would expand the jurisdiction of his Department. This too distinguishes this case from major-questions cases where agencies exercised authority in unaccustomed areas. *See, e.g., Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 ("The moratorium intrudes into an area that is the particular domain of state law: the landlord- tenant relationship."); *Brown & Williamson*, 529 U.S. at 159-60 ("Congress [has] … squarely rejected proposals to give the FDA jurisdiction over tobacco.").

Finally, the Secretary's use of HEROES Act authority to delay the resumption of payments and interest accrual cannot fairly be characterized as an "unheralded power," that transforms the

Department's "regulatory authority," *West Virginia*, 142 S. Ct. at 2610, or a delegation that Congress could not have intended. Congress has vested the Secretary with extensive authority to grant forbearances, deferments, and even to reduce or eliminate borrowers' debt obligations under the federal student loan programs. This authority, which dates back nearly six decades to the enactment of the HEA in 1965, is foundational to the Secretary's power to administer the federal student loan programs. The statute granted the Secretary the fundamental legal power to "compromise, waive, or release" any "right, title, claim, lien, or demand" acquired in the Secretary's performance of his vested "functions, powers, and duties," and to "consent to modification, with respect to rate of interest, time of payment of any installment or principal and interest … or any other provision of any note or other [financial] instrument." *E.g.*, 20 U.S.C. § 1082(a)(4),(6).

In any event, the text of the HEROES Act shows that Congress anticipated that the Secretary might have to use his authority broadly. In granting the Secretary wide latitude to waive or modify "any" statutory or regulatory provision applicable to the federal student loan programs, *id.* § 1098bb(a)(1), Congress did not "use oblique or elliptical language," nor provide a potentially broad delegation "through 'modest words,' 'vague terms,' or 'subtle devices.'" *West Virginia*, 142 S. Ct. at 2609 (citation omitted). Indeed, it would have been hard for Congress to more clearly express its intent to provide the Secretary, during a national emergency, with maximum flexibility to provide appropriate relief to student loan borrowers facing extraordinary and unforeseen circumstances. If there could have been any question whether Congress in fact meant to empower the Secretary to waive or modify any statutory or regulatory provision applicable to federal student loan programs, Congress eliminated all doubt by granting that authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to" the HEROES Act. 20 U.S.C. § 1098bb(a)(1).

The analysis of an agency's statutory authority "begins with the statutory text"—and, when the text is clear, it "ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citation omitted). Courts may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020).

27

Because the Secretary here can point to "'clear congressional authorization' for the power [he] claims," SoFi's attempt to invoke the major-questions doctrine is meritless.

### III.   Temporarily Pausing Payments to Avert a Wave of Delinquency and Default was Neither Arbitrary nor Capricious.

SoFi's substantive APA challenge is equally doomed. Relying on the press release announcing the most-recent extension, *see* Compl. ¶¶ 8, 64-65, SoFi claims that the Secretary did not "make any attempt to explain why the current extension satisfie[d] the [HEROES] Act's statutory requirements" and that his "asserted justification fails even on its own terms" because the extension applies to all borrowers, rather than only those eligible for targeted debt relief, *id.* ¶ 8. But the focal point for review is the extensive administrative record produced by the agency, *see Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985), not its press release, and that record amply supports the Secretary's choices.

As an initial matter, the APA does not permit the Court to set aside the Secretary's decision simply because SoFi would have preferred a swifter resumption of payments and interest accrual, regardless of the damage that might inflict on borrowers. Rather, this Court may invalidate the decision only if it concludes that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is not arbitrary and capricious unless the agency has "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Insurance Co.*, 463 U.S. 29, 43 (1983)). A court's review is "narrow," limited to determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43). The Court "is not to substitute its judgment for that of the agency," and

ultimately, the question before the Court is simply whether the agency's decision "was the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 43, 52.

Indeed courts "'presume the validity' of the agency's action," which a plaintiff "can overcome only by demonstrating that the [it] constitutes a 'clear error of judgment.'" *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002) (citations omitted). The standard essentially requires "that agency action be reasonable and reasonably explained." *Prometheus Radio Project*, 141 S. Ct. at 1158. In other words, SoFi's burden in overcoming the Secretary's judgment is substantial.

