# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

SOFI BANK, N.A. and SOFI LENDING CORP.,

*Plaintiffs*,

v.

MIGUEL CARDONA, in his official capacity as
Secretary of Education, and UNITED STATES
DEPARTMENT OF EDUCATION,

*Defendants*.

Civil Action No. 23-CV-599-TSC

---

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.      STATUTORY AND REGULATORY FRAMEWORK ...................................................... 3

        A.     Student Loans under the Higher Education Act ...................................... 3

        B.     The HEROES Act ................................................................................. 4

II.     FACTUAL BACKGROUND ..................................................................................... 5

        A.     The Student Loan Extensions ................................................................. 5

        B.     The Debt-Cancellation Program .............................................................. 7

        C.     The Eighth Extension .............................................................................. 9

ARGUMENT ........................................................................................................ 10

I.      THE EIGHTH EXTENSION WAS ISSUED WITHOUT OBSERVANCE OF
PROCEDURES REQUIRED BY LAW .................................................................... 10

II.     THE EIGHTH EXTENSION EXCEEDS THE SECRETARY'S STATUTORY AUTHORITY .............. 15

        A.     The Eighth Extension Is Not Properly Limited to Remedying
Direct Economic Hardship Suffered Because of the Pandemic ........................... 16

        B.     The Department's Attempts to Justify the Eighth Extension Fail ....................... 21

               1.   The extension was not based on direct economic hardship ........................... 22

               2.   The extension covers millions of borrowers known to be
ineligible ..................................................................................... 23

        C.     Any Doubts Must Be Resolved in Favor of a Narrow Construction
of the Statute under the Major Questions Doctrine ................................... 26

III.    THE EIGHTH EXTENSION IS ARBITRARY AND CAPRICIOUS ................................... 29

        A.     The Secretary Failed to Justify Providing Relief to All Borrowers ..................... 30

        B.     The Secretary Failed to Consider Restarting the Accumulation of
Interest on Outstanding Principal .............................................................. 32

        C.     The Secretary Failed to Address Materially Changed
Circumstances ..................................................................................... 33

        D.     The Secretary Ignored Countervailing Reliance and Fairness
Interests ............................................................................................... 36

IV.   SOFI HAS A CAUSE OF ACTION UNDER THE APA .............................................. 38

CONCLUSION ..................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Fruit Co. v. Barrett*,
494 U.S. 638 (1990)................................................................................20

\* *Ala. Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021)..........................................18, 19, 23, 26, 27, 35

*Amgen, Inc. v. Smith*,
357 F.3d 103 (D.C. Cir. 2004).................................................................42

*Asiana Airlines v. FAA*,
134 F.3d 393 (D.C. Cir. 1998).................................................................10

\* *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. Of Governors*,
745 F.2d 677 (D.C. Cir. 1984).................................................................10

*Atl. Richfield Co. v. Christian*,
140 S. Ct. 1335 (2020).............................................................................12

*Bechtel v. FCC*,
957 F.2d 873 (D.C. Cir. 1992).................................................................33

*Biden v. Nebraska*,
143 S. Ct. 477 (2022).................................................................................8

*Brown v. U.S. Dep't of Educ.*,
No. 22-CV-908, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022)............8

*Cement Kiln Recycling Coal. V. EPA*,
493 F.3d 207 (D.C. Cir. 2007).................................................................11

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993)...................................................................................12

*Citizens Exposing Truth About Casinos v. Kempthorne*,
492 F.3d 460 (D.C. Cir. 2007)...........................................................41, 43

*COMPTEL v. FCC*,
978 F.3d 1325 (D.C. Cir. 2020)...............................................................33

*Copper & Brass Fabricators Council, Inc. v. Dep't of Treasury*,
679 F.2d 951 (D.C. Cir. 1982).................................................................44

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
   33 F.4th 584 (D.C. Cir. 2022) ..........................................................39, 41

*Dep't of Educ. v. Brown*,
   143 S. Ct. 541 (2022) ...............................................................................9

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ...........................................21, 29, 33, 36, 37

*First Nat'l Bank & Trust Co. v. NCUA*,
   988 F.2d 1272 (D.C. Cir. 1993) ..................................................40, 44, 45

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ..........................................................34

*Glass Packaging Inst. v. Regan*,
   737 F.2d 1083 (D.C. Cir. 1984) ..........................................................44

*Hazardous Waste Treatment Council v. EPA*,
   861 F.2d 277, 283 n.2 (1988) ..............................................................44

*Hazardous Waste Treatment Council v. Thomas*,
   885 F.2d 918 (D.C. Cir. 1989) ..........................................................44

*Honeywell Int'l Inc. v. EPA*,
   374 F.3d 1363 (D.C. Cir. 2004) ..................................................39, 40, 42

*King v. Burwell*,
   576 U.S. 473 (2015) ...............................................................................29

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ...............................................................................28

*Marcato v. U.S. Agency for Int'l Dev.*,
   11 F.4th 781 (D.C. Cir. 2021) ..............................................................16

*Marcello v. Bonds*,
   349 U.S. 302 (1955) ...............................................................................10

\* *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ..............................................39, 40, 43, 44

*Merck & Co. v. HHS*,
   962 F.3d 531 (2020) ...............................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................37-38

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
  522 U.S. 479 (1998)............................................................................................43, 44

*Nebraska v. Biden*,
  52 F.4th 1044 (8th Cir. 2022) ...............................................................................8, 38

*Nebraska v. Biden*,
  No. 22-CV-1040, 2022 WL 11728905 (E.D. Mo. Oct. 20, 2022).............................8

*NFIB v. OSHA*,
  142 S. Ct. 661 (2022)......................................................................................25, 26, 31

*Ngou v. Schweiker*,
  535 F. Supp. 1214 (D.D.C. 1982) ...............................................................................20

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021).............................................................................................. 16-17

*NLRB v. SW Gen., Inc.*,
  580 U.S. 288 (2017).........................................................................................................11

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
  494 F.3d 188 (D.C. Cir. 2007)......................................................................................31

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011).................................................................................33, 34

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).........................................................................................................25

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002).........................................................................................15

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014).........................................................................................................28

* *West Virginia v. EPA*,
  142 S. Ct. 2587 (2022).............................................................. 27, 27-28, 28, 29

**Statutes**

5 U.S.C.

  § 553 ...............................................................................................................................5

  § 553(b) .........................................................................................................................10

  § 553(b)(B) ....................................................................................................................10

§ 553(c) ...............................................................................................................10

§ 553(d) ...............................................................................................................10

§ 559 ....................................................................................................................10

§ 702 ....................................................................................................................39

§ 706(2)(A) ..........................................................................................................29

§ 706(2)(D) .................................................................................................10, 15

5a U.S.C.

§ 101 *et seq.* ........................................................................................................12

§ 102 ....................................................................................................................12

§ 110 ....................................................................................................................12

16 U.S.C. § 460m-3 ....................................................................................................15

19 U.S.C. § 2578a(c) ..................................................................................................15

20 U.S.C.

§ 1070 *et seq.* ........................................................................................................3

§ 1070(a) ..............................................................................................................41

§ 1071 *et seq.* ........................................................................................................4

§ 1077a ................................................................................................................41

§ 1087a *et seq.* ......................................................................................................4

§ 1087aa *et seq.* ....................................................................................................4

§ 1087dd ..............................................................................................................41

§ 1087e ................................................................................................................41

§ 1087e(m) ..........................................................................................................37

§ 1098a(a)(1) .......................................................................................................41

§ 1098bb(a) ............................................................................................................5

§ 1098bb(a)(1) .......................................................................................12, 15, 16, 20

§ 1098bb(a)(2) ................................................................15, 20, 25, 33, 41, 44

§ 1098bb(a)(2)(A) ..............................................................1, 16, 17, 35

§ 1098bb(a)(2)(B) ............................................................................42

§ 1098bb(b) ......................................................................................41

§ 1098bb(b)(1) .....................................................................2, 5, 11, 14, 22

§ 1098bb(b)(3) ................................................................................26

§ 1098bb(c) ......................................................................................42

§ 1098ee(2) ........................................................................................5

§ 1098ee(2)(C) ................................................................................17

§ 1098ee(2)(D) ..................................................1, 15, 16, 17, 20, 22, 23, 33

29 U.S.C. § 655(a) ................................................................................14

42 U.S.C.

§ 264(a) ......................................................................................18, 20

§ 8275 ...........................................................................................14

§ 11825(b)(1) ................................................................................15

44 U.S.C. § 1507 ................................................................................15

45 U.S.C. § 1116(a) ..........................................................................14

46 U.S.C. § 70022(a)(2)(C) ...............................................................15

50 U.S.C. § 835 ................................................................................14

Coronavirus Aid, Relief, and Economic Security (CARES) Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) ................................6, 29

Higher Education Relief Opportunities for Students (HEROES) Act,
    Pub. L. No. 107-122, 115 Stat. 2386 (2002) ...................................4

Higher Education Relief Opportunities for Students (HEROES) Act of 2003,
    Pub. L. No. 108-76, 117 Stat. 904 (2003) .......................................4

**Legislative Materials**

149 Cong. Rec. 7922 (2003) ..................................................................................4

149 Cong. Rec. S10866 (July 31, 2003) .............................................................28

149 Cong. Rec. E663 (Apr. 3, 2003) ..................................................................28

149 Cong. Rec. H2553-54 (Apr. 1, 2003) ..........................................................28

Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021)..........................7

**Other Authorities**

68 Fed. Reg. 69,312 (Dec. 12, 2003) .................................................................28

85 Fed. Reg. 79,856 (Dec. 11, 2020) ...................................................................7

86 Fed. Reg. 5,008 (Jan. 19, 2021) .......................................................................7

87 Fed. Reg. 61,512 (Oct. 12, 2022) .....................................................................7

60 Minutes, *President Biden: "The Pandemic Is Over,"* YouTube (Sept. 19, 2022), https://bit.ly/3UZpIo1 ..................................................34

Am. Fintech Council, Survey on Financial Health of Student Loan Borrowers (2021), https://bit.ly/3Ow2ypx ................................................36

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .....12

Associated Press, *Biden Ends COVID National Emergency After Congress Acts*, NPR (Apr. 11, 2023), https://bit.ly/43dCxzO ...............................10

*Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://bit.ly/3Bnweh3 ..............................6, 8

*Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause*, U.S. Dep't of Educ. (Nov. 22, 2022), https://bit.ly/3Y7V3aK...................................9, 21

*CDC Public Health Determination and Termination of Title 42 Order*, Ctrs. for Disease Control & Prevention (Apr. 1, 2022), https://bit.ly/3UDP0Yw.................................34

Cong. Rsch. Serv., Federal Student Loan Debt Cancellation: Policy Considerations (2022), https://bit.ly/3hmnO2H ..................................................4

*COVID-19 Public Health Emergency (PHE)*, U.S. Dep't of Health & Hum. Servs. (May 2023), https://bit.ly/43uPzZn.............................................10

*Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, U.S. Dep't of Educ. (Mar. 20, 2020), https://bit.ly/3FhTkqM ............................................................................6

*FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3iUhb8w ...........................................7

*Federal Student Loan Portfolio,* Fed. Student Aid, https://bit.ly/3qgfvd7 ...................................17

GAO, *U.S. Department of Education—Applicability of the Congressional Review Act to the Department of Education's Student Loan Debt Relief Website and Accompanying Federal Register Publication*, No. B-334644 (Mar. 17, 2023), https://bit.ly/3qhb5Ti .......................13

*Interest Rates for Direct Loans First Disbursed Between July 1, 2018 and June 30, 2019*, Fed. Student Aid (May 18, 2018), https://bit.ly/3MWnZ21 ...........................................................43

*Joe's Agenda for Students*, JoeBiden.com (2020), https://bit.ly/3VQk7BE...................................7

*Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, The White House (Aug. 8, 2020), https://bit.ly/3FHwSJ7 ......................................................6

Off. of Mgmt. & Budget, Statement of Administration Policy (Jan. 30, 2023), https://bit.ly/3jmdf0T................................................................................................... 9-10

*One-Time Federal Student Loan Debt Relief*, Fed. Student Aid, https://bit.ly/3iQ7urt ............. 7-8

Oral Arg. Tr., *Biden v. Nebraska*, No. 22-506 (S. Ct. Feb. 28, 2023) ..............................27, 38, 39

*Pausing Federal Student Loan Payments*, The White House (Jan. 20, 2021), https://bit.ly/3Pgg4Mm....................................................................................................6

Penn Wharton, The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact (Aug. 26, 2022), https://bit.ly/3lJifxn ..........................................................................7

Rakesh Kochhar & Jesse Bennett, *Despite the Pandemic, Wage Growth Held Firm for Most U.S. Workers, with Little Effect on Inequality*, Pew Rsch. Ctr. (Sept. 7, 2022), https://bit.ly/42aSipJ ...................................................................................................35

*Secretary DeVos Extends Student Loan Forbearance Period Through January 31, 2021, in Response to COVID-19 National Emergency*, U.S. Dep't of Educ. (Dec. 4, 2020), https://bit.ly/3YbHerW ...............................................................................................6

*Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, The White House (Aug. 6, 2021), https://bit.ly/3heemOY......................................................6

*Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, The White House (Dec. 22, 2021), https://bit.ly/3PlTP7S ...............6, 35

*Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, The White House (Apr. 6, 2022), https://bit.ly/3hijfX9 ............................6

*Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems*, Ctrs. for Disease Control & Prevention (Aug. 19, 2022), https://bit.ly/3VJSmdX ...........................................................................................34

The White House, *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States* (Sept. 20, 2022), https://bit.ly/3BqgWIr....................................................................................................17

The White House, The Biden-Harris Economic Blueprint (Sept. 2022), https://bit.ly/3MCPL1W .......................................................................................................35

*Transcript for CDC Media Telebriefing: Update on COVID-19*, Ctrs. for Disease Control & Prevention (Feb. 25, 2022), https://bit.ly/3FEoqdp.....................................................34

*Update: Three Rounds of Stimulus Checks. See How Many Went Out and for How Much*, Pandemic Oversight (Feb. 17, 2022), https://bit.ly/43bD1GI.................................................36

U.S. Gov't Accountability Off., GAO-23-106647, COVID-19 Relief: Funding and Spending as of Jan. 31, 2023 (Feb. 28, 2023), https://bit.ly/45xHZ22 ......................................................35

## INTRODUCTION

At the start of the COVID-19 pandemic, Congress enacted legislation temporarily suspending interest accrual and payments on federally held student loans. This law, commonly known as the CARES Act, was designed to alleviate acute distress to borrowers whose ability to make payments was threatened by the upheaval and dislocation of the pandemic's early stages. But after legislative authorization for the suspension expired in September 2020, the Department of Education declared an *administrative* moratorium on interest and repayment for all federal borrowers. The Department then extended the moratorium yet again; and again and again—a total of seven extensions from October 2020 through December 2022.

As authority for these extensions, the Department of Education invoked the Higher Education Relief Opportunities for Students Act, known as the HEROES Act. Enacted at the outset of the Iraq War to help avoid loan-payment defaults by troops suddenly called into active duty, the Act gives the Secretary of Education limited authority to waive certain requirements for federal borrowers when "necessary" to avoid placing those who have "suffered direct economic hardship as a direct result of" a national emergency "in a worse position financially in relation to [their federal] financial assistance because of" the emergency. 20 U.S.C. §§ 1098bb(a)(2)(A), 1098ee(2)(D). The Department repeatedly asserted that continuing the moratorium was necessary to help borrowers still struggling with the pandemic's ongoing effects. And then in August 2022, the Department invoked the Act yet again—this time to support a $519 billion program to *cancel* student debt, as well as one "final" extension of the moratorium through the end of the year.

When its loan-cancellation program stalled in litigation, however, the Department changed course. On November 22, 2022, it announced an eighth extension of the loan moratorium. Unlike the other extensions, the Department did not claim that continuing the moratorium was necessary to address harm to borrowers caused directly by the pandemic. Instead, the Department asserted

1

that the further extension was intended to alleviate "uncertainty" for borrowers during the pendency of ongoing litigation regarding the debt-cancellation program. Yet the extension applies to *all* federal borrowers, whether or not they qualify for debt cancellation. The Department also expressly tied the extension's duration to the pending litigation, requiring payments to resume 60 days after the Supreme Court's ruling (or 60 days after June 30, 2023, if no decision has issued by then). This "Eighth Extension" of the loan moratorium is unlawful on multiple grounds.

*First*, the Department issued the Eighth Extension without providing the public with notice or an opportunity to comment, as required by the Administrative Procedure Act. The Government defends this failure under a HEROES Act provision that requires the Secretary to publish waivers in the Federal Register "Notwithstanding . . . section 553 of title 5." 20 U.S.C. § 1098bb(b)(1). But "notwithstanding" language merely prioritizes one statutory instruction over another when the two conflict. Here, no conflict exists between the commands to follow notice-and-comment procedures and to publish the waivers in the Federal Register—which the Secretary has *also* failed to do.

*Second*, the Eighth Extension exceeds the Secretary's authority under the HEROES Act. The extension seeks to mitigate harm caused by "uncertainty" and "unfairness" resulting from the debt-cancellation litigation. But those putative harms do not constitute "direct economic hardship as a direct result of" the pandemic: They are neither "direct" nor "economic." And in any event, they were caused by the Secretary's own actions, which have been struck down as in excess of statutory authority by several courts, not by the pandemic itself. The Secretary's contrary view is based on the position that he is authorized to remedy any adverse condition that can be attributed, however indirectly, to a national emergency—no matter how long ago or tenuous the connection. That untenable interpretation would give the Secretary nearly unlimited powers. But even taking his view at face value, it *still* does not justify granting relief to *all* federal borrowers, including

those he has deemed ineligible for debt cancellation (and hence are unaffected by the litigation).

*Third*, the Eighth Extension is arbitrary and capricious. The Secretary acknowledged that an end to the moratorium for high-income borrowers would be "well targeted," but he proclaimed it "infeasible" to determine borrower incomes. That ignores the most obvious way to do so: asking them. But even if that were somehow infeasible, the Secretary also never considered restarting *interest accrual*, which raises none of his stated concerns about harm to borrowers from resuming payments. Worse still, the Secretary denied any need to account for how the pandemic, and the financial circumstances of borrowers in light of the pandemic, have shifted significantly over the two years since the moratorium was first instituted; indeed, by then the President had already declared that the pandemic was "over." Yet the Secretary merely asserted that nothing of significance had changed, failing even to consider modifying the Eighth Extension to account for changed circumstances since forbearance began years earlier. And the Secretary also utterly failed to consider any countervailing considerations, including fundamental reliance or fairness concerns.

*Finally*, Plaintiff SoFi has a cause of action to challenge the Eighth Extension because its interests fall comfortably within the zone implicated by the relevant statutory scheme. SoFi seeks to preserve the integrity of the financial-aid system and to promote borrower welfare by competing with the federal Government on fair and valid terms—all well-recognized bases for suit.

The Court should vacate the Eighth Extension, set it aside, and issue an injunction requiring the Secretary to end the unlawful moratorium.

## BACKGROUND

### I.   STATUTORY AND REGULATORY FRAMEWORK

#### A.   Student Loans under the Higher Education Act

Title IV of the Higher Education Act (HEA), 20 U.S.C. § 1070 *et seq.*, establishes several federal student loan programs administered by the Department of Education including, as relevant

here: The William D. Ford Federal Direct Loan program, *id.* § 1087a *et seq.*; the Federal Family Education Loan Program, *id.* § 1071 *et seq.*; and the Perkins Loan Program, *id.* § 1087aa *et seq.* Collectively, approximately 45 million American participate in these programs, with a total outstanding loan balance of more than $1.6 trillion. Cong. Rsch. Serv., Federal Student Loan Debt Cancellation: Policy Considerations 1 (2022), https://bit.ly/3hmnO2H.

### B.    The HEROES Act

In 2001, weeks after members of our Armed Forces invaded Afghanistan in Operation Enduring Freedom, Congress unanimously enacted the Higher Education Relief Opportunities for Students (HEROES) Act, Pub. L. No. 107-122, 115 Stat. 2386 (2002). The Act was reauthorized in 2003, shortly after servicemembers began deploying in large numbers to fight in Iraq. Pub. L. No. 108-76, 117 Stat. 904 (2003). The Act "provide[s] the Secretary of Education with specific waiver authority to respond to a war or other military operation or national emergency." *Id.*

In passing the HEROES Act, Congress was focused on helping servicemembers who were temporarily unable to comply with their loan-repayment obligations while deployed overseas. As one supporter explained, the Act "provides assurance to our men and women in uniform that they will not face education-related financial or administrative difficulties while they defend our Nation." 149 Cong. Rec. 7922 (2003) (Rep. Kline); *see id.* (Rep. Isakson) ("to ensure that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that their families are not harassed by collectors").

To accomplish these objectives, the HEROES Act authorizes the Secretary of Education to waive or modify certain repayment obligations under federal financial assistance programs:

**(1) In general**

Notwithstanding any other provision of law, unless enacted with specific reference to this section, the Secretary of Education (referred to in this part as the "Secretary") may waive or modify any statutory or regulatory provision applicable to the student financial

assistance programs under title IV of the Act [20 U.S.C. 1070 et seq.] as the Secretary deems *necessary* in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2).

**(2) Actions authorized**

The Secretary is authorized to waive or modify any provision described in paragraph (1) as may be *necessary* to ensure that—

(A) recipients of student financial assistance under title IV of the Act who are *affected individuals* are not placed in a worse position financially in relation to that financial assistance *because of their status as affected individuals*; . . .

20 U.S.C. § 1098bb(a) (emphases added). The statute also defines "affected individuals":

**(2) Affected individual**

The term "affected individual" means an individual who—

(A) is serving on active duty during a war or other military operation or national emergency;

(B) is performing qualifying National Guard duty during a war or other military operation or national emergency;

(C) resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency; or

(D) suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary.

*Id.* § 1098ee(2). Finally, the HEROES Act provides that, in addition to any applicable rulemaking requirements under the Administrative Procedure Act (APA), which are codified at 5 U.S.C. § 553, the Secretary must *also* publish notice of any waivers or modifications in the Federal Register:

Notwithstanding section 1232 of this title and section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section.

20 U.S.C. § 1098bb(b)(1).

## II.   FACTUAL BACKGROUND

### A.   The Student Loan Extensions

In March 2020, at the outset of the pandemic, the Department of Education announced that

it would set the interest rates on federally held student loans to 0% for "a period of at least 60 days" and would allow borrowers with such loans to suspend their payments "for at least two months." *Delivering on President Trump's Promise, Secretary DeVos Suspends Federal Student Loan Payments, Waives Interest During National Emergency*, U.S. Dep't of Educ. (Mar. 20, 2020), https://bit.ly/3FhTkqM. The Department tied this temporary relief directly to the pandemic. Then-Secretary of Education Betsy DeVos explained: "Right now, everyone should be focused on staying safe and healthy, not worrying about their student loan balance growing." *Id.*

On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES Act gave the Secretary of Education statutory authority to "suspend all payments" for federal loans held by the Department of Education until September 30, 2020, and provided that no interest would accrue for such loans during that period. *Id.* § 4513(a)-(b). It did not grant the Department authority to extend this repayment suspension beyond the September 30 deadline.