*1. The Secretary reasonably explained his decision.*

SoFi first claims that, "[w]hile prior extensions were ostensibly based on the HEROES Act, the Secretary made no attempt to explain why the eighth extension was an appropriate exercise of authority under the Act," Compl. ¶ 95. This argument is entirely derivative of SoFi's excess-of-statutory authority claim. As explained *supra* Section II, the Secretary's decision memorandum thoroughly explained the bases for his decision that a brief further extension was necessary to avoid "exactly the financial harms that the [forgiveness] Program was intended to prevent," because resumption of payments *without* implementation of the forgiveness plan risked placing millions of borrowers "in a worse position financially due to" the COVID national emergency. SoFi – 002.

The supporting rationale on which the Secretary relied provides further evidence of the agency's careful decisionmaking process. First, the agency relied on its expertise and previous experience with borrowers entering repayment "after long periods of forbearance" to determine that abruptly resuming payments could "negat[e] the benefits of the pause" by sparking a wave of delinquencies and default. SoFi – 005. "Borrowers in default are ineligible for deferments or forbearances, face negative credit reporting, lose eligibility for further federal student aid, are charged collection fees, and can have their tax refunds and Social Security payments withheld, and have their wages garnished." *Id.* Judicial review under the arbitrary-and-capricious standard is at its most deferential "in matters implicating predictive judgments," where certainty cannot be expected, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), and here the Secretary reasonably relied

on the evidence before him to determine that an extension of the pause was warranted to prevent these harms from occurring.

Second, the agency found that the likelihood of delinquency "will be compounded by borrower confusion," since *16 million borrowers* already had been approved for debt relief; another 10 million were awaiting resolution of their applications for loan forgiveness; and "roughly 45 percent of eligible borrowers would see their loans completely eliminated, and the rest could see lower required monthly payments." SoFi – 005. There is no merit to SoFi's charge that, in weighing these data, the Secretary relied on a factor Congress did not intend him to consider, *see* Compl. ¶ 96; the Secretary fully explained his reliance on the factors required by the HEROES Act, so there is nothing unlawful in his *also* considering the plight of borrowers who could be forced into repayment without knowing whether they in fact owe any student-loan debt and, if so, what balance remains. The D.C. Circuit has instructed courts to maintain "reluctance to infer from congressional silence an intention to preclude the agency from considering [additional] factors other than those listed in a statute," *George E. Warren Corp. v. EPA*, 159 F.3d 616, 624 (1998). And particularly here—where an individual's outstanding loan balance is plainly related to their financial position, *i.e.*, the critical statutory factor under the Act— there was nothing arbitrary nor capricious in considering it.

Third, the Secretary considered the practical consequences to the agency, servicers, and other borrowers that this confusion likely would spark. "[B]orrowers can be expected to seek forbearances or deferments while the litigation plays out," which, the agency found, would strain servicer capacity, "leading to higher wait times and call abandonment rates and diverting customer service representatives from helping borrowers access other benefits like Public Service Loan Forgiveness and Income-Driven Repayment." SoFi – 0005.

The Secretary also considered the fact that the potential harms to borrowers cannot easily be rectified by refunds to borrowers after the fact should the targeted debt-relief program later go into effect. SoFi – 005. Many borrowers anticipating debt relief, and whom over the past three years have grown accustomed to not making student loan payments, would be forced "to choose between paying their student loans" and other needs, which "could lead to loss of housing and transportation, or the

inability to meet other basic needs," and harm borrowers' credit, which can cause a host of problems including inability to obtain a mortgage or auto loan. *Id.* With only weeks remaining before payments were set to resume, there was nothing arbitrary or capricious in taking into account these additional potential harms.