Even so, between August 2020 and August 2022, the Executive Branch issued seven additional extensions of the Loan Moratorium—at least two of which it described as "final."[1] Each time, it represented that extending the Loan Moratorium was necessary to alleviate economic

---

[1] *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://bit.ly/3Bnweh3; *Statement by President Joe Biden Extending the Pause on Student Loan Repayment*, The White House (Aug. 6, 2021), https://bit.ly/3heemOY; *see Memorandum on Continued Student Loan Payment Relief During the COVID-19 Pandemic*, The White House (Aug. 8, 2020), https://bit.ly/3FHwSJ7; *Secretary DeVos Extends Student Loan Forbearance Period Through January 31, 2021, in Response to COVID-19 National Emergency*, U.S. Dep't of Educ. (Dec. 4, 2020), https://bit.ly/3YbHerW; *Pausing Federal Student Loan Payments*, The White House (Jan. 20, 2021), https://bit.ly/3Pgg4Mm; *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, The White House (Dec. 22, 2021), https://bit.ly/3PlTP7S; *Statement by President Biden Extending the Pause on Student Loan Repayment Through August 31st, 2022*, The White House (Apr. 6, 2022), https://bit.ly/3hijfX9; *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://bit.ly/3Bnweh3.

hardship inflicted directly by the pandemic. The Department invoked the Secretary's "authority" to grant "waivers and modifications" under the HEROES Act. *See, e.g.*, 85 Fed. Reg. 79,856 (Dec. 11, 2020); 86 Fed. Reg. 5,008 (Jan. 19, 2021); 87 Fed. Reg. 61,512, 61,513-14 (Oct. 12, 2022).

The Department of Education did not, however, provide advance notice or an opportunity for public input before putting these extensions into place. Instead, the Department asserted that the HEROES Act relieved the agency of its duty under the Administrative Procedure Act to engage in notice-and-comment rulemaking. To justify forgoing public comment, the Department relied on Section 1098bb(b)(1)—the statutory provision that requires publication of waiver decisions in the Federal Register. According to the Department, that provision means that the APA's notice-and-comment requirements "do not apply" to the HEROES Act. 85 Fed. Reg. at 79,856.

### B.      The Debt-Cancellation Program

In August 2022, the Biden Administration announced a $519 billion program to *cancel* student debt. *See FACT SHEET: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://bit.ly/3iUhb8w (*Fact Sheet*); Penn Wharton, The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact 1 (Aug. 26, 2022), https://bit.ly/3lJifxn. President Biden had campaigned on student debt forgiveness, *see, e.g.*, *Joe's Agenda for Students*, JoeBiden.com (2020), https://bit.ly/3VQk7BE, but had been unable to secure the passage of debt-forgiveness legislation in office, *see, e.g.*, Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021).

The Biden Administration's debt-cancellation program seeks to cancel up to $20,000 in student debt for borrowers who earn less than $125,000 ($250,000 for married couples) and who have loans held by the federal government. *See Fact Sheet*, *supra*. The Department of Education also intends to refund payments to certain borrowers who made voluntary payments during the Loan Moratorium. *One-Time Federal Student Loan Debt Relief*, Fed. Student Aid,

https://bit.ly/3iQ7urt. In a decision memorandum addressing the debt-cancellation program, the Secretary of Education concluded that although certain borrowers would require debt cancellation before returning to repayment, other borrowers could enter repayment without cancellation. *See* SoFi-000297-298. The Administration thus began setting up a system by which qualifying borrowers could apply for debt cancellation, while simultaneously taking the "necessary steps to restart loan payments after December 31, 2022." SoFi-000298. The Secretary also extended the repayment moratorium for a seventh time, stating that the seventh extension would be the "final" one. *Id.*; *see Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://bit.ly/3Bnweh3.

Following announcement of the debt-cancellation program, six States sued the Administration, alleging that the program was unlawful. The district court dismissed the case for lack of standing, *Nebraska v. Biden*, No. 22-CV-1040, 2022 WL 11728905, (E.D. Mo. Oct. 20, 2022), but the Eighth Circuit reversed and granted the States' request for an injunction pending appeal, *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (per curiam). In a separate suit by private plaintiffs, a district court held that the debt-cancellation program was "an unconstitutional exercise of Congress's legislative power," and it vacated the program on a nationwide basis. *Brown v. U.S. Dep't of Educ.*, No. 22-CV-908, 2022 WL 16858525, at *1, *15 (N.D. Tex. Nov. 10, 2022). The Fifth Circuit denied the Government's motion for a stay pending appeal. Order, *Brown v. U.S. Dep't of Educ.*, No. 22-11115 (5th Cir. Nov. 30, 2022), ECF No. 75.

In December 2022, the Supreme Court granted certiorari in *Biden v. Nebraska* to determine whether the plaintiff States have standing and whether the debt-cancellation program exceeds the Secretary of Education's authority. *Biden v. Nebraska*, 143 S. Ct. 477 (2022). The Supreme Court

later granted certiorari before judgment in *Department of Education v. Brown*, 143 S. Ct. 541 (2022). The Supreme Court heard oral argument in both cases on February 28, 2023.

### C. The Eighth Extension

On November 22, 2022, in the midst of these legal challenges, the Department of Education announced the Eighth Extension of the Loan Moratorium. *Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Student Loan Repayment Pause*, U.S. Dep't of Educ. (Nov. 22, 2022), https://bit.ly/3Y7V3aK (*Eighth Extension Announcement*). In contrast to all seven previous extensions, the Department of Education did *not* claim that the Eighth Extension was necessary to address harm caused to borrowers affected by the COVID-19 pandemic. Instead, the Department asserted that the Eighth Extension was intended to "alleviate uncertainty for borrowers" during the pendency of the debt-cancellation litigation. *Id.* The announcement quoted Secretary Cardona's statement that "it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay, were it not for the [pending lawsuits]." *Id.* The Department also tied the extension's expiration to the pending litigation: "Payments will resume 60 days after the Department is permitted to implement the program or the litigation is resolved," and, "[i]f the program has not been implemented and the litigation has not been resolved by June 30, 2023—payments will resume 60 days after that." *Id.*

Although the Department of Education had determined months earlier that millions of borrowers could return to repayment without cancellation, the Eighth Extension continued forbearance for *all* federal borrowers, even those ineligible for cancellation under the administration's own program. SoFi-000006-8. The Department did not publish advanced notice or solicit public input before issuing the Eighth Extension.

On January 30, 2023, the Biden Administration announced that it would end the COVID-19 national emergency on May 11. Off. of Mgmt. & Budget, Statement of Administration Policy

1 (Jan. 30, 2023), https://bit.ly/3jmdf0T. On April 10, President Biden signed a bipartisan

congressional resolution ending the national emergency. Associated Press, *Biden Ends COVID*

*National Emergency After Congress Acts*, NPR (Apr. 11, 2023), https://bit.ly/43dCxzO; and a

month later, the Administration rescinded the related public health emergency, *COVID-19 Public*

*Health Emergency (PHE)*, U.S. Dep't of Health & Hum. Servs. (May 2023), https://bit.ly/43uPzZn.

## ARGUMENT

### I.  THE EIGHTH EXTENSION WAS ISSUED WITHOUT OBSERVANCE OF PROCEDURES REQUIRED BY LAW

The Eighth Extension must be set aside because it was issued "without observance of

procedure required by law." 5 U.S.C. § 706(2)(D). The Department of Education ignored

requirements imposed by the Administrative Procedure Act (APA) and by the HEROES Act.

**A.** When administrative agencies engage in substantive decision-making, the APA requires

them to undertake what is known as notice-and-comment. Leading up to a decision, they must

publish a "notice of proposed rule making" in the Federal Register, *id.* § 553(b), and must "give

interested persons an opportunity to participate in the rule making through submission of written

data, views, or arguments," *id.* § 553(c), unless they have "good cause" to skip those steps, *id.*

§ 553(b)(B). When a decision has been reached, the APA requires the agency to draft "a concise

general statement of [its] basis and purpose," *id.* § 553(c), which it must publish "not less than 30

days before its effective date," *id.* § 553(d). An agency may not circumvent these requirements

unless another law "expressly" deems them inapplicable. *Id.* § 559. "Exemptions from the terms

of the Administrative Procedure Act are not lightly to be presumed," *Marcello v. Bonds*, 349 U.S.

302, 310 (1955), and "Congress's intent" to create such an exemption must "be clear," *Ass'n of*

*Data Processing Serv. Orgs., Inc. v. Bd. of Governors*, 745 F.2d 677, 686 (D.C. Cir. 1984)

(emphasis omitted); *see Asiana Airlines v. FAA*, 134 F.3d 393, 397 (D.C. Cir. 1998).

Here, "there is no dispute that the [Eighth Extension] was not issued pursuant to APA rulemaking procedures." *Cement Kiln Recycling Coal. V. EPA*, 493 F.3d 207, 226 (D.C. Cir. 2007). Indeed, the Department of Education complied with *none* of Section 553's procedural requirements: The Department did not publish notice of the proposed extension in the Federal Register; did not give interested persons an opportunity to comment; did not publish a concise statement articulating the extension's basis and purpose; and did not delay the extension's effective date for 30 days. The Eighth Extension accordingly "should be vacated on the merits because it is a final [rule] but was promulgated in violation of the APA." *Id.* (cleaned up).

The Government nevertheless contends (at 33) that the HEROES Act "expressly exempts" the Secretary from complying with the APA's notice-and-comment requirements when invoking his authority under the Act. According to the Government, the relevant exemption is contained in Section 1098bb(b)(1), which provides:

> Notwithstanding . . . section 553 of title 5, the Secretary shall, by notice in the Federal Register, publish the waivers or modifications of statutory and regulatory provisions the Secretary deems necessary to achieve the purposes of this section.

20 U.S.C. § 1098bb(b)(1). The Government reads this provision (at 33) to mean that Congress turned off all of the APA's notice-and-comment requirements—rendering them inapplicable to exercises of authority under the HEROES Act—and replaced them with a requirement merely "by notice in the Federal Register[ to] publish the waivers or modifications." *Id.*

The Government's argument simply misunderstands the function of a "notwithstanding" clause. As the Supreme Court has explained, such a clause "just shows which of two or more provisions prevails in the event of a conflict." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). By providing a rule of construction to "resolv[e] a conflict of application," notwithstanding language "ensure[s] that the clause it introduces will absolutely, positively prevail" in circumstances where two rules may otherwise result in "contradiction [in] some applications."

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 127 (2012); *see Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("the provisions of the 'notwithstanding' section override conflicting provisions"). But although "[s]uch clauses explain what happens in the case of a clash, . . . they do not otherwise expand or contract the scope of either provision by implication." *Atl. Richfield Co. v. Christian*, 140 S. Ct. 1335, 1351 (2020).

As an example, consider a statute providing: "Notwithstanding the Ethics in Government Act, 5a U.S.C. § 101 *et seq.*, a federal judge who sits by designation on another court must file a financial disclosure twice a year." This "notwithstanding" clause signals that the specified instruction (to file a report "twice a year") prevails over the cross-referenced provision (the Ethics in Government Act) if the two conflict. Since the Ethics in Government Act requires judges to file financial disclosures only *once* a year, *see id.* § 102, the notwithstanding clause overrides that conflicting instruction for judges who sit by designation. But the clause does not render the Ethics in Government Act inapplicable in *other* respects where *no* conflict occurs—for instance, the requirement to notify the appropriate ethics official in the event of a recusal, *see id.* § 110. The clause thus functions as a "superordinating canon" (*i.e.*, a rule prioritizing one instruction over another) for resolving conflicts, *not* as a signal to ignore the cross-referenced statute in non-conflicting circumstances. Scalia & Garner, *supra*, at 127.