2.  *The Secretary considered various alternatives.*

SoFi next claims that the Secretary's decision "fails even on its own terms" because he extended the payment pause and zero-interest protections to all federal borrowers, when "the Administration" could have "easily identified" borrowers who will not qualify for forgiveness and restarted monthly payments and interest accrual for only those individuals. *See* Compl. ¶ 97. Not so: The Secretary considered not only SoFi's preferred alternative, but several others, and determined each was unworkable or impracticable.

First, the Secretary considered an extension of the payment pause only for borrowers whose incomes rendered them eligible for targeted loan forgiveness. SoFi – 007. Although that option "would be well targeted to the harms [the Department] [is] trying to address," it was "operationally infeasible" because the Department lacked "income information on its portfolio of borrowers" and knew of no method for obtaining reliable income data on tens of millions of individuals. *Id.* Second, he considered extending the pause only for the 26 million borrowers who already had applied for forgiveness. But that option would be dramatically underinclusive and arbitrary, because the injunctions blocking debt relief had forced the Department to shut down the application system at a time when *100,000 applications daily* were being filed—meaning a great number of eligible borrowers would be omitted merely because they had not yet applied when injunctions issued.

Third, the Secretary considered a hybrid approach where the pause would be extended automatically for the 26 million borrowers with pending applications while other borrowers who believed they should be eligible for forgiveness could opt in to the extended pause. That option was rejected because it would require the Department to "build[] an entirely new system to process the applications to opt in that is consistent with current court orders"—a herculean task in the 6 weeks remaining before the scheduled restart of payments—and, even if the Department might have

31

accomplished it, requiring borrowers to learn about and utilize the novel application system would run afoul of "one of the purposes of the HEROES Act," "the minimization of administrative requirements on affected individuals." *Id.* Fourth, the Secretary considered extending the pause only as to borrowers with loan balances below $10,000 (or $20,000 for Pell recipients). Although that option would be the easiest to implement, increased efficiency would come with greater arbitrariness: That option would omit many borrowers with approved applications for forgiveness whose balances happened to exceed the limit, even by a small amount, while sweeping in some borrowers whose incomes rendered them *ineligible* for forgiveness but who happened to have small loan balances. SoFi – 007-008. Fifth, the Secretary considered extending the pause only for the first $10,000 or $20,000 in loans and allowing payments to resume on the remainder. That option was totally unworkable, however, since it is not possible "to pause part of a loan and put the rest of a loan back into repayment," so the Department would instead need to select the highest interest loans for a particular borrower of "at least the debt relief amount and extend the payment pause only for those loans," which would end up "being inequitable because borrowers with higher balance consolidation loans would receive a larger benefit than borrowers with multiple smaller loans." SoFi – 008. That option also would lead to a high risk of servicer errors because of its complexity. *Id.*

As the administrative record shows, the Secretary weighed multiple options and selected the choice most tailored to the problem before him, relying on the HEROES Act's criteria. SoFi's insistence that the Secretary instead should have selected a choice that might boost its own revenue— at the expense of borrowers and agency resources—is baseless.

     *3.   SoFi's reliance on the waning public-health emergency is misplaced.*

Nor did the Secretary err by "ignor[ing]" "the substantial change in the pandemic that has occurred in more than two years" or by selecting a policy that runs counter to the evidence before him, *contra* Compl. ¶¶ 98-99. SoFi's complaint attempts to slip in extra-statutory restraints on the Secretary's HEROES Act authority by alleging he must explain why the extension "is aimed at only individuals 'affected' by *the current stage of the pandemic*" and how it "avoids harm arising 'because of' the pandemic's *current effects*." Compl. ¶ 95 (emphases added). These temporal limitations lack any textual

basis; the Secretary reasonably determined these measures were necessary because of the *financial impacts* of the pandemic, SoFi – 002, not due to health-related metrics such as hospitalizations or deaths. After all, the relevant action here is not, as SoFi portrays, a *public-health* measure, but instead a discretionary grant of limited-duration relief to mitigate the *economic consequences* of a public-health emergency. That the immediate health crisis has abated says nothing about whether the Secretary rationally determined that millions of borrowers affected by the national disaster risk being placed in a worse position financially with respect to their loans, and the statute did not require the Secretary to focus myopically on the current "stage" of the pandemic. Moreover, both the targeted forgiveness plan and the extension necessitated by the Secretary's inability to implement it were part of the administration's plan to return federal student loans to their normal payment and interest status— which is undeniably a recognition of and reaction to the ending of the national emergency.