The limited conflict-resolution function of "notwithstanding" language is clear from Section 1098bb's other notwithstanding clause: "*Notwithstanding any other provision of law*, unless enacted with specific reference to this section, the Secretary of Education . . . may waive or modify any statutory or regulatory provision applicable to [title IV] student financial assistance programs . . . as the Secretary deems necessary in connection with a war or other military operation or national emergency . . . ." 20 U.S.C. § 1098bb(a)(1) (emphasis added). This clause means that

the Secretary may exercise his waiver authority even if doing so would be incompatible with some "other provision of law." It obviously does *not* mean that all "other provision[s] of law" are rendered inapplicable to exercises of HEROES Act authority by the Secretary. For instance, the Secretary still must comply with laws that apply generally throughout the government—*e.g.*, the Rehabilitation Act, the Anti-Deficiency Act, the debt ceiling and appropriations laws, the Freedom of Information Act, etc.—insofar as those laws do not "clash" with the HEROES Act.

Indeed, the U.S. Government Accountability Office (GAO) recently reached the same conclusion when construing Section 1098bb's first "notwithstanding" clause in the context of the Congressional Review Act (CRA), which imposes certain procedural requirements on federal agencies. *See* GAO, *U.S. Department of Education—Applicability of the Congressional Review Act to the Department of Education's Student Loan Debt Relief Website and Accompanying Federal Register Publication*, No. B-334644 (Mar. 17, 2023), https://bit.ly/3qhb5Ti. The Department of Education argued that the CRA does not apply to its loan-pause and debt-cancellation decisions "because the HEROES Act allows [the Department] to modify student loan requirements 'notwithstanding any other provision of law.'" *Id.* at 7. The GAO rejected that argument. Under Supreme Court precedent, the GAO explained, "where a law cannot be reconciled with the intent of a 'notwithstanding' clause, it is overridden." *Id.* at 8. But since "applying CRA's requirements does not interfere with and would not prevent [the Department] from carrying out emergency actions under the HEROES Act," there is no "conflict" for the notwithstanding clause to resolve. *Id.* at 9 (quotation marks omitted). Absent such a conflict, therefore, the Department must comply with both laws. *Id.*

The same reasoning explains why the Department of Education was obligated to comply with the APA's notice-and-comment requirements when issuing the Eighth Extension. There is no conflict between those requirements and the instruction in Section 1098bb(b)(1) that "the Secretary shall, by notice in the Federal Register, publish the waivers or modifications." Simply put, the

Secretary can *both* undertake notice-and-comment rulemaking *and* publish notice in the Federal Register. Instead, the potential clash is between Section 1098bb(b)(1)'s publication requirement and the good-cause *exception* to the APA's notice-and-comment requirements: Section 553(b) allows agencies to skip Federal Register publication and other procedural steps when they have "good cause" for doing so. The "notwithstanding" language in Section 1098bb(b)(1) makes clear that even when there is good cause to skip *other* requirements—such as where the need to respond quickly to a national emergency renders it impractical for the agency to solicit public comments and respond to them, or to wait 30 days before putting a waiver into effect—the Secretary still must publish notice in the Federal Register.

Had Congress wanted to render the APA's notice-and-comment requirements inapplicable to the HEROES Act, moreover, it knew how to do so. Congress routinely specifies that certain laws apply "Without regard to chapter 5 of Title 5," 29 U.S.C. § 655(a), or under another formulation that suspends APA requirements. *See, e.g.*, 42 U.S.C. § 8275 ("the Secretary shall not be subject to the requirements of section 553 of Title 5, in the performance of his functions under this part"); 45 U.S.C. § 1116(a) ("The provisions of chapters 5 and 7 of Title 5 . . . are inapplicable"); 50 U.S.C. § 835 ("Subchapter II of chapter 5 . . . of Title 5, shall not apply to the use or exercise of any authority granted by this subchapter."). Congress's choice *not* to use similar language in the HEROES Act must be respected.

**B.** The Government claims (at 34) that "all the HEROES Act requires is that the Secretary publish the relevant waivers or modifications 'by notice in the Federal Register,'" *see* 20 U.S.C. § 1098bb(b)(1), but the Government acknowledges that the Secretary has failed to comply even with that minimal requirement. The Government boldly asserts (at 34) that this failure is not a problem because "[t]he HEROES Act imposes no timing requirement." The Government seems to think the Secretary can wait years, or perhaps indefinitely. But statutory provisions routinely require agencies

to publish "notice in the Federal Register" of their decisions without specifying a deadline. *E.g.*, 16 U.S.C. § 460m-3; 19 U.S.C. § 2578a(c); 42 U.S.C. § 11825(b)(1); 46 U.S.C. § 70022(a)(2)(C). The obvious meaning of these provisions is that "notice" should be published when the decision is reached, which ensures that affected persons and entities have constructive notice of the government action close enough in time to be meaningful. *See* 44 U.S.C. § 1507. At minimum, the agency should delay statutorily required publication only for a valid reason. Here, there was no valid reason for failing to publish the Eighth Extension—and the Government does not claim otherwise.

Finally, the Government argues (at 34) that the agency's failure to comply with Section 1098bb(b)(1)'s publication requirement does not require vacatur of the Eighth Extension because the error has caused no "prejudice." Although even the Government does not dispute that this failure means that the extension was issued "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), SoFi's request for relief is instead based on the agency's failure to comply with the APA's notice-and-comment requirements—which the Government does *not* argue was harmless. Nor could it. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("utter failure to comply with notice and comment" not harmless error). That said, the Department's apparent view that it can disregard Section 1098bb(b)(1) so long as no court can stop it is troubling, further underscoring why this Court should make sure the agency complies with all other legal requirements.

## II.    THE EIGHTH EXTENSION EXCEEDS THE SECRETARY'S STATUTORY AUTHORITY

The HEROES Act provides the Secretary with authority to grant relief to borrowers as "necessary" to remedy financial harm that they have suffered "because of their status" as persons subject to "direct economic hardship as a direct result" of a national emergency. 20 U.S.C. §§ 1098bb(a)(1)-(2), 1098ee(2)(D). The Eighth Extension exceeds that limited authority in almost every respect: It grants relief to borrowers who have suffered only *indirectly*; to those who have suffered only *noneconomic* harm, including harm caused by the Secretary's own actions; and to

those for whom the Secretary has already determined such relief is *unnecessary*. The Secretary's contrary view, which stretches the statutory text beyond recognition, would afford him powers nearly unlimited in scope. This Court should reject it.

### A.    The Eighth Extension Is Not Properly Limited to Remedying Direct Economic Hardship Suffered Because of the Pandemic

As relevant here, the HEROES Act contains three interlocking provisions. First, the Secretary may waive or modify student loans terms as "*necessary* in connection with a war or other military operation or national emergency." 20 U.S.C. § 1098bb(a)(1) (emphasis added). Second, a waiver or modification must be "*necessary* to ensure that . . . affected individuals are not placed in a worse position financially in relation to that financial assistance *because of* their status as affected individuals." *Id.* § 1098bb(a)(2)(A) (emphasis added). And third, "affected individual[s]" include those who have "suffered *direct* economic hardship as a *direct result* of a war or other military operation or national emergency." *Id.* § 1098ee(2)(D) (emphasis added).

Each of the five italicized phrases requires a connection between the exercise of HEROES Act authority and emergency-related harm. For agency action "to be 'necessary' to" a statutory purpose, the D.C. Circuit has explained, "the Secretary must demonstrate an actual and discernible nexus between the rule and the [goal]." *Merck & Co. v. HHS*, 962 F.3d 531, 537-38 (2020). "In other words, the further [the action] strays from truly facilitating the [statutory purpose], the less likely it is to fall within the statutory grant of authority." *Id.* The phrase "because of" further limits the number of permissible links in the causal "chain." *Marcato v. U.S. Agency for Int'l Dev.*, 11 F.4th 781, 790 (D.C. Cir. 2021). And Congress's use of the word "direct" twice in the same sentence further underscores that any emergency-related harm—and the Secretary's efforts to address it—must be tightly connected to the exercise of his authority. When read in combination, moreover, Congress's *quintuple* emphasis requires an especially strong connection. *Cf. Niz-*

*Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (placing special emphasis on a statutory phrase because it appears "[n]ot once but twice").

The Eighth Extension exceeds the Secretary's authority under any plausible reading of this language. As an initial matter, the extension is not limited to "affected individual[s]" who have "suffered direct economic hardship as a direct result" of the pandemic. 20 U.S.C. § 1098ee(2)(D). The extension affects *all* federal borrowers. Yet the Secretary himself concluded, when limiting the availability of debt-cancellation, that only a subset of federal student loan borrowers is at "heightened risk of loan delinquency and default"—the harm that the extension seeks to avoid. SoFi-000297. And the number of borrowers who are *not* affected individuals, yet are subject to the Eighth Extension, is massive: By the Secretary's own estimate, more than five million borrowers are ineligible for debt forgiveness. *Compare* The White House, *FACT SHEET: The Biden-Harris Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States* (Sept. 20, 2022), https://bit.ly/3BqgWIr (Department estimate that 38.6 million "individuals [are] eligible for student debt relief"), *with Federal Student Loan Portfolio*, Fed. Student Aid, https://bit.ly/3qgfvd7 (estimating 43.8 million total federal borrowers). Yet all of them are still subject to the Eighth Extension.[2]

Even as to those borrowers who are eligible for debt-forgiveness, moreover, the Eighth

---

[2] The Government argues that since "each of the 50 States" was designated a COVID disaster area, borrowers other than those living and working abroad "separately qualify as 'affected individuals' based on where they 'reside' or are 'employed.'" Gov't Br. 18 (quoting 20 U.S.C. § 1098ee(2)(C)) (brackets omitted). Yet the Secretary himself did not justify the Eighth Extension on that ground. Nor could he: Even those who qualify as "affected individuals" under the disaster-area prong must still need relief "because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A). But the Secretary's theory is that borrowers are eligible because they have suffered "financial harms" from the pandemic, SoFi-000002, not because they live or work in a particular geographic area. For instance, the Secretary relies on supposed "challenges in the transition back to repayment," SoFi-000001, which are purely economic-based—not geographic-based—harms. And the debt-cancellation program, which the Government acknowledges (at 22) "contributed to the problem the Secretary was forced to confront," is similarly based only on anticipated economic harms.

Extension is not necessary "because of" their status as someone who "suffered *direct* economic hardship as a *direct* result" of the pandemic. There are numerous steps between the pandemic and the ostensible need for the current extension:

(1) The pandemic harmed the economy;

(2) this harm necessitated a temporary pause on interest accrual and loan repayment;

(3) because the pandemic has affected household finances and the Department has continued the pause for so long, some low-income borrowers will be at heightened risk of default when repayment resumes;

(4) cancelling student debts for some at-risk borrowers would protect them from defaulting;

(5) the debt-cancellation program was challenged in court and temporarily enjoined;

(6) because of the litigation, the payment pause would otherwise resume before the debt-forgiveness program can be implemented;

(7) this dynamic will produce uncertainty and unfairness for borrowers, and will leave them at heightened risk of default when repayment resumes; and

(8) the Eighth Extension is necessary to address these harms.

This relationship is hardly "direct," and also unlike the sort of emergency-related injuries that the statute contemplates—*e.g.*, temporary displacement, missed work due to illness, being furloughed.

Indeed, the Supreme Court has already rejected the Administration's attempts to justify pandemic-related relief under a far shorter chain of causation. In *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485 (2021), the Centers for Disease Control issued a moratorium prohibiting the eviction of any tenant who "live[d] in a county that [wa]s experiencing substantial or high levels of COVID-19 transmission and who ma[d]e certain declarations of financial need." *Id.* at 2486. The CDC justified the moratorium under a provision of the Public Health Service Act authorizing the Surgeon General to make and enforce regulations that "in his judgment are necessary" to prevent the spread of disease. 42 U.S.C. § 264(a). The CDC argued that "[i]f evictions occur, some subset of tenants might move from one State to another, and [a] subset of

that group might do so while infected with COVID-19." 141 S. Ct. at 2488.