## IV.   The HEROES Act Provides For An Expedited Process That Does Not Include Notice-and-Comment Procedures.

SoFi's final claim is that the challenged payment pause extension was not adopted through the notice-and-comment procedures required by the APA. Compl. ¶ 103. That argument is meritless because the HEROES Act expressly exempts the Secretary from complying with "section 553 of title 5,"—*i.e.*, the APA's notice-and-comment requirement—when issuing waivers and modifications under the Act. *See* 20 U.S.C. § 1098bb(b)(1) ("Notwithstanding … section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section"). Simply put, "the Secretary may waive or modify any provision without notice and comment under the HEROES Act." *Brown v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, 2022 WL 16858525, at *11 (N.D. Tex. Nov. 10, 2022). So-Fi's procedural claim is thus unambiguously foreclosed by the plain text of the HEROES Act, which "expressly exempts the agency's rules from notice and comment" in this context. *Id.* at *10.

SoFi contorts the HEROES Act notice-and-comment exemption to instead impose *additional* procedural requirements, over and above those generally applicable to agency actions. *See* Compl. ¶ 8 (asserting that the HEROES Act requires the Department "to provide *more* public notice than regular

agency rulemaking"). But SoFi gets there only through an obvious misreading of the statute's plain text. The "notwithstanding" clause of Section 1098bb(b)(1) applies to the APA's provision on rulemaking requirements—5 U.S.C. § 553—in its entirety; not, as SoFi would have it, only to the subsection of that statutory provision that "provide[s] certain limited 'except[ions]' to the APA's notice-and-comment requirements." Compl. ¶ 37 (quoting 5 U.S.C. § 553(a)). The HEROES Act permits the Secretary to respond deftly to emergency situations by waiving or modifying otherwise-applicable legal provisions "without obstruction from the notice and comment requirements." *Brown*, 2022 WL 16858525, at *10 n.15. There is no basis for SoFi's illogical and atextual argument that Congress instead made agency action in the emergency situations addressed by the HEROES Act *more* cumbersome by eliminating otherwise-applicable exceptions to notice-and-comment rulemaking.

Ultimately, all the HEROES Act requires is that the Secretary publish the relevant waivers or modifications "by notice in the Federal Register." 20 U.S.C. § 1098bb(b)(1). As to this requirement, SoFi's complaint contains only the cursory, one-sentence allegation that the Secretary "did not publish" the challenged payment pause extension in the Federal Register. Compl. ¶ 105. As discussed above, that observation provides no basis to invalidate the Secretary's action. *See supra* Section II. The HEROES Act imposes no timing requirement, *see Gonzalez-Vera v. Townley*, 83 F. Supp. 3d 306, 311 (D.D.C. 2015) ("[T]his Court will not rewrite the law to *infer* a deadline that Congress has not proposed, voted upon, or approved."), and even if SoFi were able to prove a violation of the purely notice-giving provision it invokes, SoFi cannot carry its burden of showing prejudice. *See, e.g., Zevallos v. Obama*, 793 F.3d 106, 115 (D.C. Cir. 2015) ("We will not invalidate [agency action] based on procedural error unless the errors could have affected the outcome.").

## CONCLUSION

Because SoFi's goal of profiting from student-loan borrowers directly conflicts with Congress's purpose in enacting both the HEROES Act and the Higher Education Act, SoFi lacks a cause of action and this suit should be dismissed. In the alternative, summary judgment should be granted for Defendants because the most-recent extension of the payment pause met all legal requirements.

34

Dated: May 15, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Kate Talmor*
KATE TALMOR (Md. Bar)
R. CHARLIE MERRITT
CODY T. KNAPP
SAMUEL REBO
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-5267
kate.talmor@usdoj.gov

*Counsel for Defendants*