The Supreme Court rejected the CDC's claim of authority as "a stretch." *Id.* Unlike measures that "directly relate to preventing the interstate spread of disease"—such as "identifying, isolating, and destroying the disease itself"—the eviction moratorium "relate[d] to interstate infection far more indirectly." *Id.* The possibility that some evicted tenants might move to another state while infected with COVID, thereby spreading the disease, amounted to a "downstream connection between eviction and the interstate spread of disease," which was insufficient to show that the moratorium was "necessary." *Id.* Indeed, under the government's interpretation, the Court noted, there would have been "no limit in [the provision] beyond the requirement that the CDC deem a measure 'necessary,'" and "the sheer scope of the CDC's claimed authority" thus "counsel[led] against the Government's interpretation." *Id.* at 2489.

The "downstream connection" here between the pandemic and the Eighth Extension is far more attenuated than the one deemed insufficient in *Alabama Association of Realtors*. For one thing, the eviction moratorium at issue there was doubly targeted at tenants who (a) were financially needy and (b) lived in an area with particularly high COVID transmission rates. The Eighth Extension, by contrast, applies indiscriminately to all borrowers, including borrowers who are in a better economic position than they were before the pandemic began. For another thing, the relationship between the challenged CDC action (stopping eviction) and the agency's goal (preventing the spread of disease) required only two steps: Some evicted tenants "might move" to another state; and some of those "might do so while infected." *Id.* at 2488. Here, as just noted, it takes *eight steps* to get from the pandemic to the ostensible need for the Eighth Extension—far more than the chain of causation labeled too "indirect[]" by the Supreme Court. *Id.* Textually, moreover, the HEROES Act requires a much *closer* connection than the Public Health Service Act

did: The Surgeon General was authorized to take any measure he deemed "necessary," 42 U.S.C. § 264(a), whereas the Secretary of Education may act only as "*necessary* in connection with a . . . national emergency," if "*necessary*" to protect individuals from harm "*because of*" the emergency, in situations where those individuals have suffered "suffered *direct* economic hardship as a *direct* result of" the emergency. 20 U.S.C. §§ 1098bb(a)(1)-(2), 1098ee(2)(D) (emphases added).

Not only is the chain of causation here far too attenuated, moreover, the Secretary's *own actions* form crucial links in the chain. The Secretary deemed debt-cancellation necessary because the "extended" duration of the loan moratorium—that is, the Secretary's own decision and actions to extend the moratorium repeatedly—could cause particular "challenges" for borrowers "in the transition back to repayment." SoFi-000297; *see* SoFi-000300 (noting "the potential for elevated risk of delinquency and default" when "student loan borrowers transition[] back into repayment after long periods of forbearance"). Next, the Secretary's own choice to initiate the debt-cancellation program led to the (inevitable) litigation challenging the program, which in turn led to the injunctive relief that supposedly created the need for the Eighth Extension. But just as "an agency may not bootstrap itself into an area in which it has no jurisdiction," *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990) (citation omitted), and just as an agency "cannot bootstrap [itself] into a position of emergency based on [its] own dilatory conduct," *Ngou v. Schweiker*, 535 F. Supp. 1214, 1216-17 (D.D.C. 1982), neither may an agency bootstrap itself into authority to remedy harms that the agency itself helped bring about.

Finally, any harm to borrowers that relates to the debt-cancellation litigation also does not qualify as "direct *economic hardship* as a direct result of" the pandemic. 20 U.S.C. § 1098ee(2)(D) (emphasis added). Each of the first seven times the Department of Education extended the loan-repayment moratorium under the HEROES Act, the agency asserted that pausing repayments for

all federal student borrowers was necessary to protect borrowers from pandemic-related harms. *See* p. 6 n.1, *supra*. In announcing the Eighth Extension, by contrast, the Secretary stated that he was "extending the payment pause because it would be deeply unfair to ask borrowers to pay a debt that they wouldn't have to pay, were it not for the baseless [debt-cancellation] lawsuits." *Eighth Extension Announcement*, *supra*. The Department also stated that the extension was intended to "alleviate uncertainty for borrowers" while the litigation proceeds. *Id.* Put aside for one moment the irony of an agency using "uncertainty" as a justification for reaching a key decision that the agency then fails to publish in the Federal Register. Regardless, "uncertainty" and "unfairness" resulting from litigation do not constitute "direct economic hardship as a direct result" of a national emergency, as would be necessary to justify granting relief under the HEROES Act. And the disjunct between the pandemic and the harms addressed by the Eighth Extension is made unmistakably clear by the fact that the extension expires 60 days after the litigation ends—irrespective of the pandemic's severity or its lingering effects.

### B.    The Department's Attempts to Justify the Eighth Extension Fail

The Government does not defend the Secretary's publicly stated justifications for the Eighth Extension. Indeed, the Government goes so far as to argue (at 28) that the Secretary's public justifications are irrelevant, and the Court should instead rely on two memoranda that the agency still has not published. The Government offers no authority for the remarkable proposition that an agency's publicly stated justification for a decision can be disregarded in favor of its private reasons. Such a proposition contravenes the "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency *invoked* when it took the action." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (emphasis added) (quotation marks omitted). And relying on the Secretary's private reasons would be particularly

inappropriate under the HEROES Act, which contains a non-waivable command that the Secretary must "by notice in the Federal Register, publish" his decision. 20 U.S.C. § 1098bb(b)(1).[3] In any event, nothing in the internal memos corrects the statutory errors just identified.

### 1. The extension was not based on direct economic hardship

Like the Secretary's public justification for the Eighth Extension, the internal memos argue that the extension is necessary in light of "uncertain[ty]" and "confusion" stemming from the debt-cancellation litigation. SoFi-000005. As noted, these are not valid bases for relief under the HEROES Act. The Government nevertheless defends the Secretary's reliance on the litigation, arguing (at 21) that "to the extent that the Secretary expressed concern about the 'uncertainty' and 'unfairness' precipitated by court decisions blocking the Department from implementing the loan-forgiveness program, . . . those concerns only arose because of the impact the pandemic had on borrowers' financial health." Yet the Secretary may invoke the HEROES Act only as necessary to remedy "direct economic hardship as a direct result of" a national emergency. 20 U.S.C. § 1098ee(2)(D). "Uncertainty" and "unfairness" are not "economic hardship." And the fact that those concerns were "precipitated by court decisions," Gov't Br. 21—caused by the agency's own actions in advancing debt cancellation without Congressional authority—also shows that they were not the "*direct* result" of the pandemic itself.

Nor can the Secretary rely on supposed "financial harms" that would result from resuming repayment "while the COVID debt relief program . . . is subject to litigation." SoFi-000003. The only harm recognized by the HEROES Act is "direct economic hardship as a direct result of" the

---

[3] The Government contends (at 15-16) that "the HEROES Act d[id] not require that the Secretary publish such a notice contemporaneously with [the Secretary's] decision." That is incorrect. *See* Part I, *supra*. But it is also irrelevant: Regardless whether the Secretary was *required* to publish his reasons, he did so. He cannot now rely on justifications he withheld from the public, rather than the ones he actually disclosed.

emergency itself. 20 U.S.C. § 1098ee(2)(D). The Government's apparent argument is that the Secretary may invoke the HEROES Act to remedy any financial injury that "would not have occurred in the absence of . . . the COVID-19 pandemic." Gov't Br. 22 (quotation marks omitted). But that argument cannot be reconciled with the five different textual indications ("necessary," "necessary," "because of," "direct," "direct") that a far closer connection is required. Nor can the Government explain why Congress would give the Secretary emergency authority to combat financial harms stemming from his *own* decisions, such as to extend the moratorium repeatedly and to initiate a debt-cancellation program subject to inevitable legal challenge.

The implications of the Government's argument, moreover, are staggering. As the Government interprets the statute, the Secretary has virtually unlimited authority to waive or modify loans based on any adverse circumstance that would be even slightly different had a national emergency never occurred. Twenty years from today, for example, the Secretary could pause repayment for college graduates who started kindergarten during the pandemic and thus received a marginally worse education (and face corresponding financial difficulties) because they could not attend in-person. Or the Secretary could extend the repayment moratorium *indefinitely*— years after the declared national emergency has ended—on the theory that whenever repayment resumes, it will "create[] a heightened risk of student loan delinquency and default." SoFi-000003. "It is hard to see what measures this interpretation would place outside the [Secretary's] reach, and the [Secretary] has identified no limit in [the HEROES Act] beyond the requirement" that he eventually tie the chain of causation, however long it may be, back to COVID. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Here, as in *Alabama Association of Realtors*, the "sheer scope of the [agency's] claimed authority . . . counsel[s] against the Government's interpretation." *Id.* at 2489.

## 2.      The extension covers millions of borrowers known to be ineligible

The Administrative Record confirms that the Eighth Extension applies to numerous

borrowers for whom the Secretary himself has determined it is not "necessary." In formulating the debt-cancellation program, the Secretary acknowledged that "not all borrowers are equally at risk." SoFi-000304. In particular, "only about 10 percent of borrowers" with incomes over $125,000 face "financial insecurity." SoFi-000307. The Secretary thus concluded that although debt cancellation was necessary before low-income borrowers could return to repayment, all other borrowers could enter repayment *without* cancellation. SoFi-000297-298. The Secretary also extended forbearance a seventh and "final" time—albeit not the first "final" time—but only so that eligible borrowers could apply for cancellation and others could prepare to return to repayment. SoFi-000298.

In a memo dated November 22, 2022, the Under Secretary of Education reiterated that borrowers with incomes above the eligibility threshold did not need further forbearance. He thus explained that extending the repayment moratorium only for "borrowers eligible for [debt cancellation] . . . would be well targeted to the harms we are trying to address." SoFi-000007. That rationale applies as well to stated concerns about litigation-based "uncertain[ty]" and "confusion," SoFi-000005, since borrowers making more than $125,000 are ineligible for debt cancellation regardless of how the Supreme Court rules. And yet the Secretary applied the Eighth Extension to *every federal borrower in the nation*, even those making more than $125,000. In sum, the Secretary granted relief to millions of borrowers for whom such relief was known to be "*unnecessary*."

The Under Secretary's memo states that extending the moratorium only to those eligible for debt-cancellation, though "well targeted to the [relevant] harms," would be "operationally infeasible." SoFi-000007. That is because the Department "does not have income information on its portfolio of borrowers and is not aware of any available method for obtaining accurate income information at that scale." *Id.* Leaving aside for now the implausibility of the Secretary's excuse, *see* pp. 30-32, *infra*, it cannot overcome the admission that the Eighth Extension covers millions

of borrowers for whom forbearance is *not* "necessary . . . because of" their status as "affected individuals." 20 U.S.C. § 1098bb(a)(2). Supposed operational infeasibility cannot justify granting relief to those whom the Secretary has acknowledged are statutorily ineligible for it.

In its brief, the Government attempts to distance itself from the agency's repeated admission that not all borrowers need forbearance. Instead, the Government claims (at 18) that the Eighth Extension covers a proper "class of borrowers"—that is, *everyone*—because "all student-loan borrowers qualify as 'affected individuals' under the HEROES Act." But this explanation is inconsistent with the rationale in the agency's own internal memos, which the Secretary now urges the Court to credit. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

In any event, the Government is wrong. The HEROES Act not only limits the Secretary's authority to restoring "affected individuals" to the status quo ante, but also limits him to using only those means "necessary" to avoid placing such individuals in a "worse position financially . . . *because of their status as affected individuals*." 20 U.S.C. § 1098bb(a)(2) (emphasis added). In other words, finding that all borrowers have suffered direct economic hardship is not sufficient to justify the Eight Extension; the borrowers for whom relief is granted also must need eight more months of loan forbearance "because of" their economic injuries. Yet the Secretary has already determined that borrowers ineligible for debt-cancellation do *not* face acute "financial insecurity" and thus can return to repayment without economic risk. SoFi-000307. Nor do ineligible borrowers face "uncertainty" and "confusion" from debt-cancellation litigation (even assuming those are valid considerations). Simply put, the HEROES Act does not authorize an "indiscriminate approach" covering a massive class of borrowers who—even if they are affected individuals—do not need relief *because* they are affected individuals. *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022); *see id.* at 664 (Secretary of Labor lacked authority to regulate via "a blunt instrument" that "dr[ew]

no distinctions based on" statutorily authorized and unauthorized categories).

The Government nevertheless argues that the Secretary may extend relief to millions whom he has determined do not need it because "the HEROES Act expressly authorized [him] to act on such a class-wide basis." Gov't Br. 20 (citing 20 U.S.C. § 1098bb(b)(3)). But the cited provision specifies only that "[t]he Secretary is not required to exercise the waiver or modification authority under this section on a *case-by-case* basis." 20 U.S.C. § 1098bb(b)(3) (emphasis added). On its face, this provision means that the Secretary can waive or modify loans for an entire group of eligible borrowers, rather than for individuals. But it does not mean the Secretary can waive or modify loans for a group containing millions of borrowers *known to him to be statutorily ineligible*, just because that group *also* contains many eligible borrowers. Indeed, the Supreme Court recently rejected just such an "indiscriminate approach." *NFIB*, 142 S. Ct. at 666.

Finally, the Government argues (at 22) that the Secretary's failure to limit the Eighth Extension to those who need it "is not so much a question of the Secretary's authority . . . as it is a challenge to the reasonableness of the Secretary's choice to extend that relief in this case." But the Secretary exceeds his statutory authority if he extends relief to borrowers whom *he has determined* do not meet the statutory requirements. While the Eighth Extension is *also* arbitrary and capricious because his determinations are unreasonable, *see* Part III, *infra*, the extension exceeds the Secretary's authority even assuming the reasonableness of his judgments.

C.    **Any Doubts Must Be Resolved in Favor of a Narrow Construction of the Statute under the Major Questions Doctrine**

Any remaining doubts about the Secretary's statutory authority must be resolved in favor of a narrow construction of the HEROES Act under the major questions doctrine. Under this doctrine, courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (cleaned

up). When an agency claims such authority, therefore, "something more than a merely plausible textual basis for the agency action is necessary." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). "The agency instead must point to clear congressional authorization for the power it claims." *Id.* (quotation marks omitted).

The Eighth Extension is a matter "of vast economic and political significance." In *Biden v. Nebraska*, the Solicitor General acknowledged that the repayment moratorium had already cost taxpayers "over $150 billion" in cancellation of accrued interest, which amounts to approximately $5 billion per month. *See* Oral Arg. Tr. at 39, *Biden v. Nebraska*, No. 22-506 (S. Ct. Feb. 28, 2023). The Secretary's decision to extend the moratorium another eight months is thus expected to cost an additional $40 billion. And more than that, if the Secretary's expansive interpretation of the HEROES Act is upheld, "[i]t is hard to see what measures [it] would place outside [his] reach," as he "has identified no limit in [the statute] beyond the requirement that" the exercise of authority bears some ultimate connection to an emergency. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

The Government admits (at 24) that "administration of federal student-loan programs is a matter of economic and political significance." Even so, the Government insists (at 25) that this particular challenge to the Eighth Extension is not a "major-questions case" because "the most-recent pause is proportional and tied to the circumstances necessitating it." Yet the doctrine is a canon of statutory interpretation; it asks whether Congress provided "a clear legislative mandate" for "an agency's asserted power," *West Virginia*, 142 S. Ct. at 2619 (cleaned up), not whether the particular *application* of that power being challenged was sensible. As noted, the power asserted here is vast: The Government's rationale would authorize not merely a temporary Eighth Extension, but additional extensions indefinitely into the future.

There are other reasons to view the agency's assertion of authority "with skepticism." *Id.*

27

at 2609 (quotation marks omitted). Giving the Secretary such open-ended authority would undoubtedly have been controversial, but the HEROES Act was enacted without any controversy, passing by a 421-1 vote in the House, *see* 149 Cong. Rec. H2553-54 (Apr. 1, 2003), and by unanimous voice vote in the Senate, *see id.* S10866 (July 31, 2003). Indeed, throughout the legislation's authorization and three reauthorizations, only one legislator ever voted against it—and that was by accident. *See id.* E663 (Apr. 3, 2003) (Rep. Miller). For almost two decades after it was enacted, moreover, the HEROES Act has been invoked only for targeted relief tied *directly* to an ongoing military operation or national emergency. *See, e.g.*, 68 Fed. Reg. 69,312 (Dec. 12, 2003). The Government's recent "claim[] to discover in [this] long-extant statute an unheralded power" to remedy indirect and noneconomic harms and to grant relief to millions who do not need it thus merits an additional "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). The Government argues (at 25) that the unprecedentedly broad relief here merely reflects the "vastly greater scope of the relevant national emergency." But the issue is not merely the far greater *quantity* of people or dollars implicated by the Eighth Extension; it is the far different *quality* of the harm being addressed—and thus, of the agency power being asserted.

The Government also argues (at 24) that "[e]very case in which the Supreme Court has invoked the major-questions doctrine to invalidate agency action involved an assertion of the power to regulate—not simply the provision of government benefits." That is incorrect. The doctrine rests on "separation of powers principles and a practical understanding of legislative intent," *West Virginia*, 142 S. Ct. at 2609, and those considerations apply regardless whether an agency is regulating private actors or administering benefit programs. In both contexts, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Major-questions cases thus "arise[] from all corners

of the administrative state." *West Virginia*, 142 S. Ct. at 2608. In *King v. Burwell*, 576 U.S. 473 (2015), for example, the Court applied the doctrine to a government-benefit program—a federal tax-credit program under the Affordable Care Act—because the tax credits "involv[ed] billions of dollars in spending each year," "affect[ed] . . . millions of people," and presented a question of deep "economic and political significance." *Id.* at 485-86.

Finally, the Government contends (at 27) that "it would have been hard for Congress to more clearly express its intent to provide the Secretary" with authority for the Eighth Extension. Actually, Congress *did* "more clearly express its intent" to authorize universal forbearance in the CARES Act, which told the Secretary to "suspend all payments due for loans" for all federal borrowers "through September 30, 2020," and further provided that "interest shall not accrue" during that period. Pub. L. 116-136, § 3513(a)-(b), 134 Stat. 281, 404 (2020). Indeed, Congress's clear instructions there only underscore how far the Government's interpretation of the HEROES Act strays from the statute's plain text.

## III.    THE EIGHTH EXTENSION IS ARBITRARY AND CAPRICIOUS

The Eighth Extension also must be "set aside" as "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2)(A). Indeed, the Government does not even attempt to defend the Secretary's publicly stated justification for the extension, instead relying (at 28) on internal reasoning that has never been released to the public. As noted, this attempt contravenes the "foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 (quotation marks omitted). *See* pp. 21-22, *supra*. But even considering the Secretary's unpublished justifications, the Eighth Extension is arbitrary and capricious on multiple grounds. Indeed, the Secretary's cursory reasoning and blunderbuss approach further underscore the problems that result when agencies make complex decisions of massive public consequence

without complying with the APA's notice-and-comment requirements.

### A.     The Secretary Failed to Justify Providing Relief to All Borrowers

The Secretary failed to provide an adequate explanation for his decision to apply the Eighth Extension to *all* borrowers, rather than only to those borrowers who are eligible for debt cancellation. After all, the Secretary had already determined that borrowers whose high incomes render them ineligible generally will *not* be "at heightened risk of loan delinquency and default" when repayment resumes. SoFi-000004. Though acknowledging that extending the moratorium for eligible borrowers "would be well targeted to the harms [the agency is] trying to address," the Under Secretary described this approach as "operationally infeasible because [the Department] does not have income information on its portfolio of borrowers and is not aware of any available method for obtaining accurate income information at that scale." SoFi-000007. That is nonsense.

Surprisingly, the Secretary does not even mention—much less consider and reject—the most obvious and straightforward method of determining borrower incomes: requiring borrowers to state their income. The Department is already in contact with federal borrowers, each of whom will be required to begin repayment whenever the moratorium lapses (unless all their debt is eliminated). Indeed, on August 24, 2022, the Secretary directed the Federal Student Aid Office to "take all necessary steps to restart loan payments after December 31," SoFi-000298, which presumably included contacting borrowers to let them know about their upcoming repayment obligations. Nothing prevented the Secretary from asking borrowers to state their incomes as a way of separating those who are eligible for the debt-cancellation program (and can be encouraged to apply if the program resumes) from those who are ineligible (and can safely be returned to repayment). Indeed, the Secretary has had nearly *three years* to obtain this information from student loan borrowers, yet has done effectively nothing to prepare for an eventual return to repayment. Instead, the Secretary has opted for an "indiscriminate approach" that "fails to account

for th[e] crucial distinction[s]" underlying the statutory scheme. *NFIB*, 142 S. Ct. at 666.

Not only was it "feasible" to determine borrowers' incomes, but the Secretary could readily have accomplished that task long ago. Once the Secretary determined, on August 24, 2022, that millions of borrowers ineligible for debt-cancellation would be returned to repayment, the Department could have begun gathering any necessary income information. Such a step was even more clearly appropriate once the debt-cancellation program was enjoined on November 10. And certainly by November 22, when the Secretary decided that the moratorium would continue until two months after the litigation was resolved, it was unmistakably clear that the Department would need to determine borrowers' incomes in order to provide appropriately "targeted" relief. SoFi-000007. Yet apart from "a single conclusory sentence" stating that it would be infeasible to do so, the Department has never explained why it failed to pursue that path. *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 205 (D.C. Cir. 2007).[4]

The Secretary also provided inadequate reasons for rejecting the option of allowing borrowers to "opt into" the Eighth Extension. SoFi-000007. The Under Secretary's memo states that such an approach would require "building an entirely new system to process the applications," which would have been "infeasible" before the seventh extension lapsed. *Id.* But nowhere in the 1000-page record does the Secretary explain *why* creating an application-processing system within that timeframe would not have been possible. Did the Secretary consult those who would be responsible for building the system? Could the Department not simply have duplicated the existing system that it had been using for months to process debt-cancellation applications? The Under

---

[4] The Secretary's claim that determining borrower incomes would be "infeasible" is especially implausible in light of the Secretary's stated intention to implement the debt-cancellation program and return borrowers to repayment 60 days after the litigation ends. If the Department is capable of soliciting and processing tens of millions of debt-cancellation applications within 60 days—a complicated task that depends on assessing debt levels as well as income—then surely the Department is capable of swiftly soliciting and processing information about income only.

Secretary does not say. But even assuming that building such a system within "the 6 weeks remaining" in the seventh extension would indeed have been too "herculean [a] task," Gov't Br. 31, that does not explain why the Secretary decided that it could not be done in a matter of a few months—which *still* would have necessitated a far shorter extension than the Eighth Extension.

Nor did the Secretary consider another, even simpler opt-out approach: telling borrowers ineligible for cancellation that they are also ineligible for further forbearance, and thus requiring them to *self-report* their ineligibility and *opt out* of further forbearance. This eminently feasible approach would not have burdened any borrowers eligible for cancellation, yet would have avoided the problems of blanket forbearance. Again, though, it was not even considered.

### B. The Secretary Failed to Consider Restarting the Accumulation of Interest on Outstanding Principal

Even if the Secretary could rationally find it infeasible to return ineligible borrowers to *repayment*, nothing stood in the way of restarting the normal accrual of *interest*. The Eighth Extension imposes a moratorium not only on "payments and collection activity," but also on the accumulation of interest. SoFi-000001; *see id.* (moratorium "set[s] certain interest rates to zero"). Yet the Secretary's stated concerns about placing borrowers "at heightened risk of loan delinquency and default" will be triggered only "when loan *payments* resume." *Id.* (emphasis added). Resuming interest-accumulation, by contrast, does not raise similar concerns.

Ending such interest forbearance was (and is) operationally feasible under the Secretary's own rationale. Borrowers who are *ineligible* for cancellation have no need for zero interest rates under the Secretary's own findings, just as they have no need for debt-cancellation or repayment forbearance. SoFi-000307. And for borrowers who are *eligible* for the debt-cancellation program, any interest accumulated during the Eighth Extension could be eliminated or limited (if necessary) when the program is implemented. That approach would have addressed the Department's asserted

problem—preventing a "spike" in "delinquency and default rates among . . . vulnerable borrowers," SoFi-000004—in a manner far less drastic and overinclusive than an across-the-board extension of the moratorium in all respects. Yet the Secretary never even considered it. This was a significant oversight: Restarting interest-accumulation would have led borrowers ineligible for cancellation to remove *themselves* from forbearance, either by resuming repayment or considering refinancing options that would have allowed those borrowers to lock in favorable interest rates.

"[W]hen an agency rescinds a prior policy[,] its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (cleaned up). Here, the Secretary's "fail[ure] to consider" the option of restarting the accumulation of interest "renders [his] decision arbitrary and capricious." *Id*.

### C.    The Secretary Failed to Address Materially Changed Circumstances

"[A]gencies are expected to reevaluate the wisdom of their policies in response to changing factual circumstances," *COMPTEL v. FCC*, 978 F.3d 1325, 1335 (D.C. Cir. 2020), and such changes "may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so," *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992). Agencies thus "have an obligation to . . . reexamine their approaches if a significant factual predicate changes." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (cleaned up). Here, the Secretary failed to adequately account for how the pandemic—and the financial circumstances of borrowers in light of the pandemic—have shifted significantly over time.

**1.** ***Changes in the national emergency***. The Secretary's authority under the HEROES Act depends on relief being "necessary" to remedy harm that a borrower experienced "because" the borrower "suffered direct economic hardship as a direct result" of a national emergency. 20 U.S.C. §§ 1098bb(a)(2), 1098ee(2)(D). As the national emergency itself evolved, therefore, the Secretary was required to consider how those changes affected any "direct[ly] result[ing]" injuries. Here, the

COVID emergency had dramatically changed character over the course of the moratorium. When the Secretary first extended the moratorium in August 2020, millions of businesses were still shuttered; vaccines were not yet available; and parents were struggling to work from home in the absence of childcare options. By the time the Secretary issued the Eighth Extension in November 2022, by contrast, the pandemic had moved into a far different stage. The CDC no longer recommended quarantining exposed individuals or universal masking in most of the country, and it had terminated its order suspending migration into the United States.[5] Indeed, President Biden had already declared that "[t]he pandemic [was] over." 60 Minutes, *President Biden: "The Pandemic Is Over,"* YouTube (Sept. 19, 2022), https://bit.ly/3UZpIo1.

Given these seismic "changes" to the course of the pandemic—which is not merely "a significant factual predicate" of the Secretary's authority, but *the central predicate*—the Department was required to "reexamine" whether an across-the-board moratorium was still necessary. *Portland Cement Ass'n*, 665 F.3d at 187 (quotation marks omitted). Yet the Secretary's memo does not address the pandemic's evolution at all, much less consider making adjustments to a forbearance program that the Department has reimposed eight times over two-and-a-half years, relying instead on the bare assertion that "[t]he conditions that led [to the debt-cancellation] program have not changed significantly." SoFi-000005. That "conclusory recitation" that the agency "gave actual consideration" to changes in the pandemic's course "fall[s] far short of the reasoned consideration Congress clearly intended." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986) (cleaned up); *see id.* at 1055 ("Stating that a factor was considered

---

[5] *See, e.g.*, *Transcript for CDC Media Telebriefing: Update on COVID-19*, Ctrs. for Disease Control & Prevention (Feb. 25, 2022), https://bit.ly/3FEoqdp; *CDC Public Health Determination and Termination of Title 42 Order*, Ctrs. for Disease Control & Prevention (Apr. 1, 2022), https://bit.ly/3UDP0Yw; *Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems*, Ctrs. for Disease Control & Prevention (Aug. 19, 2022), https://bit.ly/3VJSmdX.

. . . is not a substitute for considering it."). And the agency's failure is particularly egregious here, since the Eighth Extension lies "downstream" from the debt-cancellation program—and thus has an even more tenuous "connection" to the pandemic. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488.

   **2.** ***Changes in borrowers' financial circumstances***. The Secretary's authority is also limited to steps "necessary" to ensure that borrowers are not in a "worse position financially" due to pandemic-related harm. 20 U.S.C. § 1098bb(a)(2)(A). But according to the Administration itself, most federal borrowers are in a *better* financial position than they were before the pandemic. The Administration has concluded that "household finances are stronger than pre-pandemic, putting families in a better position to navigate the economic challenges flowing from disruptions to the global economy." The White House, The Biden-Harris Economic Blueprint 29 (Sept. 2022), https://bit.ly/3MCPL1W. Between the onset of the pandemic and the Eighth Extension, President Biden announced that the nation's "jobs recovery [was] one of the strongest ever—with nearly 6 million jobs added [in 2021], the fewest Americans filing for unemployment in more than 50 years, and overall unemployment at 4.2 percent." *Statement by President Joe Biden Extending the Pause on Student Loan Repayment an Additional 90 Days*, The White House (Dec. 22, 2021), https://bit.ly/3PlTP7S. That assessment is consistent with nonpartisan research, which confirms that "the earnings of employed workers overall were largely unaffected by the pandemic." Rakesh Kochhar & Jesse Bennett, *Despite the Pandemic, Wage Growth Held Firm for Most U.S. Workers, with Little Effect on Inequality*, Pew Rsch. Ctr. (Sept. 7, 2022), https://bit.ly/42aSipJ.

   On top of income increases and job growth, moreover, "[t]he federal government has provided about $4.6 trillion to help the nation respond to and recover from the COVID-19 pandemic." U.S. Gov't Accountability Off., GAO-23-106647, COVID-19 Relief: Funding and Spending as of Jan. 31, 2023 (Feb. 28, 2023), https://bit.ly/45xHZ22. "More than 476 million

payments totaling $814 billion in financial relief went to households impacted by the pandemic." *Update: Three Rounds of Stimulus Checks. See How Many Went Out and for How Much*, Pandemic Oversight (Feb. 17, 2022), https://bit.ly/43bD1GI.

Given these economic trends, a majority of student loan borrowers no longer face the same financial prospects that they confronted at the pandemic's outset. Rather, they report feeling *more* secure in their jobs, *more* financially stable, and *more* optimistic about future economic conditions. *See generally* Am. Fintech Council, Survey on Financial Health of Student Loan Borrowers (2021), https://bit.ly/3Ow2ypx. Nearly seven in ten borrowers reported that their income had increased or remained the same since the start of the pandemic. *See id.* at 3. And nearly two-thirds felt as or more financially stable than they had been in March 2020. *See id.*

Against these seismic shifts, the Under Secretary's bare assertion that "[t]he conditions that led [to the debt-cancellation] program have not changed significantly," SoFi-000005, is plainly insufficient. In its brief, the Government invokes (at 17) "the well-established, widespread, and lingering economic hardship caused by" COVID-19, and there is no doubt some Americans continue to suffer pandemic-related financial hardship. But in the face of the Administration's *own assessment* of the broadly thriving economy and improved household finances, the Secretary cannot justify across-the-board relief for all borrowers in the country based on an *ipse dixit* that nothing of significance has changed. And the Secretary's lack of consideration is particularly troubling because the Administration Announced in January that it would end the national emergency in May—and yet the moratorium is likely to continue through the end of August.

### D.    The Secretary Ignored Countervailing Reliance and Fairness Interests

The Secretary also failed to consider any *countervailing* interests, such as "serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (quotation marks omitted). The Eighth Extension directly affects more than just borrowers. For

example, many organizations rely on the Public Service Loan Forgiveness program, 20 U.S.C. § 1087e(m), to attract talented hires. The Eighth Extension eliminated that incentive, undermining the public-service missions of these organizations. One has already sued the Secretary, alleging that "[e]ach month of extension thus lessens the incentive under [Public Service Loan Forgiveness program] for borrowers to work at a public-service employer, thereby making private-sector work comparatively more attractive than working for a qualified public service employer." Complaint ¶ 68, *Mackinac Ctr. for Pub. Pol'y v. Dep't. of Educ.*, No. 1:23-cv-10795 (E.D. Mich. Apr. 6, 2023), ECF No. 1. This dynamic has resulted in "public-service employers [suffering] financial harm and a competitive disadvantage in the labor market due to loss of borrower-employees and reduced incentive for borrower-employees to take and keep jobs with them." *Id.* ¶ 69.

The Secretary also failed to consider other countervailing interests, such as horizontal equity and fairness. He gave no thought to those borrowers who, relying on the Administration's prior representations that the Seventh Extension would be the "final" one, SoFi-000298, decided to refinance their student loans or pay them off. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1915 ("[B]ecause [the agency] was not writing on a blank slate, it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.") (cleaned up). Nor did the Secretary assess how continuing the moratorium might unfairly disadvantage individuals whose primary debt burden happens to take the form of commercial loans, rather than federally held loans. Nor he did consider the extension's likely effect on companies, like SoFi, that are crucial to the orderly functioning of the student loan program. Although an agency has some discretion when balancing competing concerns, it must actually try to balance them. Yet here, too, the Secretary "entirely failed to consider [these] important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**IV.    SOFI HAS A CAUSE OF ACTION UNDER THE APA**

The Government does not dispute that SoFi has standing to challenge the Eighth Extension—*i.e.*, that the extension has caused and will continue to cause SoFi concrete and particularized harm, and that vacatur of the Eighth Extension would redress SoFi's injuries. Indeed, at oral argument in *Biden v. Nebraska*, the Solicitor General repeatedly told the Supreme Court that loan servicers *would* have standing to challenge the Administration's debt-cancellation plan because "the plan [is] going to have financial effects on [servicers]." Oral Arg. Tr. at 18, *Biden v. Nebraska*, No. 22-506; *see id.* at 4, 33 (similar).

The Government nevertheless argues (at 10-14) that SoFi lacks a cause of action to maintain this suit because the HEROES Act and the HEA serve only borrower interests, and because SoFi's interest in returning borrowers to repayment are contrary to those of the borrowers themselves. Both parts of the Government's argument are wrong: The relevant statutes reflect a balancing of interests, including in maintaining the integrity of the federal loan program and ensuring that a robust financing market remains available for borrowers; and SoFi aims to help borrowers achieve their financial goals, including through refinancing at favorable long-term rates even where doing so would require the borrower to exit federal forbearance.

The Government's argument also proves too much. If the Government were correct that the only relevant concern is borrowers' interest in *avoiding* repayment, then even the loan servicer at issue in *Biden v. Nebraska* (MOHELA) would lack a cause of action to challenge the Administration's debt-cancellation program, since MOHELA "obtains revenue from the accounts it services," which would "decrease" if the program is implemented. *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022). Yet on appeal and at the Supreme Court, the Government abandoned the argument that MOHELA (or States suing on its behalf) lack a cause of action, now conceding

that MOHELA "could sue in its own name." Oral Arg. Tr. at 4, *Biden v. Nebraska*, No. 22-506.

**A.** The APA's core purpose is "to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). To that end, the APA authorizes suit by any "person . . . adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Establishing that a plaintiff has been "adversely affected or aggrieved by agency action"—referred to as the zone-of-interests test—"'is not meant to be especially demanding.'" *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225. Instead, the question is merely whether the party filing suit is "arguably within the zone of interests" reflected in the statute. *Id.* at 224 (citation omitted); *see id.* at 225 ("[W]e have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.").

The zone-of-interests test "does not require that the statute directly regulate the plaintiff, nor does it require specific congressional intent to benefit the plaintiff." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022). Nor must a plaintiff "share Congress' motives in enacting [the] statute to be a suitable challenger to enforce it." *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1370 (D.C. Cir. 2004), *withdrawn in unrelated part*, 393 F.3d 1315 (2005). Instead, so long as "there is reason to believe that a party's interest in statutory enforcement will advance, rather than hinder, the operation of a statute, the court can reasonably assume that Congress intended to permit the suit." *Id.*

The Supreme Court's decision in *Match-E-Be-Nash-She-Wish* reflects the inquiry's permissive nature. There, a landowner challenged the Secretary of the Interior's acquisition of nearby land in trust for an Indian Tribe seeking to operate a casino, arguing that the Secretary lacked authority under the Indian Reorganization Act to take title to the land. 567 U.S. at 212-13. The Secretary and Tribe argued that the landowner fell outside the Act's zone of interests, since

he was "not an Indian or tribal official seeking land," and since his "avowed aim of taking land out of [trust]" showed "adversity to, not consistency between, his interests and those served by" the statute. Tribe Br. 42-43; *see* Gov't Br. 30-32 (similar).

The Supreme Court disagreed with that myopic view of the relevant statutory interests, which ignored the fact that "when the Secretary obtains land for Indians under [the Act], she does not do so in a vacuum." 567 U.S. at 226. "Rather, she takes title to properties with at least one eye directed toward how tribes will use those lands to support economic development." *Id.* The Court thus concluded that the landowner's regard for proper "implementation" of the Indian Reorganization Act—whether based on his "economic, environmental, or aesthetic" concerns—fell within the Act's zone of interests. *Id.* at 227-28.

Under this lenient approach, the D.C. Circuit has repeatedly upheld the right of APA plaintiffs to enforce rule-of-law interests in proper implementation of statutory requirements, particularly where an incorrect interpretation would inflict competitive injury on the plaintiff. In *First National Bank & Trust Co. v. National Credit Union Administration*, 988 F.2d 1272 (1993), the D.C. Circuit held that banks could challenge an agency decision permitting a rival credit union to expand its membership under an allegedly overbroad interpretation of a statute "designed to benefit the members—particularly potential borrowers—of credit unions." *Id.* at 1276. The court explained that "a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations may sue to prevent the alleged loosening of those restrictions, even if the plaintiff's interest is not precisely the one that Congress sought to protect." *Id.* at 1277. Similarly, in *Honeywell International Inc. v. EPA*, 374 F.3d 1363, 1370 (D.C. Cir. 2004), a chemical manufacturer was permitted to challenge an agency rule that allegedly under-regulated a competing chemical, since the manufacturer sought "to enforce a restriction" in the

statutory text. And in *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 464-65 (D.C. Cir. 2007), a non-profit group was permitted to challenge the agency's determination that a proposed casino site was exempt from the Indian Gaming Regulatory Act. The group's "claim [wa]s sufficiently congruent with congressional purpose because it [sought] to enforce [a] provision that Congress included" in the statute, and "[i]nclusion of this provision" in the statute "demonstrate[d] that Congress could not have intended to preclude efforts to enforce it." *Id.*

**B.** SoFi "easily clear[s] the low hurdle" of establishing interests within the zone protected by the HEROES Act and the HEA. *CSL Plasma*, 33 F.4th at 590. The HEA seeks "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education" through a robust and well-regulated system of financing. 20 U.S.C. § 1070(a). The HEA thus "contemplate[s] that interest would accrue and borrowers would make payments," Gov't Br. 13 n.3, and the statute sets forth clear terms and conditions for repayment. *See* 20 U.S.C. § 1087e (Ford Federal Direct Loan Program); *id.* § 1077a (Federal Family Education Loan Program); *id.* § 1087dd (Federal Perkins Loans). But the HEA also acknowledges the integral role that private entities play in ensuring the integrity of such programs, including requiring the Secretary to "obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs [under Title IV]" when developing proposed regulations. *Id.* § 1098a(a)(1).

The HEROES Act amends the HEA to authorize a limited waiver of these student-loan obligations. But Congress also circumscribed this authority, including through *substantive* limitations—*i.e.*, the waivers must be "necessary" to achieve certain specified goals, *id.* § 1098bb(a)(2)—and *procedural* limitations with which the Secretary must comply, *id.* § 1098bb(b). These restrictions help ensure that the Secretary's authority is exercised "without

impairing the integrity of the student financial assistance programs." *Id.* § 1098bb(a)(2)(B). Along similar lines, the Secretary is required to report to Congress on the impact of any waivers "on affected individuals *and the programs under title IV of the Act*." *Id.* § 1098bb(c) (emphasis added).

SoFi's interests are far more than "arguably" congruent with these statutory interests. SoFi's mission is "to help people reach financial independence to realize their ambitions." Compl. ¶ 15. SoFi is "the nation's premiere lender in the student loan refinance space," having refinanced more than $30 billion of student loans for nearly a half-million borrowers. *Id.* ¶ 72. By helping borrowers consolidate their debt into a new loan "with a new interest rate and loan period," SoFi can help "reduce the total interest that a borrower pays over the course of his or her loan" and "enable a borrower to achieve a payment plan that is suited to his or her current and projected financial circumstances." *Id.* ¶ 73. Since loans refinanced with SoFi are ineligible for federal repayment programs, SoFi "competes" with the government for borrowers "by offering them private financing under more favorable terms." *Id.* ¶ 75.

SoFi's "interests are such that [it] in practice can be expected to police the interests that the statute protects." *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (quotation marks omitted); *see id.* (identifying this "polic[ing]" function as "the salient consideration under the APA"). Consistent with the HEROES Act and HEA, SoFi seeks to maintain the "integrity of . . . student financial assistance programs," 20 U.S.C. § 1098bb(a)(2)(B), by preventing unlawful agency action that would skew the student loan financing system. Allowing such proper "statutory enforcement will advance, rather than hinder, the operation of [these] statute[s]." *Honeywell Int'l*, 374 F.3d at 1370. And nothing in these statutes suggests Congress's desire to foreclose challenge by a party directly injured by a violation. To the contrary, Congress's decision to include special procedural protections under the HEROES Act "demonstrates that Congress could not have

intended to preclude efforts to enforce it." *Citizens Exposing Truth*, 492 F.3d at 465. SoFi is thus a "reasonable—indeed, predictable—challenger[] of the Secretary's decisions." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 227.

Beyond its interests in maintaining the integrity of student financial assistance programs, moreover, SoFi is focused on borrowers who would otherwise benefit from refinancing and consolidating their loans. *See* Compl. ¶¶ 73-75. Many borrowers who have refrained from refinancing their debt due to the ongoing moratorium would have benefitted from refinancing with SoFi. For instance, a borrower with $30,000 in debt (roughly the national average) from Direct Unsubsidized Loans for graduate and professional students could have refinanced from approximately 6.6% to approximately 3.6% in December 2021. *See Interest Rates for Direct Loans First Disbursed Between July 1, 2018 and June 30, 2019*, Fed. Student Aid (May 18, 2018), https://bit.ly/3MWnZ21.That would have saved nearly $5,300 over the life of the loan—often exceeding any benefit the borrower might have obtained from the temporary loan moratorium. That dynamic is likely to intensify as any benefits from the Eighth Extension lapse. While not every borrower would be better off locking in long-term financing with SoFi, many would; yet until the (unlawful) extension ends, most borrowers will not even consider it. *See* Compl. ¶ 77.

**C.** In arguing that SoFi lacks a cause of action to challenge the Eighth Extension, the Government contends (at 12) that the HEA and HEROES Act were enacted "to benefit borrowers, not banks," and it asserts (at 11) that returning borrowers to repayment "would *cause harm* to the statute's intended beneficiaries." But as the Supreme Court has repeatedly made clear, the zone-of-interests test does "not inquire whether there has been a congressional intent to benefit the would-be plaintiff." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 489 (1998). Indeed, the Government's "intended beneficiaries" argument mirrors the one it made (and

lost) in *Match-E-Be-Nash-She-Wish*. As with the statute at issue there, the Secretary "does not [implement the HEROES Act and HEA] in a vacuum," seeking to benefit borrowers at the expense of all other goals. 567 U.S. at 226. Rather, the Secretary exercises his authority in the context of a broader statutory scheme that "centrally depends," *id.* at 227, on maintaining the statutorily set federal loan terms, allowing the Secretary to deviate from them when—but only when—doing so is truly "necessary." 20 U.S.C. § 1098bb(a)(2).

The Government is also wrong that SoFi falls outside the zone of interests because it "competes with the federal government for federal student loan borrowers." Gov't Br. 11 (quoting Compl. ¶ 75). To the contrary, the D.C. Circuit and Supreme Court have repeatedly explained that the opposite is true—that "a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations *may sue* to prevent the alleged loosening of those restrictions." *First Nat'l Bank & Trust*, 988 F.2d at 1277 (emphasis added); *see Nat'l Credit Union Admin.*, 522 U.S. at 493 ("competitors" who "ha[ve] an interest in limiting" competition by challenging agency's "interpretation" do fall within zone of interest).

The Government's contrary argument relies on decades-old cases that are either obsolete or inapplicable. *See* Gov't Br. 13-14 (citing *Copper & Brass Fabricators Council, Inc. v. Dep't of Treasury*, 679 F.2d 951 (D.C. Cir. 1982); *Glass Packaging Inst. v. Regan*, 737 F.2d 1083 (D.C. Cir. 1984); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989)). The D.C. Circuit has "condemned" *Copper & Brass Fabricators Council* and *Glass Packaging Institute* as being "inconsistent with" the modern zone-of-interests test. *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 n.2 (1988) (citation omitted). And the third case, *Hazardous Waste Treatment Council*, is inapposite. The trade-association plaintiff there fell outside the zone of interests of the Resource Conservation and Recovery Act, but not because the

44

plaintiff competed with the Government or any private party. Rather, it was because the plaintiff's interests were "open-ended" and not "channeled by the terms of the statute into suits of a limited nature." *First Nat'l Bank & Trust*, 988 F.2d at 1278 (discussing *Hazardous Waste Treatment Council*). By contrast, where specific "incentives of competitors" lead them to bring suit "to enforce [a] statutory demarcation," as Sofi does here, the plaintiff is a proper party for "guarding [that] congressionally drawn boundary." *Id.*

Finally, the Government's zone-of-interests argument simply ignores the way in which SoFi's interests are *aligned* with those of many borrowers. By encouraging borrowers to delay refinancing at better rates and for longer loan periods, the loan moratorium has in many cases left borrowers worse off—contrary to SoFi's "mission to help people reach financial independence." Compl. ¶ 15. And the missed opportunities to lock in better long-term financing with SoFi will persist until the Eighth Extension (and any benefits therefrom) expires.

## CONCLUSION

For the foregoing reasons, the Court should grant SoFi's Motion for Summary Judgment and invalidate and set aside the Eighth Extension. A proposed Order is attached.


Dated: May 29, 2023                  Respectfully submitted,

                                    */s/ Allon Kedem*
                                    Allon Kedem (D.C. Bar No. 1009039)
                                    Andrew T. Tutt (D.C. Bar No. 1026916)
                                    ARNOLD & PORTER
                                      KAYE SCHOLER LLP
                                    601 Massachusetts Ave., NW
                                    Washington, DC 20001-3743
                                    Tel: (202) 942-5000
                                    allon.kedem@arnoldporter.com
                                    andrew.tutt@arnoldporter.com

                                    *Counsel for Plaintiffs*

45

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2023, I filed the foregoing with the Clerk of the Court using the ECF System which will send notification of such filing to the registered participants identified on the Notice of Electronic Filing.

/s/ Allon Kedem
Allon Kedem
